1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    GOLD CLUB SF, LLC, et al.,                Case No.  24-cv-04241-LJC

8                    Plaintiffs,

9            v.                                 **ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'
10   UNITED STATES SMALL BUSINESS              MOTION TO DISMISS; GRANTING
     ADMINISTRATION, et al.,                   MOTION TO STRIKE**

11                   Defendants.                Re: Dkt. No. 28

12

13          During the COVID-19 pandemic, Congress enacted the Paycheck Protection Program

14   (PPP), which administered two rounds of loans to small businesses.  Certain categories of

15   businesses were ineligible for these loans, including businesses that, when considered with their

16   affiliates, were too large to qualify as "small" businesses, and businesses that presented live

17   performances of a prurient sexual nature.  Plaintiffs, a group of fifteen bars and adult

18   entertainment venues that received PPP loans and then applied for loan forgiveness, challenge

19   these two exclusions.  Defendants moved to dismiss the majority of Plaintiffs' claims, arguing that

20   Plaintiffs lack standing under Article III of the U.S. Constitution, many claims are not yet ripe or

21   not otherwise reviewable under the Administrative Procedure Act (APA), and others fail to state a

22   cause of action.  Having considered the parties' papers and arguments, the Court GRANTS in part

23   and DENIES in part Defendants' motion to dismiss and GRANTS Defendants' request to strike

24   Plaintiffs' jury demand.

25   **I.      BACKGROUND**

26          Plaintiffs Gold Club – SF, LLC (Gold Club); Dallas Food and Beverage, LLC (Dallas);

27   2345 Meacham, LLC (Meacham); 11000 Reeder, LLC (Reeder); S.A.W. Entertainment Limited

28   (S.A.W.); Smithville Bistro, LLC (Smithville); Deja Vu Showgirls of Las Vegas, LLC (Deja Vu);

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Office Minneapolis, LLC (Office); Cats Meow of Vegas, LLC (Cats Meow); Cats 701 Bourbon,

2    LLC (Cats NOLA); Pole Position at Tacoma, LLC (Pole Position); Jamme Holdings, LLC

3    (Jamme); 90's Minneapolis, LLC (90's); Las Vegas Bistro, LLC (Las Vegas); and Stockton

4    Enterprises, LLC (Stockton) collectively applied for and received twenty-four PPP loans.

5    Plaintiffs have since applied to the United States Small Business Association (SBA) to have their

6    loans forgiven.  Some applications for loan forgiveness were granted, others were granted and then

7    subject to additional audits, and others were denied and administratively appealed by Plaintiffs.

8    The SBA denied applications for forgiveness and initiated audits based on its concerns that certain

9    Plaintiffs were ineligible for PPP loans because they exceeded the size limitations and presented

10   entertainment of a prurient sexual nature.  At the time this lawsuit was filed, only one application

11   for loan forgiveness, for Plaintiff Gold Club's second loan, had been denied both initially and after

12   administrative appeal.

13       Defendants are the SBA; Kelly Loeffler, the administrator of the SBA;[1] the Office of

14   Hearings and Appeals (OHA), which hears administrative appeals of SBA loan denials; Kimberly

15   McLeod, the assistant administrator and chief hearing officer for the OHA; and the United States.

16       Plaintiffs filed the instant action against Defendants, alleging that the size- and prurience-

17   based exclusions to the PPP violate their constitutional rights and the APA.  They further claim

18   that the procedures governing OHA appeals are unconstitutional and violate the APA, that

19   Defendants are estopped from denying their applications for loan forgiveness, that a provision of

20   the act governing the SBA and prohibiting claimants from obtaining injunctions against the SBA

21   is unconstitutional, and that the decision to deny Gold Club's application for loan forgiveness

22   must be overturned.

23       **A.    The SBA's Section 7(a) Loan Program**

24       Congress did not create the PPP from scratch, but rather built it off of the SBA's

25   preexisting Section 7(a) loan program.  The following discussion provides an overview of the

---

[1] Isabel Casillas Guzman was the SBA administrator when this case was filed but has since been replaced by Ms. Loeffler. https://www.sba.gov/about-sba/organization/sba-leadership [https://perma.cc/8SZW-LZG8].  Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Loeffler has been automatically substituted as a defendant in place of Ms. Guzman.

SBA's Section 7(a) loan program and the relevant differences between the PPP and the Section 7(a) loan program.

The SBA was created by Congress in 1953 through the enactment of the Small Business Act of 1953, 15 U.S. C. §§ 631-36 (SBA Act) in order to "aid, counsel, assist, and protect … the interests of small-business concerns."  15 U.S.C. § 631(a); *see Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960).  Through the SBA Act, the SBA was "given extraordinarily broad powers to accomplish these important objectives, including that of lending money to small businesses." *McClellan*, 364 U.S. at 447.  Section 7(a) of the SBA Act authorizes the SBA to "make loans to any qualified small business concern" either directly or "in cooperation with banks or other financial institutions," subject to certain procedures and restrictions.  15 U.S.C. § 636(a).  These loans are referred to as "Section 7(a)" loans.  The SBA administrator has the authority to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to" the SBA Act and the SBA has broad authority to "establish general policies … which shall govern the granting and denial of applications for financial assistance," particularly in regard to "the public interest involved in the granting and denial" of loans.  15 U.S.C. §§ 633(d); 634(b)(6)).

The Code of Federal Regulations, Title 13, Chapter I, Parts 120-121 sets out extensive rules regarding eligibility for Section 7(a) loans.  As relevant here, businesses are precluded from Section 7(a) loans if the business 1) is too large to qualify as a "small" business or 2) presents "live performances of a prurient sexual nature" or derives directly or indirectly "more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature."  13 C.F.R. §§ 121.201; 120.110(p).  The latter regulation is known as the prurient business exclusion.

### 1.    Size Limitations for Section 7(a) Loans and Affiliation Rules

The SBA serves small businesses.  Whether a business is small enough to qualify for the SBA's programs is determined by industry-specific "size standards" based on either the

United States District Court
Northern District of California

businesses' annual receipts or number of employees.[2]  *See* FAC ¶¶ 549-52; 13 C.F.R. § 121.201.

The SBA's size standards are based on the North American Industry Classification System

(NAICS), a classification system promulgated by the U.S. Census Bureau, which is used by

numerous federal agencies.[3]  *See* 13 C.F.R. § 121.201.  NAICS lists categories of businesses (such

as "Construction," "Education Services," "Agriculture, Forestry, Fishing and Hunting"), which are

further divided into sub-categories (for example, "Construction" includes "Residential Building

Construction," "Industrial Building Construction," and "Water and Sewer Line Construction").

Each sub-category is assigned a numerical code, and businesses within the same over-arching

category share the same first two digits.  "Accommodation and Food Services" businesses are

listed at NAICS Code 72.  NAICS Code 72 businesses include the sub-category "Drinking Places

(Alcoholic Beverages)," NAICS code 722410.  Mirroring the NAICS Code 72 classification, the

SBA size standards at 13 C.F.R. § 121.201 categorize "Accommodation and Food Services" as

Sector 72 businesses.  To be small enough to qualify for Section 7(a) loans, "Drinking Places

(Alcoholic Beverages)," Code 722410, must have annual receipts at or under $9 million to qualify

for SBA programs.  13 C.F.R. § 121.201.

When evaluating if a business is small enough to qualify for a Section 7(a) loan, the SBA

does not consider the business in isolation.  Instead, it considers if a business and its affiliates

exceed the size standards established in 13 C.F.R. § 121.201.  *See* 13 C.F.R. § 121.103(a)(6).

Businesses "and entities are affiliates of each other when one controls or has the power to control

the other, or a third party or parties controls or has the power to control both."  *Id.* § 121.103(a)(1).

In determining "whether affiliation exists," the "SBA considers factors such as ownership,

management, previous relationships with or ties to another [business] concern, and contractual

relationships."  *Id.* § 121.103(a)(2).  The SBA considers "the totality of the circumstances, and

may find affiliation even though no single factor is sufficient to constitute affiliation."  *Id.*

---

[2] For example, under 13 C.F.R. § 121.201, a strawberry-farming business is considered "small" if
its yearly receipts are less than $5.5 million.  A sawmill is considered "small" if it has fewer than
550 employees.
[3] The NAICS classifications are available online:
https://www.census.gov/naics/?58967?yearbck=2022.

4

§ 121.103(a)(5).  Throughout this Order, the Court refers to these regulations as the "affiliation rules."

### 2.    The Prurient Business Exclusion

In addition to the size-based restrictions on eligibility for Section 7(a) loans, 13 C.F.R. § 120.110 establishes that certain types of businesses are ineligible for Section 7(a) loans.  As relevant here, the prurient business exclusion establishes that businesses that present "live performances of a prurient sexual nature" or derive "more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature" are not eligible for Section 7(a) loans.  13 C.F.R. § 120.110(p).  Separate and apart from the prurient business exclusion, by statute, "the [SBA] is prohibited from providing any financial or other assistance to any business concern or other person engaged in the production or distribution of any product or service that has been determined to be obscene by a court of competent jurisdiction."  15 U.S.C. § 633(e).

### B.    The Paycheck Protection Program

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), which established the Paycheck Protection Program (PPP) as a temporary extension of the SBA's Section 7(a) loan program to provide eligible businesses emergency loans.  Pub. L. No. 116-135, § 1102, 134 Stat. 281, 286-94 (2020) (codified at 15 U.S.C. § 636(a)).  The PPP established that the SBA would guarantee PPP loans "under the same terms, conditions, and processes" as its regular Section 7(a) loans, but that the eligibility requirements were somewhat relaxed so that more businesses could receive loans on an expedited timeline.  15 U.S.C § 636(a)(36)(B).  The affiliation rules, described above, were waived for NAICS code 72 businesses (Accommodations and Food Services) with not more than 500 employees.  *See* 15 U.S.C. § 636(a)(36)(D)(iv)(I).  The Court refers to the PPP's carve-out of the affiliation rules for accommodations and food services businesses as the "affiliation exception provision."

The SBA Act authorized regular Section 7(a) loans to be made directly by the SBA or in cooperation with lending banks.  15 U.S.C. § 636(a).  The PPP "delegated authority by the [SBA] Administrator" to lending banks "to make and approve covered loans" to eligible businesses,

guaranteed by the SBA.  15 U.S.C. § 636(a)(36)(F)(ii)(I).  Most PPP loans were obtained through lenders and guaranteed by the SBA, rather than obtained directly from the SBA.  To ensure the timely disbursement of PPP loans, the CARES Act authorized the SBA to exercise "emergency rulemaking authority" and "issue regulations to carry out the" PPP loan administration "without regard to the notice [and comment] requirements" within fifteen days of the enactment of the CARES Act.  15 U.S.C. § 9012; *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 224 (2d Cir. 2021).

In April 2020, the SBA issued Interim Final Rules (April 2020 IFR) establishing eligibility and application requirements for PPP loans.  85 Fed. Reg. 20,812-15.  In relevant part, these rules established that a business would be eligible for a PPP loan if it had "500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry," and was a  "small business concern as defined in section 3" of the SBA or a nonprofit that was operating in February 2020.  *Id.*  The April 2020 IFR specified: "Businesses that are not eligible for PPP loans are identified in 13 C.F.R. § 120.110 and described further in SBA's Standard Operating Procedure … except that nonprofit organizations authorized under the Act are eligible." 85 Fed. Reg. 20,812.  The April 2020 IFR thus "incorporated longstanding restrictions on eligibility for 7(a) loans," including the prurient business exclusion at 13 C.F.R. 120.110(p), into the PPP.  *Pharaohs*, 990 F.3d at 224.  The PPP launched on April 3, 2020, and expired on August 8, 2020.  Loans obtained through the PPP as authorized by the CARES Act during this time are referred to as first-draw loans.

The Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (EAA) (Consolidated Appropriations Act, 2021, Div. N, Title III, Pub. L. No. 116-260, 134 Stat. 1182, 1993-2052, largely codified at 15 U.S.C. § 636(a)(37)), reauthorized the PPP and extended it through March 2021.  The EAA authorized the SBA to issue a second round of loans under the PPP to eligible businesses.  Additional loans were made available to businesses of not more than 300 employees that met certain income requirements and were otherwise eligible for loans under 15 U.S.C. § 636(a)(36).  Explicitly prohibited from eligibility for second-draw loans was:

[A]ny entity that is a type of business concern (or would be, if such entity were a business concern) described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance or rule that may be issued by the Administrator) other than a business concern described in subsection (a) [non-profits] or (k) [reserved] of such section.

15 U.S.C. § 636(a)(37)(A)(iv)(III) (the "Incorporating Statute").  Through the EAA, Congress expressly incorporated the eligibility standards of 13 C.F.R. § 120.110, which includes the prurient business exclusion.  Loans issued under the EAA are referred to as second-draw loans.

### 1.    Loan Forgiveness

Section 1106 of the CARES Act, codified at 15 U.S.C. § 636m, governs forgiveness for first- and second-draw PPP loans.  "An eligible recipient shall be eligible for forgiveness of indebtedness on a covered loan in an amount equal to" the amount of the PPP loan used for authorized purposes, including payments towards rent, payroll, and utilities, as long as at least sixty percent of the PPP loan went towards payroll costs.  15 U.S.C. § 636m(b), (d)(8).  Loan recipients could apply for forgiveness by submitting an application, including documentation verifying the number of employees, payroll tax filings, proof of payment of rent, utilities, and other covered expenditures, and "any other documentation the [SBA] determines necessary," to its lender.  15 U.S.C. § 636m(e).  The lender would then issue its decision to the SBA, and, if the lender forgave the loan in whole or in part, the SBA would remit the forgiven amount to the lender, subject to the SBA's own review.  *Id.* § 636m(c), (g); 85 Fed. Reg. 38,306.  "If SBA determines in the course of its review that the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's PPP loan application, or the terms of the borrower's PPP loan application (for example, because the borrower lacked an adequate basis for the certification that it made in its PPP loan application), the loan will not be eligible for loan forgiveness."  85 Fed. Reg. 38,306.

Once a PPP borrower has applied for loan forgiveness, repayment of the principal loan amount and interest thereon is deferred until the SBA remits the forgiven amount to the lender or determines that the loan is not eligible for forgiveness.  15 U.S.C. § 636(a)(36)(M)(ii) (establishing that the SBA Administrator must "provide complete payment deferment relief for

1    impacted borrowers with covered loans … until the date on which the amount of forgiveness

2    determined under section 363m of this title is remitted to the lender"); *see* 86 Fed. Reg. 8283,

3    8288.

### 2.    The Special OHA Appeals Process

5    The SBA established procedures to rule on applications for PPP loan forgiveness and for

6    businesses to administratively appeal such decisions.  If the SBA, upon reviewing a PPP loan,

7    found that the borrower was ineligible for the loan, used the PPP loan for unauthorized purposes,

8    or was ineligible for PPP loan forgiveness, the SBA could issue a final loan review decision

9    (FLRD) denying loan forgiveness.  13 C.F.R. § 134.1201(b).

10    The borrower could then administratively appeal the decision to SBA's Office of Hearings

11    and Appeals (OHA).  13 C.F.R. § 134.1201(c).  Appeals must be filed within thirty days of the

12    borrower receiving the FLRD and must include a copy of the FLRD, a statement of why the

13    FLRD is "alleged to be erroneous," and any relevant exhibits and attachments.  *Id.* §§ 134.1202,

14    134.1204(a).  The SBA must then lodge the administrative record, and the borrower has an

15    opportunity to object to the administrative record.  *Id.* § 134.1207.  The SBA may file a response

16    to the borrower's appeal.  *Id.*§ 134.1208(a).  "Generally, a reply to a response is not permitted"

17    unless the ALJ directs otherwise upon the borrower's request.  *Id.* § 134.1208(e).  All appeals of

18    FLRDs are "decided solely on a review of the administrative record, the appeal petition, any

19    response, any reply or supplemental pleading, and filings related to objection to the administrative

20    record" and neither "discovery nor oral hearings" are permitted.  *Id*. § 134.1209.  The borrower

21    has the burden of proof to show that the FLRD "was based on clear error of fact or law."  *Id.*

22    § 134.1210.  This procedure for administratively appealing FLRDs (the Special OHA Rules) is

23    more streamlined than the OHA's process for reviewing administrative appeals of non-PPP

24    Section 7(a) loans.

25    For administrative appeals, the ALJ's decision regarding a challenged FLRD must be

26    issued within forty-five days after close of the record, as practicable, and contain "findings of fact

27    and conclusions of law, the reasons for such findings and conclusions, and any relief ordered."  *Id.*

28    §134.1211.  The ALJ's decision becomes final after thirty days, and final decisions "may be

United States District Court
Northern District of California

appealed to the appropriate Federal district court." *Id.* § 134.1211(g). "An appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a Federal district court." *Id.* § 134.1201(d). A timely appeal of an FLRD "extends the deferment period of the PPP loan until a final decision is issued." *Id.* § 134.1202(d).

Plaintiffs allege that the Special OHA Rules governing administrative appeals of FLRDs lack due process. Among other things, Plaintiffs complain that the special OHA rules require appellants to file their opening briefs *before* receiving the administrative record (which documents the SBA's reasoning for issuing FLRDs) and appellants are generally not permitted to submit additional briefing regarding the merits of their appeal after they have received the administrative record. FAC ¶¶ 424, 428. Appellants may file objections to the administrative record, but only have ten days to do so, which, Plaintiffs allege, is insufficient given that the administrative record for any FLRD can be thousands of pages long. *Id.* ¶ 426. Portions of the administrative records are redacted, which, Plaintiffs allege, render it "impossible for them to file full and substantive objections" to the administrative record or ascertain why their loan forgiveness applications were rejected. *Id.* ¶ 429. The special OHA rules do not permit appellants to obtain discovery from the SBA during the administrative appeals process. *See* 13 C.F.R. § 134.1209(b), FAC ¶ 410. OHA summarily grants the SBA's motions to dismiss Plaintiffs' appeals without permitting Plaintiffs to oppose the motions. *See, e.g.*, FAC ¶¶ 83, 128. The OHA decision-makers are not necessarily ALJs who work within the SBA and instead may be ALJs borrowed "from other federal agencies" or outside attorneys. *Id.* ¶ 405.

### C.    Plaintiffs' Loans

As alleged in the FAC, together, Plaintiffs applied for and received twenty-four PPP loans. Five Plaintiffs only received first-draw loans, one Plaintiff (Pole Position) only received a second-draw loan, and the remaining Plaintiffs received both. All Plaintiffs applied to have their loans forgiven. Plaintiffs' lenders determined the loans should be forgiven and, upon review, the SBA initially approved some applications but denied others. The status of Plaintiffs' loans, according to their complaint, is as follows:

### 1.    Gold Club

Gold Club applied for and received first- and second-draw PPP loans.  FAC ¶¶ 66, 70-71.
Gold Club applied for forgiveness of its first-draw loan in November 2021, and, in October 2023,
the SBA issued an FLRD denying the application because it had determined that Gold Club was
1) ineligible as a prurient business, and 2) along with its affiliate businesses, too large to qualify
for PPP loans.  *Id.* ¶ 73.  Gold Club appealed the FLRD to the OHA and filed a discovery motion.
The OHA summarily dismissed the discovery motion, stating that its authority was limited to
reviewing whether an FLRD was based on clear error.  *Id.* ¶¶ 76, 78.  The SBA then filed a 5,967-
page administrative record, and, the day before Gold Club's objections to the administrative
record were due, the SBA filed a motion to dismiss Gold Club's appeal on the grounds that it had
withdrawn the underlying FLRD.  *Id.* ¶¶ 79, 82.  The OHA granted the SBA's motion and
dismissed the appeal before Gold Club had the opportunity to respond.  *Id.* ¶¶ 82-83.

Gold Club applied for forgiveness of its second-draw loan in April 2022.  *Id.* ¶ 84.  The
SBA issued an FLRD as to the second-draw loan in October 2023, again on the basis that Gold
Club was 1) ineligible as a prurient business, and 2) along with its affiliate businesses, too large to
qualify for PPP loans.  FAC ¶ 85.  Gold Club appealed to the OHA and filed a motion for
discovery, which was summarily denied.  *Id.* ¶¶ 86-87.  The SBA then filed a voluminous
administrative record, which Gold Club began reviewing and preparing objections to.  Before
Gold Club filed its objections, the SBA filed a motion to dismiss the appeal on the basis that it had
withdrawn the underlying FLRD.  *Id.* ¶ 89.  The OHA again granted the SBA's motion to dismiss
the appeal before Gold Club could respond.  *Id.* ¶¶ 91-92.

After Gold Club's appeal challenging the first FLRD as to Gold Club's second-draw loan
was dismissed, the SBA issued a second FLRD as to Gold Club's second-draw loan, this time
denying Gold Club's application for forgiveness of its second-draw loan *only* because Gold Club
was ineligible as a prurient business.  *Id.* ¶ 93.  Gold Club appealed, the SBA filed the
administrative record, and Gold Club filed its objections to the record.  *Id.* ¶ 98.  Gold Club filed a
discovery motion, which was again summarily denied by the OHA.  *Id.* ¶¶ 99-100.  The SBA then
responded to Gold Club's appeal, relying on exhibits that had not been included in the

administrative record; Gold Club moved to strike these exhibits. *Id.* ¶¶ 101-104.  Less than a week after the SBA filed its response, the OHA affirmed the FLRD and denied as moot Gold Club's motion to strike. *Id.* ¶ 105.  Per 13 C.F.R. § 134.1211, the OHA's affirmance became final and ripe for judicial review thirty days after it was issued. *Id.* ¶ 108.  Gold Club has begun making repayments on its second-draw loan. *Id.* ¶ 110.

### 2.  Dallas Food and Beverage

Plaintiff Dallas applied for and received a first-draw PPP loan and proceeded to apply for loan forgiveness in July 2021. *Id.* ¶¶ 118-19.  Dallas received forgiveness for the full amount in April 2022, but, in January 2024, received a letter from the SBA initiating a "Post-Payment Review" of its first-draw loan and requesting additional documents. *Id.* ¶ 121.  The stated reasons for initiating the review was to assess whether Dallas was eligible for PPP loans under the prurient business exclusion and the affiliation rules. *Id.*

Dallas also applied for and received a second-draw loan. *Id.* ¶ 125.  It applied for loan forgiveness in May 2022, and the SBA issued an FLRD as to the second-draw loan in December 2023 on the basis that Dallas was 1) ineligible as a prurient business, and 2) along with its affiliate businesses, too large to qualify for PPP loans. *Id.* ¶ 128.  Dallas appealed the FLRD to the OHA, SBA filed a motion to dismiss the appeal after withdrawing the "applicable FLRD," and the OHA granted the motion to dismiss. *Id.* ¶¶ 128, 345.

### 3.  Meacham

Plaintiff Meacham applied for, received, and obtained forgiveness of a first-draw PPP loan. *Id.* ¶ 135.  Meacham also applied for and received a second-draw loan. *Id.*  It applied for forgiveness of its second-draw loan in April 2022, and, in June 2023, the SBA issued an FLRD denying the application because Meacham was 1) ineligible as a prurient business, and 2) along with its affiliate businesses, too large to qualify for PPP loans. *Id.* ¶ 141.  Meacham appealed and the SBA moved to dismiss the appeal on the grounds that it had withdrawn the FLRD. *Id.* ¶ 144.  The OHA granted the SBA's motion to dismiss the appeal. *Id.* ¶ 145.

After the first FLRD was withdrawn, the SBA issued Meacham a second FLRD as to its second-draw loan solely on the ground that Meacham was ineligible because it was a prurient

business.  *Id.* ¶ 146.  Meacham appealed, the SBA filed a lengthy administrative record (which included an entry indicating that the SBA considered Google Maps results to determine that Meacham was a prurient business), and Meacham filed a discovery motion and objections to the administrative record.  *Id.* ¶¶ 149-52.  The OHA sustained Meacham's objections.  The SBA filed its response to Meacham's appeal, which included exhibits not in the administrative record.  *Id.* ¶ 154-57.  The OHA granted Meacham's appeal in May 2024, finding that it "was without a firm conviction that [the] SBA's FLRD" was "free from clear error," and remanded the second FLRD to the SBA.  *Id.* ¶ 158.

### 4.    Reeder

Plaintiff Reeder applied for and received first- and second-draw PPP loans.  *Id.* ¶¶ 165-66. It applied for and received full forgiveness of both loans in 2021.  *Id.* ¶¶ 170, 172.  In January 2023, the SBA informed Reeder that the SBA would be initiating a Post-Payment Review of both loans and requested that Reeder submit additional documentation to the SBA.  *Id.* ¶ 173.  The SBA's stated purpose for conducting the review was to determine if Reeder was eligible for PPP loans under the prurient business exclusion and affiliation rules.  *Id.*

### 5.    S.A.W.

Plaintiff S.A.W. applied for and received a first-draw PPP loan.  *Id.* ¶¶ 181, 184.  It applied for loan forgiveness and the SBA issued an FLRD denying the application on the basis that S.A.W., along with its affiliates, was too large to receive the loan.  *Id.* ¶ 187.  S.A.W. appealed the FLRD to the OHA and filed a discovery motion, which the SBA summarily denied.  *Id.* ¶¶ 188-90. The SBA lodged the administrative record, and, eight days later, filed a motion to dismiss S.A.W.'s appeal because it had withdrawn the underlying FLRD as it had "determined that it was necessary to complete a further review of the Loan."  *Id.* ¶¶ 191, 193.  The OHA granted the SBA's motion to dismiss.  *Id.* ¶¶ 191-94.

About three weeks after SBA withdrew the first FLRD, it issued a second one, this time denying S.A.W.'s forgiveness application on the basis that S.A.W. was a prurient business.  *Id.* ¶ 195.  S.A.W. appealed to the OHA and the SBA filed a motion to dismiss, stating that the appeal was moot as it had withdrawn the second FLRD.  *Id.* ¶ 197-98.  The OHA dismissed S.A.W.'s

United States District Court
Northern District of California

1  appeal, and, when S.A.W. filed for reconsideration of the dismissal, denied the request for

2  reconsideration. *Id.* ¶ 201.

3  ### 6.    Smithville

4  Plaintiff Smithville applied for and received first- and second-draw PPP loans. *Id.* ¶¶ 210,

5  212. Smithville obtained partial loan forgiveness of its first-draw loan pursuant to a settlement

6  agreement with the SBA. *Id.* ¶ 210. Smithville applied for forgiveness of its second-draw loan,

7  and the SBA issued an FLRD denying the application because Smithville, along with its

8  associates, was too large to qualify for PPP loans in December 2023, and because it was a prurient

9  business. *Id.* ¶ 215. Smithville appealed the FLRD and, at the time the FAC was filed, the appeal

10 was still pending. *Id.*

11 ### 7.    Deja Vu

12 Similarly to Smithville, Plaintiff Deja Vu applied for and received first-and second-draw

13 PPP loans. *Id.* ¶¶ 222, 224. Deja Vu applied for and received partial loan forgiveness of its first-

14 draw loan pursuant to a settlement agreement with the SBA. *Id.* ¶ 224. It applied for forgiveness

15 of its second-draw loan in July 2022, and in December 2023 the SBA issued an FLRD denying its

16 application on the basis that Deja Vu was too large to qualify for PPP loans and was a prurient

17 business. *Id.* ¶ 229. Deja Vu appealed the FLRD, and the appeal is pending. *Id.*

18 ### 8.    Office

19 Plaintiff Office applied for and received a first-draw PPP loan, and then applied for and

20 received loan forgiveness. *Id.* ¶¶ 235, 238-39. In January 2024, the SBA sent Office a letter

21 stating it was initiating Post-Payment Review to assess if Office was eligible for PPP loans under

22 the prurient business exclusion and affiliation rules. *Id.* ¶ 240. Office is a bar and grill and does

23 not present adult entertainment. *Id.* ¶¶ 231-32.

24 ### 9.    Cats' Meow

25 Plaintiff Cats' Meow is a karaoke bar and nightclub. *Id.* ¶ 242. It applied for and received

26 first- and second-draw PPP loans. *Id.* ¶¶ 246, 248. It applied for and received forgiveness for

27 both loans in 2021, but, after it received loan forgiveness, the SBA conducted a "review" of both

28 loans to determine if it was too large to qualify for PPP loans under the affiliation rules and to

review if it had submitted adequate documentation and lost sufficient income to qualify for PPP loans. *Id.* ¶¶ 255-56.

### 10. Cats NOLA

Plaintiff Cats NOLA is a karaoke bar and nightclub. *Id.* ¶ 258. It applied for and received a first-draw PPP loan, and, in September 2021, its first-draw loan was forgiven. *Id.* ¶ 267. In January 2024, the SBA emailed Cats NOLA that it was initiating a Post-Payment Review and requested that Cats NOLA submit additional documents. *Id.* ¶¶ 269-70. The SBA did not give a reason for initiating this review. *Id.*

### 11. Pole Position

Plaintiff Pole Position was a sports bar that, name notwithstanding, allegedly did not present any form of live entertainment. *Id.* ¶¶ 272, 607. It applied for and received a second-draw PPP loan, and then applied for and received loan forgiveness. *Id.* ¶¶ 276, 281-82. In December 2023, the SBA emailed Pole Position informing it that the SBA was conducting a review of the loan it received and requesting that Pole Position send the SBA various documents. *Id.* ¶ 283. Pole Position closed in March 2023. *Id.* ¶ 272.

### 12. Jamme

Plaintiff Jamme applied for and received first- and second-draw PPP loans. *Id.* ¶¶ 291-92. It applied for forgiveness of its first-draw loan in July 2021. *Id.* ¶ 295. The application was granted, but, in January 2024, the SBA informed Jamme that it was initiating a Post-Payment Review and requested additional documents. *Id.* ¶ 297. The SBA stated that the purpose of the review was to assess if Jamme was eligible for PPP loans under the prurient business exclusion and affiliation rules. *Id.*

Jamme applied for forgiveness of its second-draw loan in May 2022. *Id.* ¶ 298. As of the filing of the filing of the First Amended Complaint, SBA had not issued a decision on the application. *Id.* ¶ 299.[4]

---

[4] In violation of Civil Local Rule 7-3(d), Plaintiffs filed supplementary material informing the Court that the SBA had issued an FLRD denying Jamme's application for forgiveness of its second-draw PP loan based on a potential "affiliation issue." ECF No. 42 at 2. Their supplemental filing is stricken.

### 13.    90s

Plaintiff 90s applied for and received first- and second-draw PPP loans.  *Id.* ¶¶ 307-08.  It applied for forgiveness of its first-draw loan in July 2021, and the loan was forgiven.  *Id.* ¶ 312.  In January 2024, the SBA notified 90s that it was conducting a Post-Payment Review to assess if 90s was eligible for PPP loans based on the prurient business exception and affiliation rules.  *Id.* ¶ 313.  The SBA requested that 90s send in additional documents.  *Id.*

90s applied for and received full forgiveness of its second-draw loan.  *Id.* ¶¶ 314-15.  90s has not been subject to a Post-Payment Review of its second-draw loan.

### 14.    Bistro and Stockton

Plaintiffs Bistro and Stockton both applied for and received first-draw loans.  FAC ¶¶ 323, 335.  Both of their loans were forgiven in July 2021 (*id.* ¶¶ 327, 339), but, in January 2024, the SBA notified them that it was initiating Post-Payment Reviews to determine if Bistro and Stockton were eligible for PPP loans under the prurient business exclusion and affiliation rules.  *Id.* ¶¶ 328, 340.

***

In sum, fourteen of the twenty-four loans were forgiven in their entirety.  Of those fourteen, the SBA has initiated Post-Payment Review of twelve loans; two have not been subject to Post-Payment Review.  Two loans were partially forgiven pursuant to settlements with the SBA.  At the time of the filing of the FAC, the SBA had not made an initial determination on one forgiveness application (for Jamme's second-draw loan).  Seven applications for forgiveness were denied via the issuance of FLRDs, and Plaintiffs administratively appealed all seven denials to the OHA.  Of those seven, the FLRDs for four applications were withdrawn after Plaintiffs appealed, two appeals are still pending with the OHA, and one application (for forgiveness of Gold Club's second-draw loan) was denied initially and upon appeal to the OHA.

Plaintiffs allege that Defendants believe that all Plaintiffs, except Meacham and Reeder, are affiliated with two individuals, Harry and Jason Mohney (the Mohneys).  FAC ¶¶ 604, 651.  They claim that the SBA, and in particular SBA's Associate General Counsel Eric Benderson, whom "Plaintiffs understand and believe" to be "the person at the SBA who makes final loan and

forgiveness determinations when application of the Prurience Regulation is involved," has a particular "distain" for the Mohneys and their associated businesses. *Id.* ¶¶ 523, 607. Plaintiffs allege that while the SBA "has forgiven PPP loans for numerous 'adult' businesses" not associated with the Mohneys, the SBA has subjected businesses that the SBA believes are "affiliated with the Mohneys [to] additional scrutiny … and has been looking for ways to deny Plaintiffs … pandemic aid funding, … to claw back any pandemic aid funding the Plaintiffs received, or to simply run up the entities['] costs associated with loan forgiveness." *Id.* ¶¶ 616, 655. Other adult entertainment businesses connected to the Mohneys previously sued the SBA in the Eastern District of Michigan, in *DV Diamond Club of Flint v. SBA*, No. 20-cv-10899 (E.D. Mich.) (Diamond Club Action), challenging the prurient business exclusion. FAC ¶¶ 487, 651.

### D.    Plaintiffs' Theories of Liability and Their Exhibits to the FAC

Plaintiffs assert eighteen claims against Defendants. Counts One through Four challenge the validity and constitutionality of the prurient business exclusion. *Id.* ¶¶ 627-49. At Count Five, Plaintiffs claim that Defendants are retaliating against them for exercising their First Amendment rights. *Id.* ¶¶ 650-60. Counts Six through Eleven challenge the validity and constitutionality of the affiliation rules and the application of the affiliation exception provision. *Id.* ¶¶ 661-96. Counts Twelve and Thirteen challenge the Special OHA Rules governing the process for administratively appealing FLRDs. *Id.* ¶¶ 694-704. At Count Fourteen, Plaintiffs claim that Defendants are estopped from denying Plaintiffs' loan forgiveness applications. *Id.* ¶¶ 705-15. Count Fifteen requests attorneys' fees and costs. *Id.* ¶¶ 716-19. Count Sixteen challenges the constitutionality of the portion of the SBA Act at 15 U.S.C. § 634(b)(1) (the injunction provision) that, Plaintiffs claim, prohibits injunctions from being issued against the SBA. *Id.* ¶¶ 720-26. At Count Seventeen, Plaintiffs request judicial review of the OHA's order denying Gold Club's application for forgiveness of its second draw loan and of the underlying FLRD. *Id.* ¶¶ 727-35. Count Eighteen requests injunctive relief against the SBA. *Id.* ¶¶ 736-45.

Plaintiffs attached voluminous exhibits to their 745-paragraph FAC. Federal Rule of Civil Procedure 8(a)(2) requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(c) provides that "[a] copy of a written instrument

16

that is an exhibit to a pleading is a part of the pleading for all purposes."  Plaintiffs apparently took

Rule 10(c) as permission to circumvent the "short and plain statement" requirement of Rule 8.

They have attached fifty-eight exhibits, totaling over 7,000 pages, to the FAC.  Their exhibits

include, among other things, correspondence between the SBA and Plaintiffs' lending banks,

different iterations of the SBA's standard operating procedures, FLRDs issued by the SBA,

excerpts of administrative records, Plaintiffs' appeals and discovery briefs to the OHA, emails

between Plaintiffs' counsel and the SBA, and transcripts of hearings in related cases.

   Including such voluminous exhibits to the complaint is unnecessary and unhelpful.  First,

the scale of the exhibits makes it "unnecessarily difficult for Defendants to decipher the scope of

the allegations underlying each claim."  *United States v. Erie Cnty.,* 724 F. Supp. 2d 357, 367

(W.D.N.Y. 2010); *see Harris v. Newsom*, No. CV 19-04904, 2020 WL 7084548, at *2 (C.D. Cal.

Sept. 22, 2020) (finding that a complaint that contained "183 paragraphs and incorporates

hundreds of pages of exhibits by reference" was "unreasonably difficult" for the court to review

and dismissing it with leave to file an amended complaint that "contains a short and plain

statement").  Second, at this stage in the proceeding, the Court takes Plaintiffs' allegations in the

FAC as true; Plaintiffs' apparent attempt to prove up their allegations via exhibits adds nothing.[5]

Third, Plaintiffs may not use their exhibits to avoid their obligation to provide a "short and plain"

statement of their claims, as required by Rule 8.  Plaintiffs carry the "burden of presenting the

facts of [their] case in a 'short and plain' manner."  *Cantu v. Garcia*, No. 09-cv-00177, 2010 WL

2605336, at *2 (E.D. Cal. June 28, 2010) (quoting Fed. R. Civ. P. 8(a)).  "[S]ifting through"

thousands of pages of documents to find factual support for Plaintiffs' claims "crosses the line

between liberal construction and advocating on Plaintiff[s'] behalf."  *Id.*

---

[5] For example, Plaintiffs allege that the SBA "filed a 458-page administrative record" in February 2024 as part of Plaintiff Meacham's appeal of an FLRD, excerpts of which are attached to their FAC as Exhibit L.  FAC ¶ 146.  Quoting from the administrative record, Plaintiffs allege that SBA employees noted that Meacham was a "'Gentlemen's Club,' which [was] confirmed through open-source searches," and an "ineligible business" based on "a visual search of Google" that "determined these businesses to be adult entertainment clubs, or of a prurient nature."  *Id.* ¶ 150. The attachment that confirms the quote, ECF No. 18-1 at 1854-55, is immaterial because at the motion to dismiss stage, the Court must accept Plaintiffs' allegations in the FAC about these comments as true.

The Court takes the factual allegations of the FAC as true, and, where the FAC references a specific factual allegation contained in an exhibit or the existence of a document attached as an exhibit, the Court takes such allegations (or the existence of such a document) as true as well. The Court will not, at this stage of the proceeding, sift through the thousands of unidentified pages not referenced in the FAC to try to ferret out if factual allegations supporting Plaintiffs' claims are buried somewhere in the haystack.[6] *See United States v. U.S. Telecom Long Distance, Inc.*, No. 17-cv-02917, 2018 WL 4566673, at *2 (D. Nev. Sept. 24, 2018) (explaining that attaching voluminous exhibits, comprised of filings in an underlying administrative action, did "not excuse the [plaintiff] of its obligation under Rule 8(a) to provide a short and plaint statement of its claims").[7]

E.    **Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint and to Strike Jury Demand**

In support of their motion to dismiss, Defendants assert that many of Plaintiffs claims are not suitable for judicial review under Article III or the APA, and challenge the sufficiency of Plaintiffs' allegations in support of their claims. More specifically, Defendants argue that the majority of Plaintiffs' claims are not yet ripe. They contend that Plaintiffs' claims related to the affiliation rules and affiliation exception provision (Counts Five to Eleven) are not yet ripe because "no Plaintiff is the subject of a final decision denying loan forgiveness based" on the

---

[6] One illustration of this is Plaintiffs' Exhibit AA, which is a 1,724-page discovery motion. ECF No. 18-2 at 136-1861. Plaintiffs apparently filed Exhibit AA to provide the Court with an example of the discovery motions they have been filing in the OHA appeals. *See* FAC ¶ 431. Of the 1,724 pages, Plaintiffs cite to a single paragraph to support their allegation that they informed the OHA that their due process rights were being violated. *See id.* ¶ 434. It is not clear what the purpose of the other 1,723 pages is. It is Plaintiffs' duty under Rule 8 to crystalize their allegations into a "short and plain" statement; they may not circumvent this obligation by appending such an exhibit to their FAC and expecting the Court to discern which facts, within this thousand-plus page document, support their claims.

[7] For related reasons, the Court DENIES Plaintiffs' administrative motion to file supplemental materials. ECF No. 35. That motion, filed three days before the hearing on the motion to dismiss, requests that the Court allow the filing of two letters from Bank of America regarding repayment of Gold Club and S.A.W.'s first draw loans. However, allowing the filing of such material would compound the problem posed by Plaintiffs' voluminous attachments. The request for relief is not styled as a Rule 15(d) motion, and thus, is not favored. *See Keith v. Volpe*, 858 F.2d 467, 472 (9th Cir. 1988). In any event, Plaintiffs still have the option to include in a Second Amended Complaint factual allegations pertaining to these letters, which were sent by the bank after briefing on the motion to dismiss.

18

United States District Court
Northern District of California

affiliation rules, and Plaintiffs will not suffer any cognizable hardship from delaying judicial review "until there is a final agency action." ECF No. 28 at 14, 28-31. Of those claims, Defendants assert that Counts Seven, Eight, Ten, and Eleven, do not challenge final agency action and are thus not reviewable under the APA. *Id.* at 32-33. At the hearing on the motion to dismiss, Defendants' counsel raised for the first time an argument that Plaintiffs did not have standing to bring the affiliation claims. Defendants next argue that Plaintiffs' as-applied constitutional challenges to the prurient business exclusion (Counts One and Two), Plaintiffs' challenges to the SBA's administrative appeals process (Counts Twelve and Thirteen), and Plaintiffs' estoppel claim (Count Fourteen), are only ripe as to Plaintiff Gold Club, and that Plaintiffs' challenges to the regulatory prurient business exclusion (part of Count Three and Count Four) and the constitutionality of the SBA Act's injunction provision (Count Sixteen) are not yet ripe. *Id.* at 14-15.

Turning to Plaintiffs' challenges to the prurient business exclusion (Counts One and Two), Defendants argue that Plaintiffs failed to state a cause of action for a First or Fifth Amendment violation, as the prurient business exclusion is not a government restriction on speech but rather a permissible limit on a government subsidy. *Id.* at 36-38

Lastly, Defendants argue that Plaintiffs' requests for attorneys' fees and injunctive relief must be dismissed as these are not stand-alone causes of action, and that their jury demand must be stricken as they are not entitled to a trial by jury under the APA. *Id.* at 50-51.

### F.    Plaintiffs' Post-Hearing Filings

Plaintiffs filed a "Notice of Supplemental Authority" at ECF No. 42 and a "Reply in Support of Plaintiffs' Notice of Supplemental Authority … and Notice of Additional Supplemental Authority" at ECF No. 44, both of which appear to allege additional facts regarding the state of Plaintiffs Jamme, S.A.W., and Gold Club's loans and forgiveness applications. These filings are stricken, as they were filed without leave of the Court in violation of Civil Local Rule 7-3(c). Defendants' Response at ECF No. 43 is also stricken. Should they choose to do so, Plaintiffs may include allegations regarding recent factual developments in their Second Amended complaint.

United States District Court
Northern District of California

1    Accordingly, in ruling on the instant motion to dismiss, the Court considers the allegations

2 in the FAC and disregards those allegations raised for the first time in Plaintiffs' administrative

3 motion or supplemental filings.  This is without prejudice to Plaintiffs including their additional

4 factual allegations in their Second Amended Complaint.

5 **II.    LEGAL STANDARD**

6    Defendants move to dismiss many of Plaintiffs' claims for lack of subject-matter

7 jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon

8 which relief can be granted under Federal Rule Civil Procedure 12(b)(6).

9    **A.    Rule 12(b)(1) Legal Standard**

10    Rule 12(b)(1) permits a defendant to move to dismiss a complaint due to "lack of subject-

11 matter jurisdiction."  "Subject-matter jurisdiction … refers to a tribunal's power to hear a case."

12 *Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent.*

13 *Region*, 558 U.S. 67, 81 (2009) (quotation marks omitted).  A case must satisfy statutory and

14 constitutional requirements for a federal court to have subject matter jurisdiction over it.  *See*

15 *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 (9th Cir. 2012).  "[S]ubject-

16 matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or

17 waived."  *United States v. Cotton*, 535 U.S. 625, 630 (2002).

18    For a case to satisfy the statutory requirements of subject-matter jurisdiction, it must,

19 generally speaking, either arise "under the Constitution, laws, or treaties of the United States," or

20 the amount in controversy must exceed $75,000 and be between citizens of different states.  28

21 U.S.C. §§ 1331, 1332(a).  For a case to satisfy the Article III constitutional requirements of

22 subject-matter jurisdiction, the matter must be a "live case[] or controvers[y]," and courts may not

23 "issue advisory opinions [or] declare rights in hypothetical cases."  *Thomas v. Anchorage Equal*

24 *Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).  The constitutional "case or controversy

25 requirement limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs

26 have standing and that claims be 'ripe' for adjudication."  *Chandler v. State Farm Mut. Auto. Ins.*

27 *Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010).  "Standing addresses whether the plaintiff is the proper

28 party to bring the matter to the court for adjudication," whereas ripeness addresses whether a

plaintiff's claim is "premature for review." *Id.* at 1122. "Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss." *Id.*

"The ripeness doctrine is designed to 'separate matters that are premature for review because the injury is speculative and may never occur from those cases that are appropriate for federal court action.'" *Thomas v. Cnty. of Humboldt*, 124 F.4th 1179, 1187 (9th Cir. 2024) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)). Under that doctrine, "ripeness[] is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Id.* (internal quotation omitted). "The constitutional component of the ripeness inquiry is often treated under the rubric of standing," coinciding with standing's injury-in-fact prong, whereas the prudential component of ripeness considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (internal quotation marks omitted).

The party asserting federal subject matter jurisdiction bears the burden of proving its existence. *Chandler*, 598 F.3d at 1122. When ruling on a Rule 12(b)(1) motion to dismiss that present a facial challenge, courts must "accept as true all material allegations in the complaint, and must construe the complaint in the nonmovant's favor." *Id.*; *cf. San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023) (addressing factual challenges under Ruler 12(b)(1)). When a claim is dismissed under Rule 12(b)(1) because judicial review is premature, dismissal should be without prejudice to the plaintiff reasserting their claims once they have ripened. *See Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 785 (9th Cir. 2000).

## B.    Rule 12(b)(6) Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that complaints may be dismissed where they fail "to state a claim upon which relief can be granted." Dismissal under Rule 12(b)(6) may be "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation and internal quotation marks omitted). A complaint generally must

1    include a "short and plain statement of the claim showing that the pleader is entitled to relief."

2    Fed. R. Civ. P. 8(a)(2).

3    A court reviewing a 12(b)(6) motion must "accept all factual allegations in the complaint

4    as true and construe the pleadings in the light most favorable to the nonmoving party." *Outdoor*

5    *Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). "Threadbare recitals

6    of the elements of a cause of action . . . do not suffice," however, and a court need not credit "legal

7    conclusions" or "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

8    The allegations in the complaint "must be enough to raise a right to relief above the speculative

9    level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must demonstrate

10   "facial plausibility" by pleading "factual content that allows the court to draw the reasonable

11   inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

12   A court's review under Rule 12(b)(6) is generally limited to the contents of a complaint,

13   with the exception of materials incorporated by reference in a complaint or materials subject to

14   judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). A

15   court should not consider facts first alleged in a plaintiff's opposition papers, although such new

16   facts may be considered when deciding whether to dismiss with or without prejudice. *See Orion*

17   *Tire Corp. v. Goodyear Tire & Rubber Co., Inc.*, 268 F.3d 1133, 1137-38 (9th Cir. 2001).

18   Courts generally do not dismiss a complaint with prejudice under Rule 12(b)(6) unless it is

19   clear the complaint cannot be saved by amendment. *See United States v. Corinthian Colls.*, 655

20   F.3d 984, 995 (9th Cir. 2011). "[L]eave to amend 'shall be freely given when justice so

21   requires.'" *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting

22   Fed. R. Civ. P. 15(a)). Generally, leave to amend may be denied only if allowing the amendment

23   would unduly prejudice the opposing party, cause undue delay, or be futile, or if a plaintiff has

24   acted in bad faith. *Id.*

25   **III.    ARTICLE III STANDING**

26   At the hearing on the motion to dismiss, Defendants raised for the first time that Plaintiffs

27   lack standing to challenge the affiliation rules. The parties submitted supplemental briefing

28   following the hearing. ECF Nos. 40, 41.

United States District Court
Northern District of California

The court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas*, 220 F.3d at 1138. "The doctrine of standing implements this requirement by insisting that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" *Carney v. Adams*, 592 U.S. 53, 58 (2020) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). A party "invoking federal jurisdiction" must establish these three elements to demonstrate they have standing, although, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Chandler*, 598 F.3d at 1122 (holding that the plaintiff's factual allegations were insufficient to establish an injury that is "fairly traceable to Defendant's conduct"). "First, the plaintiff must prove that he suffered an 'injury in fact,' i.e., 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' Second, the plaintiff must establish a causal connection by proving that her injury is fairly traceable to the challenged conduct of the defendant. Third, the plaintiff must show that her injury will likely be redressed by a favorable decision." *Chandler*, 598 F.3d at 1122 (citations omitted) (quoting *Lujan*, 504 U.S. at 560-61); *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1105 (9th Cir. 2025) (explaining that the three constitutional standing requirements must be met where plaintiffs challenge administrative action).

The first element—injury-in-fact—is contested here. Such an injury must be "real and not abstract[,]… must 'affect the plaintiff in a personal and individual way'" rather than be a generalized grievance, and must "have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Lujan*, 504 U.S. at 560 n.1). A "credible threat" of future harm that is "both real and immediate" may satisfy the injury-in-fact requirement. *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (quotation marks omitted).

Defendants contend that Plaintiffs lack standing to challenge the affiliation rules because the SBA has not "made a final determination that any [P]laintiff is ineligible" for loan forgiveness

under the affiliation rules, and thus any injury based on the application of the affiliation rules is "conjectural [and] hypothetical" rather than "actual or imminent." ECF No. 40 at 3 (citing *Carney*, 592 U.S. at 58). Plaintiffs respond that, even though there has not yet been a "final determination" of ineligibility based on the affiliation rules, they have still suffered actual or will suffer imminent injuries due to the affiliation rules. ECF No. 41 at 6. They argue that being subjected to the SBA's Post-Payment Review procedures, which require each Plaintiff subject to such review to submit voluminous documentation regarding their business affiliations, constitutes an injury-in-fact. *See id.* at 3-6. They also contend that the two Plaintiffs (Smithville and Deja Vu) who have had FLRDs issued against them based on the affiliation rules and have pending administrative appeals have suffered injuries-in fact. *Id.* at 4.

The Court agrees with Plaintiffs that they have standing to challenge the affiliation rules. All Plaintiffs received PPP loans and then applied for PPP loan forgiveness, and all except Cats NOLA and Pole Position[8] have been subject to some manner of review based on the affiliation rules. At the time the FAC was filed, the SBA was conducting Post-Payment Reviews of several Plaintiffs' loans based on the affiliation rules. *See* FAC ¶¶ 7-8, 121, 173, 240, 297, 313, 328, 340. As the SBA may retroactively deny loan forgiveness and require these Plaintiffs to begin repayment as a result of its review, these Plaintiffs face an "imminent" risk that they will experience a "concrete and particularized" injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *see Lujan*, 504 U.S. at 560.

Furthermore, Plaintiffs Smithville and Deja Vu received FLRDs denying their applications for loan forgiveness based, in part, on the affiliation rules, and have pending administrative appeals. *Id.* ¶¶ 215, 229. Their applications for loan forgiveness were denied, and the OHA may ultimately uphold the FLRDs, requiring Plaintiffs to repay their loans. These Plaintiffs have been concretely harmed by the affiliation rules and further harm may be imminent. Their objections to the affiliation rules are more than "impermissible generalized grievance[s]." *Lujan*, 504 U.S. at 575 (quotation marks omitted). In addition, as part of the Post-Payment Review process, certain

---

[8] The SBA has initiated Post-Payment Review of Cats NOLA and Pole Positions' forgiveness applications, but did not provide a reason for initiating these reviews. FAC ¶¶ 269-70, 283.

United States District Court
Northern District of California

Plaintiffs were required to submit voluminous records regarding their business affiliates.  Plaintiffs who were "compelled to…provide documents [they] would prefer to withhold" as part of the SBA's review suffered a "concrete injury."  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020); *see* FAC ¶ 4.  As at least one Plaintiff has "standing to bring the suit, the court need not consider the standing of" all plaintiffs.  *Laub v. U.S. Dep't of the Interior*, 341 F.3d 1080, 1086 (9th Cir. 2003); *see Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Perini N. River Assocs.*, 459 U.S. 297, 305 (1983) (holding that the presence of at least one party with standing is sufficient to show that "an admittedly justiciable controversy is" before the court).

With respect to the other elements required to demonstrate Article III standing, the Court further holds that Plaintiffs' alleged injury is traceable to the affiliation rules and that a favorable decision would redress their injuries.  "To establish traceability, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Prutehi Litekyan*, 128 F.4th at 1106 (quotation marks omitted).  The Plaintiffs who received and are appealing FLRDs and are undergoing Post-Payment Reviews based on the affiliation rules may be denied loan forgiveness because of the affiliation rules and the SBA's application of the affiliation exception provision.  Their injuries are thus directly traceable to the SBA's challenged actions.  *See id.*  Similarly, a judicial determination that the affiliation rules are unlawful or that the SBA is incorrectly applying the affiliation exception provision would "reduce or eliminate" Plaintiffs' risk of injury from the affiliation rules.  *California v. Bernhardt*, 460 F. Supp. 3d 875, 889 (N.D. Cal. 2020).

The Court accordingly finds that Plaintiffs have standing to challenge the affiliation rules.

## IV.    PRUDENTIAL RIPENESS

Defendants argue that many of Plaintiffs' claims are not yet prudentially ripe for judicial review.  ECF No. 28 at 27.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete

United States District Court
Northern District of California

1   way by the challenging parties.'"  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-

2   08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)).  As discussed

3   above, a dispute may be unripe either in the "constitutional" sense or in the "prudential" sense.

4   *Thomas*, 124 F.4th at 1187.

5          Plaintiffs urge the court to "disregard the entirety" of Defendants' motion to dismiss

6   brought on prudential ripeness grounds, claiming that the Supreme Court abolished the prudential

7   ripeness doctrine in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).  ECF No. 32 at

8   21.  Although "[p]rudential ripeness is discretionary," the Ninth Circuit has unequivocally held

9   that *Susan B. Anthony List* "stopped short of abrogating the doctrine," and continues to exercise

10  prudential ripeness and direct district courts to do the same.  *Seattle Pac. Univ. v. Ferguson*, 104

11  F.4th 50, 65-66 (9th Cir. 2024); *see Stavrianoudakis v. United States Fish & Wildlife Serv.*, 108

12  F.4th 1128, 1139 (9th Cir. 2024).  The Court accordingly evaluates Defendants' arguments that

13  many of Plaintiffs claims are not yet prudentially ripe.

14         In evaluating prudential ripeness, courts assess "(1) the fitness of the issues for judicial

15  decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp.*

16  *Ass'n*, 538 U.S. at 808; *Thomas*, 220 F.3d at 1141.  "A question is fit for decision when it can be

17  decided without considering 'contingent future events that may or may not occur as anticipated, or

18  indeed may not occur at all.'"  *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th

19  Cir. 2010) (quoting *Cardenas v. Anzai,* 311 F.3d 929, 934 (9th Cir. 2002)).  To determine if a

20  challenge to an agency action is fit for review, courts evaluate "if the issues raised are primarily

21  legal, do not require further factual development, and the challenged action is final."  *US West*

22  *Commc'ns v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1118 (1999) (quotations marks omitted).  "The

23  core question" in evaluating if a claim is fit for review "is whether the agency has completed its

24  decisionmaking process, and whether the result of that process is one that will directly affect the

25  parties."  *American Medical*, 217 F.3d at 780 (quoting *Franklin v. Massachusetts*, 505 U.S. 788,

26  797 (1992)).  Courts consider "whether the administrative action is a definitive statement of an

27  agency's position; whether the action has a direct and immediate effect on the complaining parties;

28  whether the action has the status of law; and whether the action requires immediate compliance

with its terms." *Id.* Judicial intervention into agency proceedings is premature "where pending administrative proceedings or further agency action might render the case moot and judicial review completely unnecessary." *Sierra Club v. U.S. Nuclear Regul. Comm'n*, 825 F.2d 1356, 1362 (9th Cir. 1987).

"To meet the hardship requirement, a litigant must show that withholding review would result in 'direct and immediate' hardship and would entail more than possible financial loss." *Winter v. Cal. Med. Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1989) (quoting *State of Cal., Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987)). "Hardship in this context does not mean just anything that makes life harder; it means hardship of a legal kind, or something that imposes a significant practical harm upon the plaintiff." *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1128 (9th Cir. 2009) (quotation marks omitted). In the context of challenging agency action, courts consider if "the [challenged] regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *American Medical*, 217 F.3d at 783 (quotation marks omitted).

### A.    Ripeness of Claims Challenging the Affiliation Rules

Plaintiffs' Counts Six through Eleven challenge the SBA's affiliation rules and affiliation exception provision facially and as applied to Plaintiffs.[9] Defendants argue that these claims are not yet prudentially ripe because, at the time the FAC was filed, "no Plaintiff [was] subject to a final decision denying loan forgiveness based on the application of SBA's affiliation rules and Plaintiffs will suffer no cognizable hardship from delayed review." ECF No. 28 at 27. The Court addresses whether Plaintiffs' facial and as-applied claims are fit for judicial decision and the hardship to Plaintiffs if judicial review is delayed, as follows.

### 1.    Facial Challenges to the Affiliation Rules

The Court first considers whether Plaintiffs' facial challenges to the affiliation rules are fit for review. At Count Nine, Plaintiffs claim that the affiliations rules violate the Fifth Amendment "on their face and particularly as applied by the SBA to Plaintiffs." FAC ¶ 679. At Count Eleven,

---

[9] Plaintiffs' Count Five alleges that the SBA is applying the affiliation rules to retaliate against Plaintiffs for excising their free speech rights. The ripeness of this claim is addressed separately.

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs claim that the affiliation rules are otherwise invalid both facially and "as applied by the SBA and/or the Administrator." *Id.* ¶¶ 690-91.  To the extent Plaintiffs are mounting a facial attack on the affiliation rules at Counts Nine and Eleven, their challenges are to rules that have been finalized and promulgated.  *See* 13 C.F.R. § 121.103.  The rules are a "definitive statement" of the SBA's position and there are no pending administrative proceedings or further action by the SBA that might render this challenge moot.  *American Medical*, 217 F.3d at 780; *see Abbott Laboratories*, 387 U.S. at 151 (holding that a promulgated regulation that was "made effective upon publication" was "quite clearly definitive" and thus a final agency action and fit for judicial review); *Sierra Club v. U.S. Nuclear*, 825 F.2d at 1362.  Waiting for the SBA to finally deny a loan forgiveness application based on the affiliation rules will not make these "primarily legal" claims "more ripe."  *US West Commc'ns,* 193 F.3d at 1118; *Action for Children's Television v. F.C.C.*, 59 F.3d 1249, 1258 (D.C. Cir. 1995).  The Court accordingly finds that Plaintiffs' facial challenges at Counts Nine and Eleven are fit for judicial review.

As the Court holds that Plaintiffs' facial challenges to the affiliation rules are fit for review, it does not evaluate the potential hardship to Plaintiffs if judicial review were delayed.

### 2.        As-Applied Challenges to the Affiliation Rules

As noted above, Plaintiffs also challenge how the SBA has applied the affiliation rules and failed to apply affiliation exception provision.  The ripeness of these particular claims is a different matter from the facial challenges.  Accordingly, the Court evaluates the fitness of these claims for review and the hardship that may ensue if the Court does not review them now.

#### a.        Fitness for Review of As-Applied Challenges to the Affiliation Rules and Affiliation Exception Provision

With respect to fitness for review, Defendants explain, at the time the FAC was filed, no Plaintiff's loan forgiveness application had been denied initially via an FLRD and after review by the OHA based on the affiliation provisions.  *See* ECF No. 28 at 28-30.  Defendants argue that there has not yet been final agency action and judicial review is premature because no applications have been denied finally based on the affiliation rules.  The Court agrees.

Plaintiffs, collectively, received twenty-four PPP loans and have applied for forgiveness

for each loan.  *See* FAC ¶¶ 70-71, 118, 125, 135, 138, 170, 172, 184, 210, 212, 226, 238, 250-51, 266, 276, 280, 295, 298, 312, 315, 327, 338.  These twenty-four forgiveness applications are addressed in turn.

The SBA has granted sixteen applications for loan forgiveness.  Four of the loans that were forgiven (two pursuant to settlement agreements) are not subject to any sort of Post-Payment Review.  *Id.* ¶¶ 135, 210, 224, 315.  Twelve loans were initially forgiven but later subject to Post-Payment Review, which required Plaintiffs to submit additional documentation to the SBA.  *Id.* ¶¶ 121, 173, 240, 256, 269, 283, 297, 313, 328, 340.  None of the twelve loan forgiveness applications subject to Post-Payment Review has been retroactively denied.

The Court finds that there has been no final agency action as to the sixteen loan forgiveness applications that the SBA granted.  Plaintiffs allege, among other things, that the SBA applied and enforced the affiliation rules and affiliation exception provisions improperly to all Plaintiffs.  But the SBA plainly did not use the affiliation rules as a basis to deny the four loan forgiveness applications it granted and has not subjected to review.  While the SBA has begun auditing twelve applications pursuant to Post-Payment Reviews, "[a]n investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action." *American Medical*, 217 F.3d at 781.  As in *Association of American Medical Colleges*, although the Plaintiffs undergoing Post-Payment Reviews "are currently subject to concrete agency action…the actions are not final and their outcomes turn on contingencies which the court is ill-equipped to predict." *Id.* at 782.  Further agency action may render these Plaintiffs' claims "moot." *Id.*  That the SBA is in the process of auditing twelve of Plaintiffs' forgiveness applications is not a "definitive statement" of the SBA's position with regard to these applications. *Id.*; *see Briggs v. San Diego Unified Port Dist.*, No. 24-CV-239, 2025 WL 254923, at *5 (S.D. Cal. Jan. 21, 2025) (finding that defendant's ongoing "investigation is not a definitive statement" and "not final").

As of the filing of the FAC, seven applications for loan forgiveness remain unresolved, although the precise reasons vary to some extent because the applicants' journey through the SBA administrative process has differed.  The SBA had not made an initial determination whether to

grant or deny Jamme's application for forgiveness of its second-draw loan.[10]  *Id.* ¶ 299.  The SBA issued FLRDs for Smithville and Deja Vu's second-draw loans, which both Plaintiffs have challenged through the administrative appeals process; these administrative appeals are pending. *Id.* ¶¶ 215, 229.  The SBA issued an FLRD denying Gold Club's application for forgiveness of its first-draw loan based on the prurient business exception and affiliation rules, which Gold Club appealed to the OHA.  *Id.* ¶ 73.  The OHA dismissed Gold Club's appeal on February 27, 2024 on the grounds that SBA had withdrawn the underlying FLRD.  *Id.* ¶ 82.  The SBA issued an FLRD denying Dallas's application for forgiveness of its second-draw loan based on the affiliation rules and prurient business exclusion, which Dallas appealed.  FAC ¶ 128.  The SBA moved to dismiss Dallas's administrative appeal because the underlying FLRD had been withdrawn, which the OHA granted.  *Id.* ¶¶ 128, 345.  The SBA issued an FLRD denying Meacham's second-draw loan forgiveness application, Meacham appealed, the SBA withdrew the underling FLRD, and the OHA dismissed Meacham's administrative appeal.  *Id.* ¶¶ 141-45.  The SBA then issued a new FLRD denying Meacham's second-draw loan forgiveness application based on the prurient business exception only, and Meacham again appealed.  *Id.* ¶¶ 146-47.  The OHA granted Meacham's appeal, and the FLRD was remanded to the SBA.  *Id.* ¶ 158.  The SBA issued an FLRD denying S.A.W.'s application for forgiveness of its first-draw loan, which S.A.W. appealed.  *Id.* ¶¶ 187-88.  The SBA moved to dismiss the appeal because it had withdrawn the underlying FLRD, and the OHA dismissed the appeal.  *Id.* at 193-94.  The SBA then issued another FLRD, based solely on the prurient business exclusion; S.A.W. appealed, the SBA withdrew the FLRD, and the appeal was dismissed.  *Id.* ¶¶ 198-200.

For the four applications where the SBA has not made an initial determination, where the appeal in front of the OHA is still pending, and where the OHA remanded a decision back to the SBA for further consideration, "pending administrative proceedings or further agency action might

---

[10] As noted above, Plaintiffs filed supplementary material informing the Court that the SBA had issued an FLRD denying Jamme's application for forgiveness of its second-draw PP loan based on a potential "affiliation issue."  ECF No. 42 at 2.  This filing was without leave of the Court in violation of Civil Local Rule 7-3(d) and is accordingly stricken.  As the claims regarding the affiliation rules are being dismissed on ripeness grounds without prejudice, Plaintiffs may amend their complaint to include claims that have ripened since the filing of the FAC.

United States District Court
Northern District of California

1   render the case moot and judicial review completely unnecessary." *Sierra Club v. U.S. Nuclear*,

2   825 F.2d at 1362.  There is, accordingly, no final agency action as to Jamme's application for

3   forgiveness of its second-draw loan, Smithville and Deja Vu's appeals to the OHA regarding

4   forgiveness of their second draw loan, and Meacham's application for forgiveness of its second-

5   draw loan, which was remanded back to the SBA.  FAC ¶¶ 158, 215, 229, 299.

6        This leaves the three loan forgiveness applications that are, per Plaintiffs' allegations, in

7   limbo.[11]  The SBA issued FLRDs for Dallas's application for forgiveness of its second-draw loan,

8   Gold Club's application for forgiveness of its first-draw loan, and S.A.W.'s application for

9   forgiveness of its first-draw loan, because, among other reasons, the Plaintiffs' businesses

10  exceeded the size limits of the affiliation rules.  *Id.* ¶¶ 73, 128, 191-93.  All three Plaintiffs

11  appealed the FLRDs to the OHA.  The SBA then withdrew the underlying FLRDs and the OHA

12  dismissed the appeals as moot.  The SBA issued a second FLRD denying S.A.W.'s application

13  based only on the prurient business exception, which S.A.W. appealed to the OHA; again, the

14  SBA withdrew the underlying FLRD and the OHA dismissed the appeal as moot.  FAC ¶¶ 198-

15  200.  For all three applications, the SBA has not issued new FLRDs nor granted the applications

16  for forgiveness.  While the Court is sympathetic that waiting for the SBA to either issue new

17  FLRDs or approve the applications creates a great deal of financial uncertainty for the three

18  Plaintiffs, it finds that, in these cases, Plaintiffs have not alleged that there has been final agency

19  action.  Although the SBA initially issued FLRDs based on the affiliation rules, it since withdrew

20  these FLRDs and has not reissued FLRDs based on the affiliation rules.  There are no FLRDs

21  based on the affiliation rules in effect.  The SBA's decision on these applications is still pending,

22  and its decision to approve the applications or issue FLRDs not based on the affiliation rules could

23  "render the case moot and judicial review completely unnecessary." *Sierra Club v. U.S. Nuclear*,

24  825 F.2d at 1362.  Judicial review in such circumstances is improper.[12]

25  _____

26  [11] The twenty-fourth application, for forgiveness of Gold Club's second-draw loan, has been
    denied initially pursuant to an FLRD and on administrative appeal. But that denial was based on
27  the application of the prurient business exclusion, not the affiliation rules.  *See* FAC ¶ 106.

28  [12] Plaintiffs contend that this will create a never-ending cycle where the SBA issues FLRDs,
    Plaintiffs appeal them to the OHA, the SBA withdraws the underlying FLRDs, the OHA dismisses

Plaintiffs ask the Court to determine if the manner in which the SBA applied the affiliation rules and affiliation exception provision is invalid.  But, as explained above, the SBA has not finally denied a forgiveness application by applying the affiliation rules or failing to apply the affiliation exception provision.  If, as may well be the case, the SBA does not finally deny any forgiveness applications based on the affiliation rules, Plaintiffs' claims would be moot.  And if an application for loan forgiveness is denied via an FLRD and then upheld after an administrative appeal, the Court will be able to review the full record and determine if the SBA's actions were valid.  Judicial review now, when the administrative process is still ongoing and the SBA may never use the affiliation rules as a ground to ultimately deny loan forgiveness, is premature.  The Court accordingly concludes that Plaintiffs' Counts Six through Eleven (with the exception of Plaintiffs' facial challenges to the affiliation rules at Counts Nine and Eleven, discussed above) are not yet fit for judicial review.

### b.    Hardship if Review of As-Applied Challenges to the Affiliation Rules and Affiliation Exception Provision is Delayed

Next, the Court considers the hardship to Plaintiffs if it declines to review their as-applied challenge to the affiliation rules now.  Plaintiffs argue that they will suffer "the ongoing harm of being subjected to unconstitutional Special OHA Rules, biased decision-makers, Defendants' willful refusal to apply the Affiliation Exemption Provisions…and retaliatory enforcement based on animus toward Plaintiffs' protected expression" if the Court delays review of their claims regarding the affiliation rules.  ECF No. 32 at 37.  They also explain that they will suffer "economic damages in the form of exorbitant professional fees incurred as a result of 1) having to comply with SBA's incessant demands for more documentation … *and* 2) having to serially appeal FLRDs, because SBA withdraws them on specious grounds to be replaced at a later date with a new reason for denial, after having to have made payments on the loan."  *Id.* at 30.

The hardships Plaintiffs will experience if judicial review is delayed are thus primarily

_____

the appeals as moot, and the SBA then issues new FLRDs on the same grounds.  At this point, such a claim is hypothetical: where the SBA withdrew an FLRD based on the affiliation rules, it has so far issued new FLRDs based on *other grounds*, perhaps recognizing that, as Plaintiffs argue, their businesses fall under the exception provision for NAICS 72 businesses.

financial. They may have to keep paying their lawyers to appeal new FLRDs, advance their existing appeals through the OHA process, and submit paperwork in response to the SBA's post-payment reviews, and may have to begin repaying their PPP loans. But "possible financial loss" is not a cognizable hardship under the prudential ripeness doctrine. *Winter*, 900 F.2d at 1325. Nor is the "expense and annoyance" of progressing through "allegedly unconstitutional administrative proceedings." *Ticor Title Ins. Co. v. F.T.C.*, 814 F.2d 731, 752 (D.C. Cir. 1987) (citing *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)). The Court recognizes that the uncertainty of not knowing whether their loans will be forgiven may pose a hardship on Plaintiffs. *See Cnty. of Santa Clara v. Trump,* 250 F. Supp. 3d 497, 530 (N.D. Cal. 2017) ("Without clarity [about whether or not they would lose government funding] the Counties do not know whether they should start slashing essential programs or continue to spend millions of dollars and risk a financial crisis in the near future."). Plaintiffs who are subject to Post-Payment Review or are awaiting a final decision from the SBA do not know if they will have to begin repaying their loans—some of which were for over a million dollars—or can continue with business as usual.

But this hardship does not overcome the underlying deficiency of Plaintiffs' as-applied claims: they assert that the SBA has applied the affiliation rules (and failed to apply the affiliation exception provision) improperly, but, as of yet, the SBA has not used the affiliation rules as a basis to ultimately deny any Plaintiffs' applications for loan forgiveness. When or if the SBA finally denies an application for loan forgiveness based on the affiliation rules and in violation (per Plaintiffs' theory) of the affiliation exception provision, the Court will be able to assess if this action was proper. Asking the Court to do so now is premature. The Court accordingly finds that Counts Six through Eleven, except as to Plaintiffs' facial challenges to the affiliation rules, are not yet ripe for judicial review and are accordingly dismissed without prejudice. *See American Medical*, 217 F.3d at 785 (holding that dismissal on ripeness grounds should be without prejudice because, "[i]n the time since judgment was entered," these claims may have ripened).

By the same reasoning, the Court finds that the non-Gold Club Plaintiffs' claims that the prurient business exclusion violates the First and Fifth Amendments, as applied, are not yet ripe. The SBA has not taken final action in denying any of these Plaintiffs' applications based on the

1  prurient business exclusion.  The as-applied challenges at Counts One and Two are dismissed

2  without prejudice as unripe for all Plaintiffs except Gold Club.

3  **B.    Ripeness of Retaliation Claim**

4  Plaintiffs, at Count Five, allege that the SBA is applying the affiliation rules against them

5  in retaliation for presenting entertainment protected by the First Amendment and based on their

6  affiliation with the Mohneys, who backed the DV Diamond Club lawsuit against the SBA.  FAC

7  ¶¶ 651-54.  They claim that since "the DV Diamond Club action, the SBA, and in particular [SBA

8  Associate General Counsel] Benderson, has selected any business the SBA alleges to be an adult

9  entertainment business or to be affiliated with the Mohneys for additional scrutiny on any

10  pandemic related funding."  *Id.* ¶ 655.  Such retaliation, they claim, violates the First Amendment.

11  *Id.*

12  The First Amendment "prohibits government officials from subjecting an individual to

13  retaliatory actions for engaging in protected speech."  *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)

14  (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006))..  That is, a claimant may bring a First

15  Amendment retaliation claim against the government when the claimant exercises their First

16  Amendment rights and then the government exercises an "ostensibly neutral power" against them

17  "in retaliation for the [exercise of their] First Amendment Rights."  Smolla & Nimmer on

18  Freedom of Speech § 3:14.  "Claims that government officials subjected an individual to

19  retaliatory action are not limited to a particular context.  They have been raised by government

20  employees, government contractors, students, prisoners, business licensees, and citizens targeted

21  by law enforcement for their political activities, among others."  *Boquist v. Courtney*, 32 F.4th

22  764, 774 (9th Cir. 2022).  To state a claim for First Amendment retaliation, a claimant must plead

23  that:

24  (1) he engaged in constitutionally protected activity; (2) as a result,
he was subjected to adverse action by the defendant that would chill
25  a person of ordinary firmness from continuing to engage in the
protected activity; and (3) there was a substantial causal relationship
26  between the constitutionally protected activity and the adverse action.

27  *Id.* at 775; *see Koala v. Kosla*, 931 F.3d 887, 905 (9th Cir. 2019).

28  Plaintiffs allege that they engaged in constitutionally protected activity by presenting adult

34

1    entertainment and by associating with businesses that sued the SBA in the DV Diamond Club

2    Action.  FAC ¶¶ 653-54.  Per Plaintiffs, the SBA took adverse action against Plaintiffs because of

3    their engagement in these protected activities, subjecting Plaintiffs to "additional scrutiny" and

4    "looking for ways to deny Plaintiffs…pandemic aid funding[,]…to claw back any pandemic aid

5    funding the Plaintiffs received, or to simply run up the entities['] costs associated with obtaining

6    loan forgiveness."  *Id.* ¶ 655.  Plaintiffs allege that one of the ways Defendants retaliated against

7    them was finding that "Plaintiffs were not entitled to PPP loan forgiveness based on SBA's failure

8    to apply the Affiliation Exception Provisions to these Plaintiffs."  *Id.* ¶ 655(b).

9         As discussed above, as alleged in the FAC, although the SBA issued FLRDs to certain

10   Plaintiffs based on the affiliation rules, it has since withdrawn all of those FLRDs and has not yet

11   issued new ones based on the affiliation rules.  To the extent that Plaintiffs claim that Defendants

12   retaliated against them by denying their loan forgiveness applications based on the affiliation rules

13   (and, by corollary, by not applying the affiliation exception provision), such claims are unripe as

14   Defendants have not yet done so.  To the extent that Plaintiffs claim that Defendants retaliated

15   against them by subjecting them to "additional scrutiny" and "looking for ways to deny Plaintiffs"

16   pandemic aid funding, these allegedly adverse actions are not "final" and "further factual

17   development" is required.  *Id.* ¶ 655; *US West Commc'ns*, 193 F.3d at 1118.  The Court is ill-

18   positioned to evaluate whether Defendants' ongoing review of Plaintiffs' loan applications is

19   retaliatory.  And as discussed above, Plaintiffs have not alleged that they would suffer a

20   cognizable hardship if judicial review of their retaliation claim was delayed.  Plaintiffs' Count

21   Five is dismissed without prejudice.[13]

22        **C.    Ripeness of Special OHA Rules Claims**

23        Plaintiffs allege that the Special OHA Rules violate the Fifth Amendment facially and as

24   applied to Plaintiffs (Count Twelve) and are invalid under the APA (Count Thirteen).  FAC

25   ¶¶ 694-704.  Among other things, these "Special OHA Rules" require appellants to file their

26

27   ──────────────

28   [13] Defendants separately argue that Plaintiffs' claim that Defendants are applying prurient business
     exclusion against them in retaliation for exercising their First Amendment rights must be
     dismissed under Rule 12(b)(6).  ECF No. 28 at 45-46.  This argument is discussed below.

United States District Court
Northern District of California

administrative appeal before the SBA has filed the administrative record, do not permit discovery or oral hearings, provide limited time for appellants to review (typically voluminous) administrative records, and permit ALJs outside of the SBA and attorneys who are not ALJs to adjudicate administrative appeals. *See* FAC ¶¶ 404-410. Defendants argue that Plaintiffs' claims regarding the Special OHA Rules are not yet ripe as to the non-Gold Club Plaintiffs, as several of these Plaintiffs have ongoing proceedings in front of the OHA. ECF No. 28 at 35-36.

Defendants' argument is unavailing as to Plaintiffs' facial challenges to the Special OHA Rules. The Special OHA Rules, at 13 C.F.R. §§ 134.1201-1214, have been issued and are a "definitive statement of" the SBA's position. *American Medical*, 217 F.3d at 780. The Court's analysis of whether these rules, as promulgated, violate the procedural due process guarantees of the Fifth Amendment or violate the APA does not depend on ongoing administrative action or require further factual development. *See US West Commc'ns*, 193 F.3d at 1118. Defendants argue that, as exactly what process is due "is a function of context," Plaintiffs' due process claim cannot be considered "in the abstract." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998); ECF No. 28 at 35-36. While the flexible and context-specific nature of the due process analysis may make it difficult for Plaintiffs to *prevail* on their facial challenge to the constitutionally of the Special OHA rules by showing that "no set of circumstances exists under which" the OHA's procedures "would be valid," this does not render their facial challenge unripe. *William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 ex rel. Orange Cnty.*, 695 F.3d 960, 963 (9th Cir. 2012) (analyzing plaintiff's facial procedural due process challenge). And it has no bearing on the fitness for review of Plaintiffs' claim that the Special OHA Rules are, as written, invalid under the APA. The Court accordingly finds that Plaintiffs' challenge to the facial constitutionality of the Special OHA Rules at Counts Twelve and Thirteen are fit for review.[14]

---

[14] At Count Thirteen, Plaintiffs claim that the Special OHA Rules:

    a. Fail to serve any lawful or legitimate regulatory purpose for the SBA or the Administrator as to first and second Draw PPP loans or otherwise;

    b. For the reasons set forth in the previous Count, they are contrary to constitutional rights and privileges;

    c. For the reasons set forth in the previous Count, they fail to provide adequate procedure; and

As to Plaintiffs' claims that the special OHA rules, as applied, violate the APA and the Fifth Amendment, the Court finds that Plaintiffs Dallas, Meacham, S.A.W., and Gold Club's claims[15] are fit for judicial review.  Dallas, Meacham, and S.A.W. received FLRDs, appealed their FLDRs to the OHA, and the OHA either dismissed or remanded their administrative appeals.  While the SBA has not issued a final decision on their forgiveness applications, these Plaintiffs have completed at least one round of the administrative appeals process.  Whether or not the process they underwent is constitutional or valid under the APA does not require further factual development or depend on future contingent events.  *See Sierra Club v. U.S. Nuclear*, 825 F.2d at 1362.  As the Court has determined these claims are fit for review, it need not assess these Plaintiffs' argument regarding hardship.  *Pub. Serv. Elec. & Gas Co. v. FERC*, 485 F.3d 1164, 1168 (D.C. Cir. 2007).

The remainder of the Plaintiffs' as-applied claims regarding the Special OHA Rules are not yet ripe.  As alleged in the FAC, Plaintiffs Reeder, Office, Cats Meow, Cats NOLA, Pole Position, Jamme, 90s, Bistro, and Stockton have not received FLRDs and thus have not yet had an occasion to file administrative appeals with the OHA.  It is premature for the Court to analyze how the Special OHA Rules will, or may, be applied to these Plaintiffs.  *See Thomas v. City of New York*, 143 F.3d 31, 35 (2d Cir. 1998) (explaining that procedural due process claims are "best considered in the context of a specific factual setting").  Plaintiffs Smithville and Deja Vu have received FLRDs and are in the process of appealing these decisions to the OHA.  While the Court could weigh in now and address how the Special OHA Rules have been applied to Smithville and Deja Vu thus far, given the ongoing nature of the administrative proceedings, the Court declines to do so.  *See US West Commc'ns*, 193 F.3d at 1118.  These claims are accordingly not yet fit for

---

> d.  The SBA and/or the Administrator failed to make a sufficient record, or to otherwise articulate a satisfactory explanation, as to why the Special OHA Rules are a rational or reasonable response to a problem that the agency was charge with solving…

FAC ¶ 701. The Court construes subparts (b) and (c) as reiterating Count Twelve's claims that the OHA Rules, as applied to Plaintiffs, violate the Fifth Amendment and finds these subparts not fit for review except as to Gold Club, Dallas, Meacham, and S.A.W.  This Count is otherwise fit for review.

[15] Defendants do not contend that Gold Club's challenges to the Special OHA Rules are unripe. ECF No. 18 at 35.

1    review.  As discussed above, the hardship these Plaintiffs will experience if judicial review is

2    delayed is primarily the "expense and annoyance" of progressing through "allegedly

3    unconstitutional administrative proceedings."  *Ticor*, 814 F.2d at 752.  This is insufficient to

4    warrant judicial review now.  The Court accordingly finds that Plaintiffs' facial challenges to the

5    Special OHA Rules are ripe, as are Plaintiffs Dallas, Meacham, S.A.W., and Gold Club's as-

6    applied challenges to the Special OHA Rules.  Plaintiffs' claims at Counts Twelve and Thirteen

7    are otherwise dismissed without prejudice on ripeness grounds.

8                    **D.        Ripeness of Claim Challenging Injunction Provision**

9            The SBA Act provides that the SBA Administrator may "sue and be sued in any court of

10   record of a State having general jurisdiction, or in any United States district court" in "the

11   performance of, and with respect to, the functions, powers, and duties vested in him by this

12   chapter," except that "no attachment, injunction, garnishment, or other similar process, mesne or

13   final, shall be issued against the [SBA] Administrator or his property."  15 U.S.C. § 634(b).

14   Plaintiffs claim that the provision of Section 634(b)(1) prohibiting injunctions (the "Injunction

15   Provision") is unconstitutional.  FAC ¶¶ 720-26.  Specifically, Plaintiffs contend that interpreting

16   the Injunction Provision as "an absolute bar to the issuance of any injunction" would violate the

17   First and Fifth Amendments.  *Id.* ¶ 723.  As Plaintiffs recognize, "the majority of courts have held

18   that the Injunction Provision does not operate as an absolute bar to the issuance of injunctive relief

19   against the SBA."  *Id.* ¶ 722.  Although the Ninth Circuit has not addressed whether the Injunction

20   Provision is a complete bar, district courts within the Circuit have held that it is not.  *See Alaska*

21   *Urological Inst., P.C. v. U.S. Small Bus. Admin.*, 619 B.R. 689, 700 (D. Alaska 2020) ("The Court

22   adopts the view that § 634(b)(1) does not shield the SBA from injunctive relief where the agency

23   has exceeded its agency authority,"); *Dubrow v. Small Business Administration*, 345 F. Supp. 4, 7

24   (C.D. Cal. 1972) ("It should be clear, however, that when the Administrator acts beyond the scope

25   of his authority 15 U.S.C. § 634(b) does not preclude injunctive action."); *Wells v. Pilkerton*, No.

26   19-cv-00407, 2020 WL 13179549, at *6 (D. Nev. Mar. 19, 2020) (same).

27           Defendants argue that Plaintiffs' "challenge to § 634(b)(1) is not ripe, because 'the

28   existence of the dispute itself hangs on future contingencies that may or may not occur.'"  ECF

                                          38

No. 28 at 49 (quoting *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996)).  That is, Plaintiffs do not "face a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Thomas*, 220 F.3d at 1139 (quotation marks omitted).

Courts "may only 'pass upon the constitutionality of acts of Congress ... when the interests of litigants require the use of this judicial authority for their protection against *actual* interference.'" *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1086 (9th Cir. 2022) (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 89-90 (1947)).  "[T]he mere 'existence of a law' absent any threat of interference is not sufficient for ripeness.  Nor does the possibility of some future unconstitutional application of [a law] entitle Plaintiffs to dispositive judgments on the provision's constitutionality." *Id.* at 1086-87 (citations omitted) (quoting *Mitchell*, 330 U.S. at 91).

Plaintiffs claim that, as "a direct and proximate result of the unconstitutional nature of the Injunction Provision, [they]…have suffered, and/or will suffer, and/or will continue to suffer irreparable injuries including but not limited to financial collapse, business ruination, and/or the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment." FAC ¶ 724.  But Plaintiffs do not allege that they have been denied an injunction on the basis of the Injunction Provision.  Their injury is, at this point, entirely hypothetical.  For the provision to harm them, Plaintiffs would have to file a motion for injunctive relief or prevail in this action.  The Court would have to find their request for injunctive relief otherwise appropriate, but that it was barred from granting such relief because of the Injunction Provision.  Because Plaintiffs' "future injury [is] purely conjectural" at this time, their challenge to the Injunction Provision is not yet ripe. *Clinton v. City of New York*, 524 U.S. 417, 431 n.16 (1998).  This claim is accordingly dismissed without prejudice.

### E.    Ripeness of Estoppel Claims

At Count Fourteen, Plaintiffs assert an estoppel cause of action against Defendants.  FAC ¶¶ 705-15.  They allege that the SBA represented that if PPP borrowers, including Plaintiffs, "retained their employees" and used loan proceeds for permitted purposes, such as payroll costs, rent, and utilities, their loans would be forgiven.  FAC ¶ 706.  Plaintiffs allege that, relying on

these representations, they obtained PPP loans and used their loans for the permitted purposes. *Id.* ¶¶ 706-14. Defendants argue that only Gold Club's estoppel claim is ripe, as no other Plaintiff has received a final determination that they were not eligible for PPP loans or had their forgiveness application denied. ECF No. 28 at 36.

An estoppel claim against the government "must show both (1) 'affirmative misconduct' on the part of the government and (2) that 'the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage.'" *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 767 F.3d 912, 928 (9th Cir. 2014) (quoting *United States v. Hatcher*, 922 F.2d 1402, 1409 n.12 (9th Cir. 1991)). Plaintiffs claim that the SBA engaged in affirmative misconduct by representing that PPP loans would be forgiven if the loans were used for proper purposes and concealing that loans would not be forgiven if the SBA later determined that borrowers were ineligible. *See* FAC ¶¶ 706, 710-11. Defendants contend that because Plaintiffs' alleged "serious injustice"—denial of the loan forgiveness applications—has not yet occurred (and, indeed, may never occur), the non-Gold Club Plaintiffs claims are not yet ripe. *See* ECF No. 28 at 36. The Court agrees. Whether the Plaintiffs other than Gold Club will suffer "a serious injustice" by having their loan forgiveness applications denied depends on whether the SBA will ultimately deny their applications. It is premature for the Court to hear this claim, as the predicate act—the SBA denying the non-Gold Club Plaintiffs' forgiveness applications—has not yet occurred. This claim is accordingly not yet fit for review. As discussed in the context of the ripeness of the affiliation claims, while the uncertainty regarding the status of their applications poses a cognizable hardship, it is not enough for the Court to review Plaintiffs' inchoate estoppel claims. The Court finds that only Gold Club's estoppel claim is ripe. All others are dismissed without prejudice.

### F.    Ripeness of Prurient Business Exclusion Claims

As discussed above, the prurient business exclusion at 13 C.F.R. § 120.110(p) (which Plaintiffs refer to as the "Prurience Regulation"), provides that businesses that "[p]resent live performances of a prurient sexual nature" or "[d]erive … more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a

prurient sexual nature" are ineligible for Section 7(a) loans.  *See* FAC ¶ 464.  The SBA applied the prurient business exclusion to first-draw PPP loans.  *See* 85 Fed. Reg. 20,812 ("Businesses that are not eligible for PPP loans are identified in 13 C.F.R. 120.110 and described further in SBA's Standard Operating Procedure…except that nonprofit organizations authorized under the Act are eligible.").  The prurient business exclusion applied to second-draw PPP loans through the Incorporating Statute.  *See* 15 U.S.C. § 636(a)(37)(A)(iv)(III) (establishing that "any entity that is a type or business concern (or would be, if such entity were a business concern) described in section 120.110 of title 13 Code of Federal Regulations…other than a business concern described in subsection (a) [nonprofits] or (k) [reserved] of such section" were not eligible for second-draw loans).

At Count Three, Plaintiffs claim that the SBA's interpretation of the "Prurience Regulation" and the "Incorporating Statute" are invalid and that the SBA's "defining of 'prurient' as 'lustful,' 'lascivious,' an 'overt strong sexual interest,' 'erotic' and/or 'arousing of strong sexual interest or desire' under the Prurience Regulation is not a legitimate exercise of the SBA's or its Administrator's authority."  FAC ¶ 641.  Plaintiffs further claim that, as applied by the SBA, the "Prurience Regulation and the Incorporating Statute are inconsistent with the SBA Act, as well as the broad form of relief provided by the CARES Act and the Appropriations Act."  *Id.* ¶ 642.  At Count Four, Plaintiffs claim that the "Prurience Regulation" is otherwise "not a legitimate or lawful exercise of the SBA's…authority as applied to first and second draw PPP loans."  *Id.* ¶ 646.

Defendants argue that the part of Count Three regarding the regulatory invalidity of the prurient business exclusion and the entirety of Count Four should be dismissed on ripeness grounds because the SBA has not yet made "a final determination denying any Plaintiff [loan] forgiveness based on the application of the prurient business exclusion to first-draw loans."  ECF No. 28 at 35.  They contend that these claims are not ripe because "[w]hether or not SBA validly promulgated and incorporated the prurient business exclusion into the first-draw program is immaterial to the validity of *Congress's* decision to do so for the second-draw program."  *Id.*

But the Court does not read Plaintiffs' Count Three as challenging whether the "SBA validly incorporated the prurient business exclusion into the first-draw loan program."  *Id.*

41

1    Instead, Plaintiffs challenge how the word "prurient" is defined under the Prurience Regulation at

2    13 C.F.R. 120.110(p) and claim that 13 C.F.R. 120.110(p) is not a legitimate exercise of the

3    SBA's authority as applied to the first- and second-draw PPP loans.  FAC ¶¶ 641-42, 646-47.  13

4    C.F.R. § 120.110(p), is a "definitive statement" of the SBA's position that certain businesses are

5    not eligible for Section 7(a) loans and is the end result of the SBA's decision-making process.

6    *American Medical*, 217 F.3d at 780.  To the extent Count Three is challenging the overall validity

7    of 13 C.F.R. § 120.110(p), this claim is fit for review.  Similarly, Gold Club's claim that the

8    SBA's definition of "prurient" is not lawful is fit for review, as the SBA has finally denied Gold

9    Club's application for forgiveness based on its interpretation of 13 C.F.R. § 120.110(p).  At Count

10   Four, Plaintiffs contend that 13 C.F.R. § 120.110(p) "is not a legitimate or lawful exercise of the

11   SBA's or the Administrator's authority as applied to first and second draw loans, and is otherwise

12   invalid under the [APA]."  FAC ¶ 646.  If Plaintiffs are contending that the fact that the SBA

13   incorporated the eligibility provisions at 13 C.F.R. § 120.110(p) into first-draw loans was

14   illegitimate and unlawful, this claim is fit for review.  The April 2020 IFR, which applied the

15   prurient business exclusion to first-draw loans, is a definitive statement of the SBA's position.  85

16   Fed. Reg. 20,812.  However, to the extent that Plaintiffs allege that the SBA has "used" 13 C.F.R.

17   § 120.110(p) to engage in unreasoned decision-making or deny Plaintiffs' forgiveness

18   applications, only Gold Club's claim is ripe.  FAC ¶¶ 646-47.  As with the affiliation claims, there

19   is no final action where a Plaintiff's application is undergoing post-payment review, where an

20   administrative appeal is pending, or where the SBA has not issued an FLRD, and claims regarding

21   these inchoate administrative procedures are not fit for judicial review.  The non-Gold Club

22   Plaintiffs have not alleged that the hardship they would experience if judicial review was delayed

23   is of the kind or severity that necessitates immediate judicial review.

24        Plaintiffs may file a Second Amended Complaint consistent with these determinations.

25   **V.    JUDICIAL REVIEW UNDER THE APA**

26        Defendants argue that "Plaintiffs' APA claims challenging the application of SBA's

27   affiliation rules," at Counts Seven, Eight, Ten, and Eleven, and Plaintiffs' APA challenges

28   concerning "the manner in which SBA interpreted and applied the prurient business exclusion to

United States District Court
Northern District of California

Plaintiffs," at Counts Three and Four, must be dismissed because "they do not challenge a final agency action." ECF No. 28 at 32, 35 n.11. In their reply brief, Defendants clarify that Plaintiffs' claims regarding the constitutionality of the application of the affiliation rules and affiliation exception provision similarly must be dismissed because they do not challenge final agency action. ECF No. 33 at 12-13.[16] Plaintiffs argue at length that the Court must hear its claims because they have exhausted their administrative remedies (*see* ECF No. 32 at 21-34), but "the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality" at issue here. *Darby v. Cisneros*, 509 U.S. 137, 144 (1993).

The Court resolves these arguments by first explaining the requirements for judicial review of APA claims pursuant to 5 U.S.C. § 704. Then, the Court determines whether these requirements are satisfied by addressing the claims that are appropriately treated as facial challenges, followed by those claims that are as-applied challenges.

### A. Legal Standard

"Judicial review of the actions of the Small Business Administration is governed by the Administrative Procedure Act." *Jet Inv., Inc. v. Dep't of Army*, 84 F.3d 1137, 1139 (9th Cir. 1996). The APA provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act … shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. The APA requires courts to, among other things, "hold unlawful and set aside agency action, findings, and conclusions found to be—(A)

---

[16] Defendants may also be arguing that Plaintiffs' claims regarding the constitutionality of the application of the prurient business exclusion do not challenge final agency action. *See* ECF No. 33 at 12 ("Constitutional claims, like the ones that plaintiffs make with respect to 13 C.F.R. § 120.110(p), are reviewable under the APA."). The Court evaluates these claims as well.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law [or] (B)

2    contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).

3        "To maintain a cause of action under the APA, a plaintiff must challenge agency action

4    that is final." *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (quotation

5    marks omitted). "The APA defines reviewable 'agency action' to include 'the whole or part of an

6    agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'"

7    *Wild Fish Conservancy*, 730 F.3d at 800 (quoting 5 U.S.C. § 551(13)). Although this definition is

8    "expansive," it does not encompass "everything done by an administrative agency." *Id.* at 800-01.

9    For an agency action to be "final," it must" mark the "consummation of the agency's

10   decisionmaking process," rather than be "of merely tentative or interlocutory nature," and must be

11   one "by which rights or obligations have been determined, or from which legal consequences will

12   flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). "The core question

13   is whether the agency has completed its decisionmaking process, and whether the result of that

14   process is one that will directly affect the parties." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,

15   465 F.3d 977, 982 (9th Cir. 2006) (quotation marks omitted). In the Ninth Circuit, "the final

16   agency action requirement has been treated as jurisdictional." *San Francisco Herring Ass'n v.*

17   *Dep't of the Interior*, 946 F.3d 564, 571 (9th Cir. 2019).

18       "In an action brought under the APA, questions of ripeness and final agency action are

19   interrelated," and analysis of whether there has been final agency action often dovetails with

20   analysis of whether a claim is fit for judicial review. *Oakley v. Devos*, No. 20-cv-03215, 2020 WL

21   3268661, at *5 (N.D. Cal. June 17, 2020) (citing *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d

22   660, 668 (9th Cir. 1998)); *see Abbott Laboratories*, 387 U.S. at 149-51 (evaluating the finality of

23   agency action in determining whether claim was fit for judicial review); *American Medical*, 217

24   F.3d at 780 ("Under the first prong [of the prudential ripeness analysis], agency action is fit for

25   review if the issues presented are purely legal and the regulation at issue is a final agency

26   action.").

27       **B.    Analysis**

28       At Counts One through Thirteen, Plaintiffs seek judicial review of the SBA's actions

44

pursuant to Section 702 of the APA.  FAC ¶¶ 633, 639, 644, 649, 660, 666, 671, 676, 683, 688, 693, 704.[17]  For judicial review of these claims to be proper under the APA, Plaintiffs must challenge a final agency action or the claims must otherwise be reviewable by statute.  *Wild Fish Conservancy*, 730 F.3d at 800.

### 1.    Facial Challenges

To the extent Plaintiffs challenge the prurient business exclusion, affiliation rules, and Special OHA rules on their face, the Court holds that these claims challenge final agency action.  (Defendants do not argue otherwise.)  The regulations consist of "agency action" in that they are "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  The regulations are final in that they are not "of a merely tentative or interlocutory nature" but are rather a "definitive statement" of the SBA's positions.  *Bennett*, 520 U.S. at 178; *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quotation marks omitted).  The regulations have been promulgated and "directly affect" the parties.  *Oregon Nat. Desert Ass'n*, 465 F.3d at 982.  The Court accordingly may review these facial challenges under the APA.

### 2.    As-Applied Challenges

The Court next assesses if Plaintiffs' as-applied challenges to the prurient business exclusion, affiliation rules and affiliation exception provision, and Special OHA rules challenge final agency action.

### a.    Prurient Business Exclusion

Plaintiffs claim, inter alia, that the prurience business exclusion violates the First and Fifth Amendments and is "inconsistent with the SBA Act," "as applied by the SBA to Plaintiffs."  FAC ¶¶ 629, 635, 642, 647.  As discussed in the context of prudential ripeness, as of the filing of the FAC, only Gold Club had received a final denial of its loan forgiveness application (the "May 14

---

[17] Although Defendants only argue that Plaintiffs' as-applied claims at Counts Three, Four, Seven, Eight, Ten, and Eleven do not challenge final agency action in their motion, as the final agency action requirement is a jurisdictional prerequisite in the Ninth Circuit, the Court addresses Plaintiffs' Counts One, Two, Five, Six, Nine, Twelve, and Thirteen sua sponte.  ECF No. 28 at 32, 35 n.11*; see San Francisco Herring*, 946 F.3d at 571.

1  Order") following administrative appeal based on the prurient business exclusion. *See id.* ¶¶ 105-

2  06. Defendants do not dispute that the May 14 Order is a final agency action and properly subject

3  to judicial review. *Id.* ¶¶ 106, 11; *see* 13 C.F.R. § 134.1211(g) (providing that final decisions by

4  the OHA "may be appealed to the appropriate Federal district court only").

5           The Court holds that the non-Gold Club Plaintiffs have not challenged final agency action.

6  The other Plaintiffs—some of whom who are subject to ongoing Post-Payment Reviews based on

7  the prurient business exclusion, who received FLRDs based on the prurient business exclusion that

8  have since been withdrawn, whose administrative appeals of the FLRDs, or whose loan

9  forgiveness applications are still pending in front of the SBA—object to the SBA's ongoing

10  application of the prurient business exclusion.[18]  These unresolved or otherwise "pending

11  administrative proceedings" are the antithesis to "consummation of the" SBA's "decisionmaking

12  process" regarding the non-Gold Club Plaintiffs' loan forgiveness applications. *U.S. Nuclear*, 825

13  F.2d at 1362 (9th Cir. 1987); *Bennett*, 520 U.S. at 178; *see City of San Diego v. Whitman*, 242

14  F.3d 1097, 1101 (9th Cir. 2001) (holding, in the context of assessing if there had been final agency

15  action, that "[u]ntil the administrative appeal process is complete, judicial review is premature").

16  The FAC does not concretely allege that these Plaintiffs face obligations to repay their loans or

17  other "legal consequences" while the administrative process is in flux. *Bennett*, 530 U.S. at 178;

18  *see* 13 C.F.R. § 134.1202(d) (establishing that a pending, timely "appeal by a PPP borrower of a

19  final SBA loan review decision extends the deferment period of the PPP loan until a final decision

20  is issued"). How or if the SBA will ultimately apply the exclusion to these Plaintiffs remains to be

21  seen. *See Lujan*, 497 U.S. at 891 (requiring "concrete action applying the regulation to the

22  claimant's situation" for an agency action to be final). The Court accordingly holds that only Gold

23  Club's as-applied challenge to the prurient business exclusion challenge a final agency action.

24           **b.       Affiliation Rules and Affiliation Exception Provision**

25           No Plaintiff has received a final decision following an appeal to the OHA that their

26

27  ───────────────
[18] A detailed recitation of the status of each Plaintiffs' loan forgiveness application at the time the

28  FAC was filed is provided earlier in this order in Part IV(A)(2)(a) (discussion of the prudential
ripeness of Plaintiffs' as-applied challenges to the affiliation rules).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    application for loan forgiveness is denied because of the affiliation rules. As detailed in the

2    discussion of prudential ripeness, some Plaintiffs have been subject to no scrutiny based on the

3    affiliation rules, some are undergoing Post-Payment Review, some have ongoing appeals in front

4    of the OHA, and others received FLRDs based on the affiliation rules that have since been

5    withdrawn. As was the case with the non-Gold Club Plaintiffs' as-applied challenges to the

6    prurient business exclusion, to the extent that Plaintiffs are challenging that the manner in which

7    the SBA is applying the affiliation rules—and failing to apply the affiliation exception provision—

8    as unconstitutional and in violation of the APA, Plaintiffs have not identified a final agency action

9    that is properly subject to judicial review. *See Whitman*, 242 F.3d at 1101 ("Until the

10   administrative appeal process is complete, judicial review is premature."); *U.S. Nuclear*, 825 F.2d

11   at 1362 ("We will not entertain a petition where pending administrative proceedings or further

12   agency action might render the case moot and judicial review completely unnecessary."); *Acura of*

13   *Bellevue v. Reich*, 90 F.3d 1403, 1408 (9th Cir. 1996) (holding that an agency's "interim

14   determination," subject to review by an ALJ, was not "the final administrative work" whether the

15   agency had "the opportunity and authority to consider, change, and eventually finalize its

16   position" as to the specific determination"). The Court accordingly holds that Plaintiffs' as-

17   applied challenges to the affiliation rules and affiliation exception provisions are not appropriate

18   for judicial review under the APA.

19                                   **c.    Special OHA Rules**

20            At Count Twelve and Thirteen, Plaintiffs assert, inter alia, that the Special OHA Rules

21   violate the Fifth Amendment and the APA as applied by the SBA to Plaintiffs. FAC ¶¶ 695, 701.

22   Gold Club proceeded through the administrative appeals process, was subject to the Special OHA

23   Rules, and ultimately received a final, judicially reviewable denial of its second-draw loan

24   forgiveness application from the OHA. See FAC ¶¶ 105-10; see 13 C.F.R. § 134.1211. While its

25   denial is a final agency action, as discussed above, how the OHA applied the Special OHA Rules

26   to Gold Club is not a "whole or part of an agency rule, order, license, sanction, relief, or the

27   equivalent or denial thereof." 5 U.S.C. § 551(13); *see Norton v. Southern Utah Wilderness*

28   *Alliance*, 542 U.S. 55, 62 (2004) (explaining that 5 U.S.C. § 551(13)'s "categories involve

circumscribed, discrete agency actions," such as "an agency statement of ... future effect designed to implement, interpret, or prescribe law or policy (rule); "a final disposition ... in a matter other than rule making (order); a permit ... or other form of permission (license); a prohibition ... or ... taking [of] other compulsory or restrictive action (sanction); or a "grant of money, assistance, license, authority, etc., or recognition of a claim, right, immunity…(relief)") (quotations omitted). Nevertheless, the preliminary, procedural actions by the SBA applying the Special OHA Rules to Gold Club are reviewable under the APA in conjunction with "review of the final agency action," that is, the ultimate denial of its second-draw loan forgiveness application.  *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.")  Non-Gold Club Plaintiffs, however, that have not had a final determination by SBA have not established a predicate final agency action to support their as-applied challenge to the Special OHA Rules.  Accordingly, other than Gold Club, all other Plaintiffs' as-applied challenges are dismissed without prejudice.

## VI.    FIRST AMENDMENT

Plaintiffs allege that the prurient business exclusion and incorporating statute violate the First Amendment facially and as applied to Plaintiffs.  FAC ¶¶ 628-29.  Defendants bring several arguments that Plaintiffs' First Amendment claims are not cognizable.  At the outset, Defendants argue that the exclusion of prurient businesses from the PPP is not a content or view-point based regulation of speech, but rather a limit on the provision of a government subsidy.  Defendants further argue that the prurient business exclusion is not a prior restraint on speech, and given that it does not infringe on a First Amendment protected interest, it need only satisfy rational basis review.  Defendants dispute that the exclusion is unconstitutionally vague and that it has been applied in a retaliatory manner.

### A.    Permissible Government Subsidy

While Plaintiffs contend that the prurient business exclusion violates the First Amendment "for numerous and various reasons," the heart of their argument is that the prurient business exclusion is a content-based government regulation of protected speech.  *Id.* ¶ 662.  The government may only regulate content-based laws when the regulation is narrowly tailored to

serve a compelling government interest. Plaintiffs argue that the prurient business exclusion and incorporating statute is not narrowly tailored as required. Defendants argue that Plaintiffs improperly assume that the PPP's prurient business exclusion is a regulation of speech, when it is in fact a permissible content-based limit on a government subsidy. For the foregoing reasons, the Court agrees with Defendants and holds that the prurient business exclusion is not regulation of speech.

### 1.    Legal Framework

The First Amendment prohibits Congress from enacting laws that abridge "the freedom of speech." U.S. Const., amdt. I. The government generally may not "restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[19] *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

Although content-based laws are presumptively unconstitutional, "[t]he Spending Clause of the Federal Constitution … provides Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities. That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 213 (2013) (quotation marks omitted). The "Supreme Court has repeatedly drawn a line between government regulation of speech, on one hand, and government subsidy of speech, on the other." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 646 (7th Cir. 2022). "[I]t is well established that the government can make content-based distinctions when it subsidizes speech" even where it could not make such distinctions when it regulates speech. *Davenport*, 551 U.S. at 188–89; *see Regan v. Tax'n With Representation of Washington*, 461 U.S.

---

[19] That being said, there are categories of speech, such as defamatory or obscene speech, that "can be constitutionally proscribed because the social interest in order and morality outweighs the negligible contribution of those categories of speech to the marketplace of ideas." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188 (2007).

United States District Court
Northern District of California

540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.").

The line between the government choosing whether to subsidize certain forms of speech and regulating speech is a fuzzy one. In *Perry v. Sindermann*, the Supreme Court held that, even though a person may not have an absolute right to a government benefit and "even though the government may deny him the benefit for any number of reasons," the government:

> [M]ay not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

408 U.S. 593, 597 (1972). *Perry* articulates the "unconstitutional conditions doctrine[:]" the government may not condition the receipt of government benefits "upon a recipient's agreement to refrain from exercising her constitutional rights." *Camelot*, 24 F.4th at 649 (citing *Speiser v. Randall*, 357 U.S. 513, 515 (1958)). Allowing the government to deny a benefit to someone based on their constitutionally protected speech would allow the government to "produce a result" that it "could not command directly" through laws outright prohibiting such speech. *Perry*, 408 U.S. at 597 (quotations omitted). The "constitutionality of government programs that subsidize[] speech … implicate a notoriously tricky question of constitutional law." *Matal v. Tam*, 582 U.S. 218, 239–40 (2017). On the one hand, "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit. But at the same time, government is not required to subsidize activities that it does not wish to promote." *Id.* (quotation marks and citation omitted).

### 2.    Analysis

The PPP, as discussed above, provided loans to eligible small businesses to help them weather the COVID-19 pandemic. Congress's decision to exclude certain types of businesses from second-draw PPP loans, Defendants argue, "does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it." ECF No. 28 at 38. Plaintiffs recognize that the government "is under no obligation to subsidize speech," but argue that, under

50

*Perry*, "it may not deny a benefit on a basis of a person's exercise of First Amendment Rights." ECF No. 32 at 40.  Plaintiffs correctly identify that adult entertainment offered at strip clubs is "expressive conduct" protected by the First Amendment, if "only marginally so."  *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991).  By excluding businesses that present prurient entertainment from receiving PPP loan forgiveness, Plaintiffs contend, the government is penalizing and inhibiting their right to present protected entertainment.  ECF No. 32 at 41; *see Perry*, 408 U.S. at 597.

The "relevant distinction" between a permissible selective subsidy and unconstitutional condition is "between conditions that define the limits of the government spending program— those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself."  *Alliance for Open Society,* 570 U.S. at 214-15.  "The line is hardly clear, in part because the definition of a particular program can always be manipulated to subsume the challenged condition."  *Id.* at 215.

*Alliance for Open Society* addresses the constitutionality of a provision of the Leadership Act, which provided funding to organizations combatting HIV/AIDS.  The Leadership Act imposed "two related conditions on that funding: First, no funds made available by the Act may be used to promote or advocate the legalization or practice of prostitution or sex trafficking … And second, no funds may be used by an organization that does not have a policy explicitly opposing prostitution and sex trafficking."  *Id.* at 208 (quotation marks omitted).  The constitutionality of the first condition was not challenged.  The second condition (referred to as the Policy Requirement) was. The Supreme Court held that the Policy Requirement violated the First Amendment:

> To begin, it is important to recall that the Leadership Act has two conditions relevant here. The first—unchallenged in this litigation— prohibits Leadership Act funds from being used "to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U.S.C. § 7631 (e). The Government concedes that § 7631(e) by itself ensures that federal funds will not be used for the prohibited purposes...

> The Policy Requirement therefore must be doing something more— and it is. The dissent views the Requirement as simply a selection criterion by which the Government identifies organizations "who

believe in its ideas to carry them to fruition." *Post,* at 2332. As an initial matter, whatever purpose the Policy Requirement serves in selecting funding recipients, its effects go beyond selection. The Policy Requirement is an ongoing condition on recipients' speech and activities, a ground for terminating a grant after selection is complete. … This case is not about the Government's ability to enlist the assistance of those with whom it already agrees. It is about compelling a grant recipient to adopt a particular belief as a condition of funding.

By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects "protected conduct outside the scope of the federally funded program." *Rust,* 500 U.S., at 197 … By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient.

*Id.* at 217-19.  Unlike the unconstitutional Policy Requirement in *Alliance for Open Society*, the exclusion of businesses that present live entertainment of a prurient nature does not require any business to adopt or "espouse a specific belief as its own" to receive funding.  *Id.* at 219; *see also Speiser*, 357 U.S. at 529 (holding a requirement that applicants subscribe to an oath of loyalty in order to qualify for a veterans' property-tax exemption unconstitutional).  It merely sets limits in "selecting funding recipients." *Alliance for Open Society*, 570 U.S. at 218.  "[B]y limiting eligibility for PPP funds to businesses that do not present live performances of a prurient sexual nature," Congress was specifying which activities it did not want to subsidize rather than leveraging "funding to regulate speech outside the contours of the [PPP] itself." *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.* (*Pharaohs II*), No. 20-CV-665, 2023 WL 9540208, at *7 (W.D.N.Y. July 31, 2023), *recommendation adopted*, 2024 WL 356568 (W.D.N.Y. Jan. 31, 2024) (quoting *Alliance for Open Society*, 570 U.S. at 15); *see Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("[W]hen the Government appropriates public funds to establish a program it is entitled to define the limits of that program.").  The SBA limited its Section 7(a) loan program to businesses that do not present adult entertainment.  Congress applied this limit to second-draw PPP loans. Businesses that presented adult entertainment were, categorically, ineligible for second-draw PPP loans; businesses that did not present adult entertainment—and met the other eligibility criteria— were eligible.  This eligibility limit did not impose any "ongoing" conditions on "recipients' speech and activities" that they were required to meet in order to continue to receive funding. *Alliance for Open Society,* 570 U.S. at 218.  As the decision to exclude businesses that present

prurient entertainment from the PPP was not "something more" than a selection criteria, the Court concludes that it does not constitute government control of speech.  *Id.*

Plaintiffs urge the Court to consider the earlier rulings in *Regan* and *FCC v. League of Women Voters*, which *Alliance for Open Society* builds on.  ECF No. 32 at 42.  In *Regan*, nonprofit Taxation with Representation (TWR) challenged a requirement that nonprofit organizations seeking tax-exempt status under 26 U.S.C. § 501(c)(3) not engage in lobbying activities.  461 U.S. at 545-46.  Explaining that 501(c)(3) status had "much the same effect as a cash grant," the Supreme Court held that Congress had "not violated TWR's First Amendment rights by declining to subsidize its First Amendment activities" and that the lobbying exclusion was a permissible limit on a government subsidy.  *Id.* at 544, 548.  The Supreme Court also noted that TWR could return to a "dual structure" it used in the past and incorporate as two separate organizations: "a § 501(c)(3) organization for non-lobbying activities and [an affiliate] § 501(c)(4) organization for lobbying."  *Id.* at 544.  One arm of TWR could thus obtain § 501(c)(3) benefits while the other could engage in lobbying.  While Congress "refused to pay for the lobbying out of public monies," the lobbying exclusion did "not deny TWR the right to receive deductible contributions to support its non-lobbying activities," nor bar it from lobbying.  *Id.* at 545.

In *FCC v. League of Women Voters*, the Supreme Court held that a provision of the Public Broadcasting Amendments Act forbidding news stations that received federal funds from engaging "in editorializing" violated the First Amendment.  468 U.S. 364, 366 (1984).  Unlike in *Regan*, the broadcasting stations at issue could not readily split into affiliate organizations that engaged in editorializing but did not receive federal funds and non-editorializing stations that could receive federal funds.  *Id.* at 399-401.  As the stations could not "segregate [their] activities according to the source of … funding," they had to choose between editorializing but forgoing federal funding and forgoing editorializing but receiving federal funding.  *Id* at 400.  Even if "a noncommercial education station … receive[d] only 1% of its overall income from [federal] grants," it would be entirely barred from editorializing.  *Id.*  The Supreme Court thus differentiated *League of Women Voters* from *Regan* and held that *Regan* was not controlling.  *Id.* at 401.

Plaintiffs analogize their businesses to the radio stations in *League of Women Voters*.  They

53

contend that they "are food and/or beverage serving establishments" that also present "protected dance entertainment," akin to the stations airing both non-editorializing broadcasts and editorials. ECF No. 32 at 42.  They argue that the prurient business exclusion prohibits businesses from using "any PPP funds toward any approved purpose if it also presents any live performances of a prurient sexual nature," and thus the government improperly conditioned "the receipt of funds for mundane business purposes upon whether the recipient offers defined First Amendment-protected activities." *Id.* at 42-43.

Plaintiffs' focus on the impact on "mundane business purposes" is misplaced: this would be akin to finding that the editorializing prohibition in *League of Women Voters* was unconstitutional because it limited federal funding for non-editorializing broadcasts.  The Supreme Court did not hold that the editorializing prohibition was unconstitutional because a station that engaged in editorializing and thus could not receive federal funding could not then receive federal funding for non-editorializing.  Rather, it found that the editorializing prohibition was unconstitutional because, unlike in *Regan*, the stations could not both receive federal funding and broadcast editorials.  *See League of Women Voters*, 468 U.S. at 366.  If they received *any* federal funding—even if it made up 1% of their budget—they could not broadcast any editorials. Although Plaintiffs' particular point of comparison is inapt, their underlying argument merits consideration.  Unlike in *Regan*, each Plaintiff cannot—and did not—bifurcate themselves into two businesses, one eligible for PPP loans and loan forgiveness and offering food, beverages, and non-prurient entertainment, and the other ineligible for PPP loan forgiveness but free to offer prurient entertainment.  Like the broadcast stations in *League of Women Voters*, Plaintiffs could not both engage in protected speech and receive federal funding.

But there are key differences between this case and *League of Women Voters*.  First, adult entertainment is "only marginally" protected by the First Amendment.  *Barnes*, 501 U.S. at 566. Not so editorial opinions.  "[T]he special place of the editorial in our First Amendment jurisprudence reflects the fact that the press, of which the broadcasting industry is indisputably a part carries out a historic, dual responsibility in our society of reporting information and of bringing critical judgment to bear on public affairs." *League of Women Voters*, 468 U.S. at 382

(citations omitted).  Potential government restriction of editorials, which have "always rested on the highest rung of the hierarchy of First Amendment values" requires greater caution than potential government restriction of adult entertainment.  *Id.*  Second*, League of Women Voters* concerned ongoing grants.  The appellee broadcasting station "received and [was] presently receiving grants" and was thus "prohibited from editorializing," even if it used "wholly private funds to finance its editorial activity."  468 U.S. at 370, 400.  Under the statute at issue there, the station had to choose between forgoing ongoing federal funding and airing editorials or accepting federal funding and not airing editorials.  The stations' continued receipt of federal funds was thus conditioned on not airing editorials; federal funds indirectly regulated their speech.  *See Perry*, 408 U.S. at 597 (cautioning that the government cannot "produce" indirectly "a result which it could not command directly") (quotation modified).  But the second-draw PPP loans were one-time subsidies.  Plaintiffs did not have to choose between presenting adult entertainment and receiving PPP loans—indeed, they did not have the opportunity to make such a choice.  If they presented adult entertainment, they were not eligible for PPP loans.  While Plaintiffs may object to the eligibility criteria Congress employed, Congress's choice to limit second-draw PPP loans to certain types of businesses is not the same as conditioning the ongoing receipt of federal funding on engaging in or refraining in protected speech.  *See Alliance for Open Society*, 570 U.S. at 213.

The Court accordingly finds that the exclusion of businesses that present "live performances of a prurient sexual nature" from the PPP is a permissible eligibility criterion for a government subsidy, not government regulation of speech.  *See Camelot*, 24 F.4th at 651; *Pharaohs*, 990 F.3d at 229; *Am. Ass'n of Pol. Consultants*, 810 F. App'x at 9; *Deja Vu-San Francisco LLC v. U.S. Small Bus. Admin.,* No. 20-cv-03982, 2020 WL 6260010, at *8-9 (N.D. Cal. Sept. 11, 2020).  And the government may "make content-based distinctions when it subsidizes speech," as it is doing here, so long as the distinctions are rationally related to a legitimate government purpose.  *Davenport*, 551 U.S. at 188–89.

### B.    The Rational Basis for the Prurient Business Exception

As the exclusion of prurient businesses from second-draw PPP loans a statutorily enacted content-based limitation on a subsidy, it only needs to have a "rational relation to a legitimate

government purpose." *See Regan*, 461 U.S. at 547.  Under rational-basis review, courts uphold classifications if there is a "rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).  There must be a "plausible policy reason for the classification." *Nordlinger v. Hahn,* 505 U.S. 1, 11–12 (1992).  A "legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification[;]" instead, a classification will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for it. *Heller*, 509 U.S. at 320 (quotation marks omitted); *see F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (explaining that, under rational basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").  Although more exacting levels of scrutiny require a close fit between the purpose of a discriminating statute and its effects, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.

Defendants contend that there is a rational basis for the prurient business exclusion because there are recognized "secondary effects" of adult-entertainment establishments, including "negative impacts on crime rates, property values, and the quality of a city's neighborhoods" and "unlawful public sexual activity, prostitution, and drug trafficking."  ECF No. 28 at 42 (quotation marks omitted).  They argue that Congress's decision not to subsidize "prurient" businesses is rationally related to the government's interest in deterring—or at least, in not inadvertently supporting—these negative secondary effects.  *Id.*

Courts have repeatedly recognized that the state has a substantial interest in limiting the adverse "secondary effects" of adult entertainment.  *See Ctr. For Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1164-66 (9th Cir. 2003) (holding that the government has a "substantial" interest in "reducing the secondary effects associated" with sexually-oriented businesses and finding that an ordinance limiting the hours when such businesses could operate met intermediate scrutiny); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-49, 52 (1986) (holding that a zoning regulation that restricted where adult-entertainment venues could operate met intermediate

scrutiny, as it combatted the "unwanted secondary effects" associated with adult entertainment). As the government's interest limiting these secondary effects is enough to pass intermediate scrutiny, it is enough to satisfy rational basis review. The Court concludes that applying the prurient business exclusion to second-draw PPP loans is rationally related to the "legitimate government" interest in "reducing the secondary effects associated" with businesses that present adult entertainment. *Heller*, 509 U.S. at 319 (quotation marks omitted); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166; *Camelot Banquet*, 24 F.4th at 648 (holding that as the "secondary effects of sex-oriented businesses … can support time, place, and manner regulations, they surely provide a rational basis for Congress to choose not to subsidize this group of businesses").

### C.    Viewpoint Discrimination

Plaintiffs' additional First Amendment challenge to the prurient business exclusion is grounded in their contention that the exclusion is unconstitutional viewpoint discrimination. *See* FAC ¶ 629(a), (c). Although Congress's decisions to subsidize certain categories of speech over others are generally permissible if the decisions have a "rational relation to a legitimate government purpose," Congress does not have free reign in allocating subsidies. *Regan*, 461 U.S. at 547; *see Pharaohs II*, 2023 WL 9540208, at *8 ("Even though the Court concludes that PPP loans are subsidies, the government still may not make funding choices that are the product of invidious viewpoint discrimination or 'aimed at the suppression of dangerous ideas." (quotation marks omitted)). Congress may "not discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas." *Regan*, 461 U.S. at 547-48 (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)). That is, in the context of government subsidies, content-based discrimination is permissible (as long as it satisfies rational basis review) but viewpoint-based discrimination is not. "[T]he distinction between content and viewpoint discrimination is not a precise one." *PMG Int'l Div. L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1171 (9th Cir. 2002) (quotation marks omitted); *see Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829, 831 (1995) (describing content discrimination as discrimination based on "subject matter" and viewpoint discrimination as discrimination based on the particular views taken by speakers on a subject).

1    But under Ninth Circuit law, regulation of sexually explicit material is considered content-

2    based, not viewpoint-based, discrimination. *PMG Int'l*, 303 F.3d at 1171 (dismissing the

3    plaintiff's argument that "a ban on sexually explicit materials targets the viewpoint that 'the

4    human sexual response is positive, healthy and appropriate for consideration and consumption by

5    the adult public.'"). The Ninth Circuit explained:

> [I]f we were to accept PMG's argument that materials depicting
> nudity … in a lascivious way … articulate the "viewpoint" that the
> sexual response is positive, then we risk eviscerating altogether the
> line between content and viewpoint. To cite one example from the
> district court, 'the inclusion in a magazine of an article about rock-
> climbing could be said to express a viewpoint that rock climbing is an
> activity worthy of attention,' or positive, or healthy.

10    *Id.* Following *PMG International*, the Court disagrees with Plaintiffs' contention that the prurient

11    business exclusion is viewpoint discrimination. *See id.*; *see also Camelot*, 24 F.4th at 649

12    ("Accordingly, excluding the entire category or subject matter of prurient live performances from

13    a government subsidy program does not amount to viewpoint discrimination and does not violate

14    the Free Speech Clause."). The exclusion discriminates based on subject matter, not based on a

15    particular viewpoint regarding the subject matter. And as the prurient business exclusion is a limit

16    on a government subsidy, not government regulation of speech, such content-based distinctions

17    are permissible so long as they have a rational relationship to a legitimate government purpose.

18    Plaintiffs argue that the Prurient Business Exclusion is akin to the Lanham Act's

19    prohibition on "immoral or scandalous" trademarks, which the Supreme Court "recently found to

20    be clearly viewpoint-based" in *Iancu v. Brunetti.* ECF No. 32 at 47 (quotation marks omitted).

21    But the Supreme Court's holding in *Iancu*—that the Lanham Act's prohibition on registering

22    trademarks that consist of or comprise "immoral or scandalous" material was "viewpoint-based"

23    and thus violated the First Amendment—does not control here. 588 U.S. 388, 394 (2019). In

24    *Iancu*, the Supreme Court found that the exclusion of "immoral or scandalous" marks improperly

25    distinguished between speech about a topic that was "aligned with conventional moral standards"

26    and speech about the same topic that was "hostile" to such standards. *Id.* Under the "immoral or

27    scandalous" exclusion, the Patent and Trademark Office "rejected marks conveying approval of

28    drug use" such as "YOU CAN'T SPELL HEALTHCARE WITHOUT THC" but registered marks

1    disapproving of drug use, such as "D.A.R.E. TO RESIST DRUGS AND VIOLENCE." *Id.* at 395.

2    The differentiation between speech aligned with conventional moral standards and speech

3    "hostile" to mainstream standards created a viewpoint-based classification and violated the First

4    Amendment. *Id.* at 394.

5         Plaintiffs argue that the word "prurient" is more than a description of subject matter and is

6    necessarily a moral judgment. *See* ECF No. 32 at 46-47.  They contend that "prurient," as used by

7    the SBA, means "a shameful or morbid, and unhealthy interest in sex; as opposed to appealing to

8    normal and healthy sexual desires." *Id.* at 46.  They argue that the prurient business exclusion is

9    thus akin to the "immoral or scandalous" exclusion overturned in *Iancu*, as it discriminates

10   between speech that is in line with conventional moral standards (that is, "normal and healthy

11   sexual desire") and speech that is "hostile" to such standards (that is, "a shameful or morbid, and

12   unhealthy interest in sex"). *Id.; Iancu*, 588 U.S. at 394.

13        Plaintiffs' argument rests on the assumption that "prurient," as used in the prurient

14   business exclusion, has the same meaning as it does in the context of the *Miller* test's definition of

15   obscenity.  Their argument is as follows.  The SBA's enabling Act at 15 U.S.C. § 633(e)

16   establishes:

17             Notwithstanding any other provision of law, the [SBA] is prohibited
               from providing any financial or other assistance to any business
18             concern or other person engaged in the production or distribution of
               any product or service that has been determined to be obscene by a
19             court of competent jurisdiction.

20   Plaintiffs contend that by using "obscene"—a term of art with an established legal definition—the

21   SBA Act expressly adopted the legal definition of the word as defined in *Miller v. California*.  *See*

22   413 U.S. 15 at 24-25 (1973).  Under the *Miller* test, material is obscene (and thus does not warrant

23   First Amendment protection) if: "(a) … the average person, applying contemporary community

24   standards would find that the work, taken as a whole, appeals to the prurient interest … (b) … the

25   work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the

26   applicable state law; and (c) … the work, taken as a whole, lacks serious literary, artistic, political,

27   or scientific value." *Id.* (quotations and citations omitted).  "Prurient," as used in the *Miller* test,

28   has been "constitutionally defined for the purposes of identifying obscenity as that which appeals

United States District Court
Northern District of California

1   to a shameful or morbid interest in sex," as opposed to "normal, healthy sexual desires." *Brockett*

2   *v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985).  Plaintiffs argue that because the SBA Act

3   used the term of art "obscene," Congress adopted the *Miller* test and the definition of "prurient" as

4   used in the *Miller* test.  Thus, when the SBA uses the word "prurient" elsewhere (for instance, in

5   13 C.F.R. § 120.110(p)) it must be using the word as defined under *Miller*: a "shameful or morbid

6   interest in sex." *Id.*; *see* ECF No. 32 at 46 ("[I]f 'prurient' under the [prurient business exclusion]

7   means *anything*, it must mean the same things that Congress intended as the constitutional

8   standards as referenced in § 633(e).").[20]

9        The Court recognizes the general principle that "identical words used in different parts of

10  the same statute are generally presumed to have the same meaning," but this principle is not

11  persuasive here.  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).  Plaintiffs' argument—that a word

12  used in a regulation must have the same meaning as the identical word used within a three-part

13  definition of a different word used in another statute—extrapolates this principle nearly beyond

14  recognition.  Furthermore, nothing in the exclusion itself references the words or other elements in

15  the *Miller* three-part test that Plaintiffs argue indicate a viewpoint.  *See* 13 C.F.R. § 120.110(p).

16  The text does not plainly subject sexual live performances to regulation when they are shameful or

17  morbid, or "patently offensive" and lacking in any "serious literary, artistic, political, or scientific

18  value."  The minimal language appears to address sexually explicit performances generally, rather

19  than establishing a clear viewpoint-based regulation.

20        Plaintiffs cite the SBA's explanation of the exclusion when it was proposed in support of

21  their contention that it effectuates a view-point regulation.[21]  ECF No. 32 at 34.  However, the

22  SBA's explanation undercuts their contention; it indicates that the exclusion was designed to reach

United States District Court<br>Northern District of California

---

[20] Plaintiffs also claim that one of the reasons why the prurient business exclusion and statute violate the First Amendment is that they "fail to conform to the constitutional standards regarding obscenity" as articulated in *Miller*.  FAC ¶ 629(j).  But the *Miller* test is the standard "which must be used to identify obscene material that a State may regulate without infringing on the First Amendment."  *Miller*, 413 U.S. at 19.  As discussed above, the prurient business exclusion is not government regulation of speech.  In this context, the *Miller* test is inapplicable.

[21] The proposed exclusion referred to "live performances of a prurient sexual nature," and this verbiage did not change in the final regulation, and no further explanation of the provision or definition of "prurient" was provided.  *See* Business Loan Programs, Final Rule, 61 Fed.Reg. 3,240 (Jan. 31, 1996).

1    sexually explicit performances and material broadly.  *See* Business Loan Programs, Proposed

2    Rule, 60 Fed.Reg. 64,360 (Dec. 15, 1995) (proposing 13 C.F.R. § 120.110(p) in light of requests

3    for "guidance on the eligibility of small businesses which sell sexually oriented products or

4    services, or engage in sexually oriented activities.").  As the SBA described it, the regulation

5    previously was "silent regarding obscene, pornographic, or sexually oriented activities."  *Id.*

6    Having considered legal precedent, the SBA determined that "it may exclude small businesses

7    engaging in lawful activities of an obscene, pornographic, or prurient sexual nature."  *Id.*  The

8    SBA did not discuss *Brocket* or reference its definition of "prurient".

9        Plaintiffs also ignore that, unlike the Lanham Act's provision at issue in *Iancu*, the prurient

10   business exclusion is limited to a specific subject matter.  While the word "prurient" undoubtedly

11   carries a degree of the moral judgment that *Iancu* warns against (to describe something as being of

12   a prurient nature is to describe it as unusually or excessively sexual), it is evident from the

13   regulatory language that it is bound to a specific topic: explicit sexual material.  In contrast, the

14   "immoral or scandalous" exclusion overturned in *Iancu* was not tethered to any particular subject

15   matter.  588 U.S. at 394.  It prohibited all marks that were "hostile" to "conventional moral

16   standards," regardless of topic.  *Id.*  The prurient business exclusion by no means goes this far,

17   instead excluding certain businesses from a subsidy program based on the nature of the

18   performances or products they offer.  *See Pharaohs*, 990 F.3d at 231.  The Court accordingly

19   holds that "[t]he prurience restriction is content—not viewpoint—based."  *Pharaohs II*, 2023 WL

20   9540208, at *8 (W.D.N.Y. July 31, 2023); *Camelot*, 24 F.4th at 649 ("Accordingly, excluding the

21   entire category or subject matter of prurient live performances from a government subsidy

22   program does not amount to viewpoint discrimination and does not violate the Free Speech

23   Clause.").  It would "be a category mistake to think that prurience or lasciviousness reflects a

24   'viewpoint' that the government may not discriminate against."  *Camelot*, 24 F.4th at 649.

25   Instead, it is a "category or subject matter of expressive conduct that may be subject to some forms

26   of government regulation."  *Id.*  Plaintiffs' First Amendment claim is dismissed to the extent it is

27   based on alleged viewpoint discrimination.

28

United States District Court
Northern District of California

D.      **The Prior Restraint Doctrine**

Plaintiffs claim that one of the reasons the prurient business exclusion and incorporating statute violate the First Amendment is that they constitute "an impermissible prior restraint on speech and expression."  FAC ¶ 629(h).  "The term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications" before such communications take place.  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotations omitted); *see Levine v. U.S. Dist. Ct. for Cent. Dist. Of California*, 764 F.2d 590, 593 (9th Cir. 1985) (district court's order prohibiting attorneys from making any statements to the press during the pendency of the case was "properly characterized as a prior restraint").  There are no allegations supporting Plaintiffs' claim that the prurient business exclusion is a prior restraint.  The exclusion does not forbid Plaintiffs "from engaging in expressive activities in the future" or require them "to obtain prior approval for any expressive activities."  ECF No. 32 at 44; *Alexander*, 509 U.S. at 550-51.  As in *Alexander*, the exclusion "imposes no legal impediment to—no prior restraint on—petitioner's ability to engage in any expressive activity."  509 U.S. at 551.  To the extent Plaintiffs' First Amendment claim is based on an alleged prior restraint, it is dismissed with prejudice.

E.      **The Void for Vagueness Doctrine**

Plaintiffs also claim that the prurient business exclusion is "unconstitutionally vague."  FAC ¶ 629(o).  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."  *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).  The void-for-vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second … that those enforcing the law do not act in an arbitrary or discriminatory way."  *Fox Television*, 567 U.S. at 254.

"When speech is involved, rigorous adherence to those requirements is necessary to ensure

United States District Court
Northern District of California

that ambiguity does not chill protected speech." *Id.* at 253-54; *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (explaining that the vagueness of content-based speech regulations "raises special First Amendment concerns because of its obvious chilling effect on free speech"). But the void for vagueness doctrine is not applied as strictly in "the context of selective subsidies." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). "[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* As the Court has concluded that the prurient business exclusion and incorporating statute is a government subsidy, and not a government regulation of speech, the standards articulated in *Finley* apply here.

In *Finley*, the Supreme Court explained that a provision requiring the National Endowment for the Arts to consider "general standards of decency and respect" when judging the "artistic merit of grant applications" were "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 576, 588 (quotation marks omitted). But the same vagueness concerns were not at issue in the context of selective subsidies, because, the Court reasoned, it was "unlikely … that speakers will be compelled to steer too far clear of any forbidden area in the context of grants of this nature." *Id.* at 588. The Supreme Court explained that if the statute at issue was "unconstitutionally vague, then so too are all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence.'" *Id.* at 589. Thus, accepting the "respondents' vagueness argument would be to call into question the constitutionality of these valuable Government programs and countless others like them." *Id.* The Supreme Court dismissed the respondents' argument that the "decency and respect" criteria was unconstitutionally vague. *Id.*

Defendants argue that "[a]s a standard by which the Government makes funding decisions, prurient sexual nature is far less opaque than criteria like 'general standards of decency,' and 'respect for the diverse beliefs and values of the American public'" upheld in *Finley*. ECF No. 28 at 45. The Court accepts Defendants' overall contention: as the Supreme Court in *Finley* found that the phrase "general standards of decency and respect for the diverse beliefs and values of the American public" was permissible, despite its imprecision, the term "prurient sexual nature" must

likewise be permissible.  As Plaintiffs note, "prurient" is a somewhat capacious term.  *See* ECF

No. 32 at 48 ("Lewd, lascivious, erotic, overt strong sexual interest, or sexually-oriented.  Take

your pick.").  Under *Finley*, however, language is not unconstitutionally vague just because it may

be "susceptible to multiple interpretations."  524 U.S. at 583, 590.  The prurient business

exclusion is not void for vagueness.

### F.    First Amendment Retaliation

Plaintiffs additionally allege that Defendants are applying the prurient business exclusion

against them to retaliate against them for presenting entertainment protected by the First

Amendment and to retaliate against them for their connection to the Mohneys and the prior

Diamond Club lawsuit against the SBA.  *See* FAC ¶ 629(e).  Although this claim is organized as a

subpart of Plaintiffs' challenge to the constitutionality of the prurient business exclusion, it

challenges the manner in which Defendants applied the prurient business exclusion, not the

constitutionality of the exclusion itself.

To state a case of First Amendment retaliation, a claimant must plead that:

> (1) he engaged in constitutionally protected activity; (2) as a result,
> he was subjected to adverse action by the defendant that would chill
> a person of ordinary firmness from continuing to engage in the
> protected activity; and (3) there was a substantial causal relationship
> between the constitutionally protected activity and the adverse action.

*Boquist*, 32 F.4th at 775 (quotation marks omitted).  Plaintiffs allege that they engaged in

constitutionally protected activity by presenting adult entertainment (FAC ¶ 654) and petitioning

the government for redress regarding the denial of PPP loans and loan forgiveness (FAC ¶ 651-

655).  As to the petitioning activity, Plaintiffs allege that the SBA believes all Plaintiffs (except

Meacham and Reeder) are affiliated with the Mohneys and DV Diamond Club of Flint, who filed

an earlier action against the SBA.  *Id.* ¶ 651.

Plaintiffs' claim that the SBA applied the prurient business exclusion against them in

retaliation for offering allegedly prurient adult entertainment is impermissibly circular.  While in

the most literal sense, the SBA investigated or denied loan forgiveness to Plaintiffs because they

"engaged in constitutionally protected activity," in this case, engaging in the "constitutionally

protected activity" was grounds for ineligibility for PPP loans and loan forgiveness.  *Boquist*, 32

United States District Court
Northern District of California

United States District Court
Northern District of California

1  F.4th at 775.  Denying someone a benefit because they did not meet the criteria to qualify for the

2  benefit, without more, is not retaliation.  *See Regan*, 461 U.S. at 546 (explaining that where the

3  government "merely refused to pay for the [First Amendment activities of] lobbying out of public

4  monies," it did not deny the plaintiffs "any independent benefit on account of its intention to

5  lobby").  Defendants, applying *Regan*, argue that "Plaintiffs must show that SBA retaliated against

6  them for some expression 'independent' of the basis on which Congress chose not to subsidize its

7  activities."  ECF No. 28 at 46.  The Court agrees.  To the extent Plaintiffs allege that Defendants

8  retaliated against them for engaging in the "constitutionally protected activity" of offering adult

9  entertainment, this claim is dismissed with prejudice.

10     Plaintiffs also claim that Defendants are using the prurient business exclusion to retaliate

11  against Plaintiffs "and/or their principals [for] having participated in other litigation against the

12  SBA arising out of Pandemic funding programs."  FAC ¶ 629(e).  This is a cognizable

13  "constitutionally protected activity."  *Boquist*, 32 F.4th at 775.  To state a claim for retaliation,

14  Plaintiffs must also allege that they were subjected "to adverse action by the defendant that would

15  chill a person of ordinary firmness from continuing to engage in the protected activity" and there

16  was a causal relationship between the "constitutionally protected activity and the adverse action."

17  *Id.*  Plaintiffs appear to be alleging that the "adverse action" Defendants subjected them to was

18  denying their loan forgiveness applications based on the prurient business exclusion.  As discussed

19  above, only Gold Club has received a final determination based on the prurient business exclusion,

20  and thus only Gold Club's claim is ripe for judicial review.[22]  The Court finds that Gold Club has

21  alleged facts to plausibly show that Defendants took "adverse action" against it.

22     The Court accordingly turns to the third element of First Amendment retaliation: causation.

23  Defendants argue that Plaintiffs have failed to "plausibly allege a substantial causal relationship

24  between the constitutionally protected activity" at issue—participating in "other litigation against

25  the SBA"—"and the adverse action."  ECF No. 28 at 47 (quotations omitted).  They argue that

26

27  _____

28  [22] If Plaintiffs contend Defendants have taken "adverse action" related to the prurient business exclusion against the non-Gold Club Plaintiffs, they may include such allegations in their Second Amended Complaint.

United States District Court
Northern District of California

1    Plaintiffs' allegations of causation are undercut by the fact that a year and a half elapsed between

2    the protected petitioning activity and the final denial of Gold Club's loan, and "the fact that SBA

3    initially forgave the majority of Plaintiffs' loans during the same period."  *Id.*  Plaintiffs counter

4    that while a temporal gap between the protected First Amendment activity and the adverse act may

5    indicate that the adverse act was not retaliatory, it is not dispositive, and courts must consider

6    other factors when assessing causation.  ECF No. 32 at 50*; see Keyser v. Sacramento City Unified*

7    *Sch. Dist.,* 265 F.3d 741, 753 (9th Cir. 2001).

8    　　　The Court agrees with Plaintiffs that the temporal gap between the protected activity and

9    the final denial of Gold Club's application is not dispositive.  While "proximity in time between

10    the protected action and the allegedly retaliatory" adverse act may support an inference of

11    causation, a gap in time does not necessarily disprove causation at the motion to dismiss stage.

12    *Keyser*, 265 F.3d at 751.

13    　　　"At the pleading stage," a complaint must allege "plausible circumstances connecting the

14    defendant's retaliatory intent to the suppressive conduct."  *Arizona Students' Ass'n v. Arizona Bd.*

15    *of Regents*, 824 F.3d 858, 870 (9th Cir. 2016).  Although Plaintiffs allege that Defendants

16    misapplied the affiliation exception provision because of their association with the Mohneys and

17    the Diamond Club Action (*see* FAC ¶¶ 650-55), the Court cannot locate any allegations

18    "connecting" the SBA's denial of Gold Club's loan forgiveness application with Gold Club's

19    involvement with the Mohneys and the prior litigation against the SBA.  *Arizona Students' Ass'n*,

20    824 F.3d at 870.  If Plaintiffs can allege facts to support that Defendants denied the application

21    because of Gold Club's involvement with the prior litigation, they may do so in their Second

22    Amended Complaint.

23    　　　Plaintiffs' First Amendment retaliation claim at Count One is accordingly dismissed to the

24    extent it is based on Defendants retaliating against Plaintiffs by applying the prurient business

25    exclusion against them.  Plaintiffs may amend this claim consistent with this Order, though the

26    Court cautions Plaintiffs that their retaliation claim appears misplaced as a subpart of their

27    challenge to the constitutionality of the prurient business exclusion and would fit better as a stand-

28    alone claim or subpart to Plaintiffs' retaliation claim at Count Five.

1    In sum, the Court finds that the exclusion of businesses that "[p]resent live performances

2    of a prurient sexual nature" from the PPP does not constitute government regulation of speech.  It

3    is a viewpoint-neutral permissible criteria for a government subsidy that has a rational relationship

4    "to a legitimate governmental purpose." *Regan*, 461 U.S. at 547.  Plaintiffs' Count One is

5    accordingly dismissed without prejudice.

6    **VII.    FIFTH AMENDMENT**

7        At Count Two, Plaintiffs assert that that the prurient business exclusion and incorporating

8    statute violate the Fifth Amendment because they treat businesses that present adult entertainment

9    differently from other establishments "for no compelling, important, or rational reason."

10   FAC ¶ 635.  Plaintiffs' claim fails.  "Generally, statutory classifications are valid if they bear a

11   rational relation to a legitimate governmental purpose." *Regan*, 461 U.S. at 547.  Although

12   "[s]tatutes are subjected to a higher level of scrutiny if they interfere with the exercise of a

13   fundamental right, such as freedom of speech," where no fundamental right is implicated or

14   suspect class is regulated, courts apply rational basis review.  *Id.*  The Court has established that

15   the prurient business exclusion is a permissible limit on a government subsidy, not government

16   regulation of speech, that has a rational relationship to a legitimate government interest.  It is

17   accordingly valid under the Fifth Amendment.  *See id.*

18       Plaintiffs also contend that the prurient business exclusion and statute violate the Fifth

19   Amendment by violating "occupational liberty rights of the affected Plaintiffs" and their

20   employees.  FAC ¶ 635(c).  The Ninth Circuit has "recognized the liberty interest in pursuing an

21   occupation of one's choice." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir.

22   2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008).  "[A] plaintiff can

23   make out a substantive due process claim if she is unable to pursue an occupation and this inability

24   is caused by government actions that were arbitrary and lacking a rational basis." *Id.*  The

25   inability to pursue an occupation must be a "complete prohibition," not a "brief interruption."

26   *Conn v. Gabbert*, 526 U.S. 286, 292 (1999).  Among other reasons, Plaintiffs' occupational liberty

27   claim fails because they have not alleged that their employees were completely prohibited from

28   engaging in their preferred type of employment. *Id.*  Moreover, to the extent Plaintiffs' employees

United States District Court
Northern District of California

were "unable to pursue an occupation" due to government action, the Court has determined that the prurient business exclusion is rationally related to a legitimate government interest and thus not arbitrary or "lacking a rational basis." *Engquist*, 478 F.3d at 997. Plaintiffs' Count Two is accordingly dismissed.

## VIII. REQUEST TO DISMISS OR STRIKE OTHER CLAIMS

### A. Plaintiffs' Claims for Attorneys' Fees and Injunctive Relief

Plaintiffs assert claims for "Attorneys' Fees and Costs" pursuant to the EAJA (FAC ¶ 716-719) and "Injunctive Relief" (FAC ¶ 736-745). Neither a request for attorneys' fees under the EAJA nor a request for injunctive relief is an independent cause of action, and these claims are accordingly dismissed. *Cota v. United States*, No. C 13-00576, 2013 WL 6234574, at *7 (N.D. Cal. Dec. 2, 2013), *aff'd*, 628 F. App'x 500 (9th Cir. 2015) ("The EAJA does not provide an independent cause of action for litigants in federal court; instead, it simply authorizes the payment of fees to the prevailing party in an action against the United States.") (quotation marks and citations omitted); *EVIG, LLC v. Natures Nutra Co.*, 685 F. Supp. 3d 991, 996 (D. Nev. 2023) ("[I]njunctive relief is not an independent, free-standing cause of action. It is a form of relief the court may grant."). These claims are stricken without prejudice to Plaintiffs requesting these forms of relief from the Court.

### B. Plaintiffs' Jury Demand

Defendants request that the Court strike Plaintiffs' request for a jury, arguing that sovereign immunity "precludes demands for jury trials on claims against the federal government unless Congress has clearly waived that immunity and expressly granted a right to a jury trial." ECF No. 28 at 51 (quoting *Haynie v. Veneman*, 272 F. Supp. 2d, 10, 20 (D.D.C. 2003). Plaintiffs counter that the sovereign immunity argument is misplaced, as the "'APA waives sovereign immunity for suits seeking relief other than money damages from federal agencies or officials,' including declaratory relief, which Plaintiffs seek." ECF No. 32 at 51 (quoting *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 922 F. Supp. 273, 280 (D. Ariz. 1996), *aff'd* 136 F.3d 641 (9th Cir. 1998). Plaintiffs argue that because they are seeking declaratory relief, they have a right to a jury trial. *Id.* (citing *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*,

United States District Court
Northern District of California

560 F.3d 935, 942 (9th Cir. 2009) ("[I]n a declaratory relief action, as in other civil actions, a party has an absolute right to a jury trial *unless a jury has been waived*.").[23]

"[T]he Seventh Amendment right to trial by jury does not apply in actions against the Federal Government." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). The United States is generally "immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (quotations omitted). Where "Congress waives the Government's immunity from suit … the plaintiff has a right to a trial by jury only where that right is one of the terms of the Government's consent to be sued." *Id.* (quotations omitted). The right to a jury trial "must be unequivocally expressed" by Congress. *Id.* (quotations omitted).

As Defendants argue, the APA does not "provide a right to a trial by jury." *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009). The fact that Congress expressly allowed the SBA to be sued (other than for money damages) does not, contrary to what Plaintiffs argue, indicate otherwise. *See Lehman*, 453 U.S. at 160 (holding that where "Congress waives the Government's immunity from suit …the plaintiff has a right to a trial by jury *only* where that right is one of the terms of the Government's consent to be sued") (quotations omitted). That jury trials are generally available in declaratory relief actions does not entitle Plaintiffs to one in their suit against the government absent express authorization. *See Synanon Church v. United States*, 557 F. Supp. 1329, 1331 (D.D.C. 1983) (finding that the proposition that "jury trials are available as a matter of right in most declaratory judgment actions … is not applicable to cases against the government"). Plaintiffs argue that the request to strike the jury trial is premature as "more jury-triable issues may emerge." ECF No. 32 at 52. But Plaintiffs' jury demand is

---

[23] Plaintiffs also argue that Defendants improperly brought their motion to strike under 12(b)(6) rather than 39(a)(2) and it should thus be denied. ECF No. 32 at 51. The Court sees no reason to prioritize form over substance and considers Defendants' motion to strike even though they used the wrong vehicle to bring their argument before the Court. ECF No. 33 at 22 n.32; *see Schwartz v. Finn*, No. 20-cv-02044, 2020 WL 13599735, at *7 (N.D. Cal. July 24, 2020) (noting, where defendants fashioned their request to strike a jury demand as a 12(b)(6) motion, that parties "may move to strike a jury trial pursuant to Fed. R. Civ. P. 39(a)(2) – not Rule 12(b)(6)" but "[n]onetheless" addressing "the substantive issues" raises in defendants' request). In any event, the Court may strike a jury demand sua sponte. Fed. R. Civ. P. 39(a)(2).

1   precluded based on the identity of the defendant, not on the type of claims they assert. The Court

2   accordingly grants Defendants' request to strike the jury trial demand.

3   **IX.   CONCLUSION**

4   Defendants' motion to dismiss is accordingly granted in part and denied in part.

5   Plaintiffs' as-applied constitutional claims at Count One and Two are dismissed as to all

6   Plaintiffs except Gold Club on ripeness grounds. Plaintiffs' facial constitutional claims at Count

7   One and Two, and Gold Club's as-applied claims as to the same, are dismissed for failure to state

8   a claim. Dismissal is without prejudice.

9   To the extent Count Three challenges the facial validity of 13 C.F.R. § 120.110(p) or the

10  manner in which it was applied to Gold Club's loan, the claim survives. Count Three is otherwise

11  dismissed without prejudice. To the extent Count Four challenges the April 2020 IFR applying 13

12  C.F.R. § 120.110(p) to first-draw PPP loans or Gold Club's claim that 13 C.F.R. § 120.110(p) has

13  been applied against it unlawfully to deny its application for forgiveness of its second-draw loan,

14  this claim survives. Count Four is otherwise dismissed without prejudice.

15  Count Five is dismissed without prejudice for on ripeness grounds and for failure to

16  challenge a final agency action.

17  Counts Six, Seven, and Eight challenging the application of the affiliation exception

18  provision are dismissed on ripeness grounds and for failure to challenge a final agency action.

19  Dismissal is without prejudice. The as-applied challenges at Counts Nine, Ten, and Eleven are

20  similarly dismissed without prejudice. To the extent Counts Nine and Eleven challenge the facial

21  validity of the affiliation rules, these claims survive.

22  Plaintiffs' as-applied challenges to the Special OHA Rules at Counts Twelve and Thirteen

23  are dismissed as to all Plaintiffs except Gold Club on ripeness grounds and for lack of final agency

24  action. Dismissal is without prejudice.

25  All but Gold Club's estoppel claims at Count Fourteen are dismissed on ripeness grounds.

26  Dismissal is without prejudice.

27  Count Fifteen, for attorneys' fees, is dismissed. Plaintiffs may request attorneys' fees in

28  their prayer for relief.

United States District Court
Northern District of California

Count Sixteen, regarding the constitutionality of the injunction provision at 15 U.S.C. Section 634(b)(1), is dismissed on ripeness grounds.  Dismissal is without prejudice.

Count Eighteen, for injunctive relief, is dismissed.  Plaintiffs may request injunctive relief in their prayer for relief.

Plaintiffs' jury demand is stricken.

Plaintiffs may file an amended order by October 31, 2025 consistent with this order. Plaintiffs must comply with the "short and plain statement" requirement of Rule 8(a).

**IT IS SO ORDERED.**

Dated: September 30, 2025

_____
LISA J. CISNEROS
United States Magistrate Judge