DOUGLAS J. MELTON, Bar No. 161353
SHANE M. CAHILL, Bar No. 227972
LONG & LEVIT LLP
465 California Street, Suite 500
San Francisco, California 94104
Telephone:    (415) 397-2222
Facsimile:    (415) 397-6392
Email:        dmelton@longlevit.com
              scahill@longlevit.com

BRADLEY J. SHAFER (MI P36604)*
ZACHARY M. YOUNGSMA (MI P84148)*
SHAFER & ASSOCIATES, P.C.
3800 Capital City Blvd., Suite 2
Lansing, Michigan 48906
Telephone:    (517) 886-6560
Facsimile:    (517) 886-6565
Email:        Brad@BradShaferLaw.com
              Zack@BradShaferLaw.com

*Admitted Pro Hac Vice

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLD CLUB - SF, LLC, et al., | Case No.: 3:24-cv-04241-LJC |
| Plaintiffs, | **DECLARATION OF NICOLE TURNWALD IN SUPPORT OF PLAINTIFFS' FIRST NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| UNITED STATES SMALL BUSINESS ADMINISTRATION, et al., | |
| Defendants. | |

I, Nicole Turnwald, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of 18 years, and I am competent to attest to the facts stated here. I make this declaration under personal knowledge, unless specifically stated to the contrary.

2.     I am a licensed Certified Public Accountant and am employed by Modern Bookkeeping, Inc. ("Modern"), which is located in the State of Michigan.

3.     As a result of the COVID 19 pandemic, Modern was involved in the preparation and submission of numerous Paycheck Protection Program ("PPP") loan applications, and thereafter forgiveness applications, by a number of its clients. I was personally involved in the preparation and submission of those applications.

4.     I've been provided with a list of the Plaintiffs in this lawsuit, and their PPP loan applications – either "first draw" or "second draw" – that are involved in this case.

5.     The submission of first and second draw applications were different in that first draw applications were submitted as "hard copies" that were emailed to the lending bank, whereas second draw applications were submitted through an online portal to a company that had been retained to administer the lending bank's PPP loan applications.

6.     From the very beginning of the PPP application process, the CPAs at Modern, including myself, were aware of what has been generally referred to as the "prurient sexual nature regulation" (the "PSNR"). As a result of the mere existence of the PSNR, we sought the advice of legal counsel in regard to whether a number of Modern's clients would be eligible under the PPP to obtain loans from the Small Business Administration ("SBA").

7.     As a result of our request for legal guidance, attorney Bradley Shafer prepared various letters that were to be submitted to the lending banks for a number of Modern's clients explaining why the PSNR did not preclude such clients from being eligible for SBA loans under the PPP. Where relevant, we included those letters as part of the PPP applications that Modern submitted on behalf of a number of its clients.

DECLARATION OF NICOLE TURNWALD IN SUPPORT OF PLAINTIFFS' FIRST NOTICE OF MOTION
AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT THEREOF

8.    For first draw PPP loans, Modern submitted, as part of the loan applications of Plaintiffs Las Vegas Bistro, LLC; Stockton Enterprises, LLC; Dallas Food & Beverage, LLC; and Jamme Holdings, LLC, the correspondence of Mr. Shafer that is attached as **Exhibit A** hereto.

9.    The first draw PPP loan applications of Plaintiffs Smithville Bistro, LLC and Deja Vu Showgirls of Las Vegas, LLC were submitted a few days after those of the Plaintiffs listed in the preceding paragraph. As a result, Modern submitted, as part of Plaintiffs Smithville Bistro, LLC and Deja Vu Showgirls of Las Vegas, LLC, the correspondence of Mr. Shafer that is attached as **Exhibit B** hereto.

10.    The only thing that changed between the correspondences attached as **Ex. A** and **B** was the date.

11.    For second draw PPP loans, Modern submitted, as part of the loan applications of Plaintiffs Dallas Food & Beverage, LLC; Smithville Bistro, LLC; Deja Vu Showgirls of Las Vegas, LLC; and Jamme Holdings, LLC, the correspondence of Mr. Shafer that is attached as **Exhibit C** hereto.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 16, 2026

_____
Nicole Turnwald, CPA

DECLARATION OF NICOLE TURNWALD IN SUPPORT OF PLAINTIFFS' FIRST NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# EXHIBIT A

LAW OFFICES
SHAFER & ASSOCIATES, P.C.
A PROFESSIONAL CORPORATION
3800 CAPITAL CITY BLVD., SUITE 2
LANSING, MI 48906
E-MAIL info@bradshaferlaw.com
PHONE: 517-886-6560
FAX: 517-886-6565

BRADLEY J. SHAFER
ALSO MEMBER, AZ BAR
Brad@bradshaferlaw.com

MATTHEW J. HOFFER
Matt@bradshaferlaw.com

To whom it may concern:

The purpose of this letter is to briefly discuss one aspect of the Payroll Protection Program ("PPP") loan application process as it is currently being administered under the recently enacted CARES Act; that being the particular provision found in 13 C.F.R. § 120.110(p), that could be construed (I believe incorrectly) to prohibit SBA loans to any and all "adult" businesses under the belief that they present entertainment of a "prurient sexual nature."

The term "prurient" is one part, of one element, of the three-prong legal test of "obscenity," which is the topic of my comments below. But before I discuss that in detail, I'd like to first share with you some of my credentials so that you can make your own evaluation of my qualifications to speak on this topic.

I have been an attorney since 1984 and am licensed in both Michigan and Arizona. I am also fully admitted to practice law before, and has actually practiced in, the United States District Courts for both the Eastern and Western Districts of Michigan, for both the Southern and Central Districts of Illinois, the Northern District of Indiana, the Western District of Texas, the Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits of the United States Court of Appeals, as well as the United States Supreme Court.

My practice concentrates on two primary areas of the law: First Amendment (Free Speech and expression) litigation -- which I believe to be particularly relevant to the subject of this letter -- and labor law. I am a past President of the First Amendment Lawyers Association (a national organization of trial lawyers who specialize in the protection of First Amendment rights) and am Chairman Emeritus of that group, and was one of the attorneys in the Supreme Court case of Barnes v. Glen Theatre, which established the constitutional protections of nude performance dance entertainment.

Because of my qualifications regarding Free Speech and expression rights, I have also received special permission to litigate and argue cases across the country in various federal and state courts in California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Missouri, North Carolina, Nevada, New Jersey, New York, Ohio, South Dakota, Tennessee, Washington, and West Virginia.

Turnwald Decl.

EXHIBIT A
Page 1

April 7, 2020
Page 2

_____

Moreover, I am a published author on the topic of legal obscenity (again, relevant to the topic here). See, for example, Shafer, Patent Offensiveness: The Black Hole of Miller, 10 Thomas M. Cooley Law Review 1, 1-69 (1993) (this is the most comprehensive law review article ever published on this topic, and is particularly relevant to the issues I discuss below); Shafer, Sex, Lies, and Videotape: In Critique of the Miller Test of Obscenity, 70 Michigan Bar Journal No. 10, 1038-1045 (October 1991); Shafer, Jurisprudence of Doubt: Obscenity, Indecency and Morality at the Dawn of the 21st Century, 84 Michigan Bar Journal No. 6, 22-26 (June 2005); Linz, Donnerstein, Land, McCall, Scott, Shafer, Klein, and Lance, Estimating Community Standards: The Use of Social Science Evidence in an Obscenity Prosecution, 55 Public Opinion Quarterly 1, 80-112 (Spring 1991); and Linz, Shafer, Donnerstein, Land, Graesser, and McCall, Discrepancies Between the Legal Code and Community Standards for Sex and Violence: An Empirical Challenge to Traditional Assumptions in Obscenity Law, 29 Law & Society Review 1, 127-168 (1995).

That having been said and without getting into an esoteric analysis with full legal citations, the most important thing I believe that I can impart to you is that the concept of "prurience" has no legal recognition except as part of legal test of obscenity, which looks at whether:

The average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

Applying contemporary community standards, the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and

A reasonable person would find that the work lacks serious literary, artistic, political, or scientific value.

This comes from three Supreme Court cases: Miller v. California, Smith v. United States, and Pope v. Illinois.

Moreover, the Supreme Court has been clear that all three test elements must be found to exist before the expression can be found to be devoid of constitutional protection (the case of Reno v. ACLU). Simply put, constitutional protections do not evaporate based on a finding of just one of these test elements. In that regard, I would point out that the PPP regulations distributed on Thursday even specifically state that all loans guaranteed by the SBA pursuant to the CARES Act will be made consistent with constitutional protections, including the First Amendment.

April 7, 2020
Page 3

_____

You should also understand that the Supreme Court has specifically defined "prurient appeal." It means a "shameful or morbid," and "unhealthy" interest in sex, as opposed to a normal, healthy, interest in sex. This comes from two other Supreme Court decisions: Roth v. United States and Brockett v. Spokane Arcades, with the Court noting in Brockett that government cannot ban entertainment that, "taken as a whole, does no more than arouse 'good, old fashioned, healthy' interest in sex." This definition certainly does not encompass all "adult" entertainment. And, the Supreme Court has been clear that mere nudity in-and-of-itself does not make an entertainment performance legally obscene.

With these fundamental legal concepts in mind, it should be clear that performance dance entertainment, whether it be clothed, "topless," or even fully nude, does not satisfy these legal precepts, and indeed there is absolutely no history here whatsoever of any performances being charged with, let alone being convicted of, being legally obscene.

First, the performances at issue are not legally obscene in that they do not satisfy the three tests of obscenity (all of which are constitutionally required, and there has never been even an allegation that they do). Second, the performances at issue do not satisfy even the single prong of being of a "prurient" sexual nature because they do not appeal to a "shameful or morbid," and "unhealthy" interest in sex as specifically defined by the Supreme Court -- particularly when applying the "contemporary community standards" which must be done in these legal circumstances.

Consequently, it is my opinion that the denial of a PPP loan based upon these regulatory provisions (which are not found in the PPP, nor are they contained in the PPP loan applications themselves) would be an unconstitutional action in-and-of itself.

As you are aware, last Thursdays' regulations make clear that these loans are to be issued on a "first-come, first-served" basis. The wrongful denial of a PPP loan application based upon the "prurient sexual nature" regulation (again, not adopted in the PPP itself) could then result in irreparable harm both to the applying business and, even more importantly, its innocent employees who are engaged in a perfectly legal – and indeed constitutionally protected – occupation, if the loan funds are exhausted before this matter can be rectified.

Finally, let me point out SBA Standard Operating Procedure, Lender Development Company Loan Programs, Doc. No. SOP 50 10 5(J) (January 1, 2018), which states, at Section 15(c) thereof (p. 93), that in the event you have an applicant that "may have a business aspect of a prurient sexual nature," you are to "submit your analysis and supporting documentation to the SBA at PSMReview@sba.gov for an eligibility determination."

April 7, 2020
Page 4

_____

I'd be happy to discuss these matters in further detail with you and/or provide to you any supporting materials that you may desire in order to verify my comments above. Should you have any further questions, please feel free to call me currently on my cell at 517-285-5222 (I'm home-bound right now because of the pandemic), or email me at brad@bradshaferlaw.com. Thank you for your consideration in this matter.

Sincerely:

Brad Shafer

Turnwald Decl.

EXHIBIT A
Page 4

# EXHIBIT B

LAW OFFICES
SHAFER & ASSOCIATES, P.C.
A PROFESSIONAL CORPORATION
3800 CAPITAL CITY BLVD., SUITE 2
LANSING, MI 48906
E-MAIL info@bradshaferlaw.com
PHONE: 517-886-6560
FAX: 517-886-6565

BRADLEY J. SHAFER
ALSO MEMBER, AZ BAR
Brad@bradshaferlaw.com

MATTHEW J. HOFFER
Matt@bradshaferlaw.com

To whom it may concern:

The purpose of this letter is to briefly discuss one aspect of the Payroll Protection Program ("PPP") loan application process as it is currently being administered under the recently enacted CARES Act; that being the particular provision found in 13 C.F.R. § 120.110(p), that could be construed (I believe incorrectly) to prohibit SBA loans to any and all "adult" businesses under the belief that they present entertainment of a "prurient sexual nature."

The term "prurient" is one part, of one element, of the three-prong legal test of "obscenity," which is the topic of my comments below. But before I discuss that in detail, I'd like to first share with you some of my credentials so that you can make your own evaluation of my qualifications to speak on this topic.

I have been an attorney since 1984 and am licensed in both Michigan and Arizona. I am also fully admitted to practice law before, and has actually practiced in, the United States District Courts for both the Eastern and Western Districts of Michigan, for both the Southern and Central Districts of Illinois, the Northern District of Indiana, the Western District of Texas, the Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits of the United States Court of Appeals, as well as the United States Supreme Court.

My practice concentrates on two primary areas of the law: First Amendment (Free Speech and expression) litigation -- which I believe to be particularly relevant to the subject of this letter -- and labor law. I am a past President of the First Amendment Lawyers Association (a national organization of trial lawyers who specialize in the protection of First Amendment rights) and am Chairman Emeritus of that group, and was one of the attorneys in the Supreme Court case of Barnes v. Glen Theatre, which established the constitutional protections of nude performance dance entertainment.

Because of my qualifications regarding Free Speech and expression rights, I have also received special permission to litigate and argue cases across the country in various federal and state courts in California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Missouri, North Carolina, Nevada, New Jersey, New York, Ohio, South Dakota, Tennessee, Washington, and West Virginia.

Turnwald Decl.

EXHIBIT B
Page 1

April 22, 2020
Page 2

Moreover, I am a published author on the topic of legal obscenity (again, relevant to the topic here). See, for example, Shafer, Patent Offensiveness: The Black Hole of Miller, 10 Thomas M. Cooley Law Review 1, 1-69 (1993) (this is the most comprehensive law review article ever published on this topic, and is particularly relevant to the issues I discuss below); Shafer, Sex, Lies, and Videotape: In Critique of the Miller Test of Obscenity, 70 Michigan Bar Journal No. 10, 1038-1045 (October 1991); Shafer, Jurisprudence of Doubt: Obscenity, Indecency and Morality at the Dawn of the 21st Century, 84 Michigan Bar Journal No. 6, 22-26 (June 2005); Linz, Donnerstein, Land, McCall, Scott, Shafer, Klein, and Lance, Estimating Community Standards: The Use of Social Science Evidence in an Obscenity Prosecution, 55 Public Opinion Quarterly 1, 80-112 (Spring 1991); and Linz, Shafer, Donnerstein, Land, Graesser, and McCall, Discrepancies Between the Legal Code and Community Standards for Sex and Violence: An Empirical Challenge to Traditional Assumptions in Obscenity Law, 29 Law & Society Review 1, 127-168 (1995).

That having been said and without getting into an esoteric analysis with full legal citations, the most important thing I believe that I can impart to you is that the concept of "prurience" has no legal recognition except as part of legal test of obscenity, which looks at whether:

> The average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

> Applying contemporary community standards, the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and

> A reasonable person would find that the work lacks serious literary, artistic, political, or scientific value.

This comes from three Supreme Court cases: Miller v. California, Smith v. United States, and Pope v. Illinois.

Moreover, the Supreme Court has been clear that all three test elements must be found to exist before the expression can be found to be devoid of constitutional protection (the case of Reno v. ACLU). Simply put, constitutional protections do not evaporate based on a finding of just one of these test elements. In that regard, I would point out that the PPP regulations distributed on Thursday even specifically state that all loans guaranteed by the SBA pursuant to the CARES Act will be made consistent with constitutional protections, including the First Amendment.

April 22, 2020
Page 3

You should also understand that the Supreme Court has specifically defined "prurient appeal." It means a "shameful or morbid," and "unhealthy" interest in sex, as opposed to a normal, healthy, interest in sex. This comes from two other Supreme Court decisions: Roth v. United States and Brockett v. Spokane Arcades, with the Court noting in Brockett that government cannot ban entertainment that, "taken as a whole, does no more than arouse 'good, old fashioned, healthy' interest in sex." This definition certainly does not encompass all "adult" entertainment. And, the Supreme Court has been clear that mere nudity in-and-of-itself does not make an entertainment performance legally obscene.

With these fundamental legal concepts in mind, it should be clear that performance dance entertainment, whether it be clothed, "topless," or even fully nude, does not satisfy these legal precepts, and indeed there is absolutely no history here whatsoever of any performances being charged with, let alone being convicted of, being legally obscene.

First, the performances at issue are not legally obscene in that they do not satisfy the three tests of obscenity (all of which are constitutionally required, and there has never been even an allegation that they do). Second, the performances at issue do not satisfy even the single prong of being of a "prurient" sexual nature because they do not appeal to a "shameful or morbid," and "unhealthy" interest in sex as specifically defined by the Supreme Court -- particularly when applying the "contemporary community standards" which must be done in these legal circumstances.

Consequently, it is my opinion that the denial of a PPP loan based upon these regulatory provisions (which are not found in the PPP, nor are they contained in the PPP loan applications themselves) would be an unconstitutional action in-and-of itself.

As you are aware, last Thursdays' regulations make clear that these loans are to be issued on a "first-come, first-served" basis. The wrongful denial of a PPP loan application based upon the "prurient sexual nature" regulation (again, not adopted in the PPP itself) could then result in irreparable harm both to the applying business and, even more importantly, its innocent employees who are engaged in a perfectly legal -- and indeed constitutionally protected -- occupation, if the loan funds are exhausted before this matter can be rectified.

Finally, let me point out SBA Standard Operating Procedure, Lender Development Company Loan Programs, Doc. No. SOP 50 10 5(J) (January 1, 2018), which states, at Section 15(c) thereof (p. 93), that in the event you have an applicant that "may have a business aspect of a prurient sexual nature," you are to "submit your analysis and supporting documentation to the SBA at PSMReview@sba.gov for an eligibility determination."

Turnwald Decl.

EXHIBIT B
Page 3

April 22, 2020
Page 4

_____

I'd be happy to discuss these matters in further detail with you and/or provide to you any supporting materials that you may desire in order to verify my comments above. Should you have any further questions, please feel free to call me currently on my cell at 517-285-5222 (I'm home-bound right now because of the pandemic), or email me at brad@bradshaferlaw.com. Thank you for your consideration in this matter.

Sincerely:

Brad Shafer

# EXHIBIT C

LAW OFFICES
SHAFER & ASSOCIATES, P.C.
A PROFESSIONAL CORPORATION
3800 CAPITAL CITY BLVD., SUITE 2
LANSING, MI 48906
E-MAIL info@bradshaferlaw.com
PHONE: 517-886-6560
FAX: 517-886-65665

BRADLEY J. SHAFER
ALSO MEMBER, AZ BAR
brad@bradshaferlaw.com

MATTHEW J. HOFFER
matt@bradshaferlaw.com

ZACHARY M. YOUNGSMA
ALSO MEMBER, NV BAR
zack@bradshaferlaw.com

To Whom It May Concern:

The purpose of this letter is to discuss one aspect of the Payroll Protection Program ("PPP") loan application process as it is currently being administered under the CARES Act and the recently enacted Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act. Specifically, I want to address the particular provision found in 13 C.F.R. § 120.110(p) which prohibits the granting of SBA loans to businesses that present entertainment of a "*prurient sexual nature*" (referred to below simply as the "Regulation"). This Applicant is concerned that the Regulation may, incorrectly, be considered in order to determine its loan eligibility.

The term "prurient" is one part, of one element, of the three-prong legal test of "obscenity" as handed down by the United States Supreme Court. For the reasons set forth below, *the Regulation does not apply to the business operated by this Applicant and should not, in any event, be used to determine this Applicant's loan eligibility.*

Summary of Reasons Why the Regulation Cannot Serve as a Basis to Deny a PPP Loan

1) The SBA's enabling Act, 15 U.S.C. § 631, *et seq.*, and in particular Section 633(e) thereof, only permits the denial of a loan if there has been a *judicial finding of legal obscenity*, which has not occurred, and which could not occur, here;

2) The entertainment presented at the Applicant's establishment does not meet the legal standard of being "prurient" as that term has been specifically defined by the United States Supreme Court; and

3) Irrespective of the two preceding points, there is an extensive body of recent case law *invalidating and enjoining enforcement of this Regulation*, with three federal appellate courts *refusing to stay those injunctions*[1] and with at least one of those injunctions arguably constituting a "*national*" injunction that enjoins the SBA's *and its lending banks'* use and enforcement of the Regulation throughout the entirety of the United States. *I was lead counsel in the first of those actions*.

Before detailing these points, however, I should share with you some of my credentials so that you can make your own evaluation of my qualifications to speak on these topics.

---

[1] These includes the States of Michigan, Ohio, Kentucky, Tennessee, Illinois, Indiana, Wisconsin, Texas, Louisiana, and Mississippi.

January 21, 2021
Page 2

_____

My Qualifications

I have been an attorney since 1984 and am licensed in both Michigan and Arizona.  I am also fully admitted to practice law before, and have actually practiced in, the United States District Courts for both the Eastern and Western Districts of Michigan; for both the Southern and Central Districts of Illinois; the Northern District of Indiana; the Western District of Texas; the Third, Fourth, Sixth, Seventh, Eighth, and Ninth Circuits of the United States Courts of Appeals; as well as the United States Supreme Court.

My practice concentrates on two primary areas of the law: First Amendment (Free Speech and Expression) litigation -- which I believe to be particularly relevant to the subject of this letter -- and labor law.  I am a past President of the First Amendment Lawyers Association (a national organization of trial lawyers who specialize in the protection of First Amendment rights), am Chairman Emeritus of that group, and was one of the attorneys in the Supreme Court case of *Barnes v. Glen Theatre*, which established the constitutional protections for exotic performance dance entertainment.

Because of my qualifications regarding Free Speech and Expression rights, I have also received special permission to litigate and argue cases before various appellate courts across the country, including the:

| | |
|---|---|
| Kentucky Supreme Court | Iowa Court of Appeals |
| Nevada Supreme Court | Kentucky Court of Appeals |
| New Jersey Supreme Court | North Carolina Court of Appeals |
| North Carolina Supreme Court | Ohio Court of Appeals |
| Tennessee Supreme Court | Tennessee Court of Appeals |
| New York Court of Appeals (that state's highest court) | Texas Court of Appeals |
| | Washington Court of Appeals |
| Florida Court of Appeals | |

Similarly, I have received special permission to litigate such cases in various federal district courts, including the Central District of California; the District of Connecticut; the Middle District Florida; the Middle District of Georgia; the Northern District of Illinois; the Southern District of Indiana; the Southern District of Iowa; the Western District of Kentucky; the Western District of Missouri; the Western District of North Carolina; the Northern District of Ohio; the Southern District of Ohio; the District of South Dakota; the Western District of Tennessee; the Middle District of Tennessee; the Western District of Washington; and the Northern District of West Virginia.

Along the same lines, I have also received special permission to appear in various state trial courts in such states as California, Florida, Indiana, Kentucky, Massachusetts, Minnesota, Missouri, Nevada, New Jersey, North Carolina, Ohio, Tennessee, Texas, and Washington.

Turnwald Decl.

EXHIBIT C
Page 2

January 21, 2021
Page 3

_____

Moreover, I am a published author on the topic of legal obscenity. My published works include: Shafer, *Patent Offensiveness: The Black Hole of Miller*, 10 Thomas M. Cooley Law Review 1, 1-69 (1993) (this is the most comprehensive law review article ever published on this topic, and is particularly relevant to the issues I discuss below); Shafer, *Sex, Lies, and Videotape: In Critique of the Miller Test of Obscenity*, 70 Michigan Bar Journal No. 10, 1038-1045 (October 1991); Shafer, *Jurisprudence of Doubt: Obscenity, Indecency and Morality at the Dawn of the 21*[st] *Century*, 84 Michigan Bar Journal No. 6, 22-26 (June 2005); Linz, Donnerstein, Land, McCall, Scott, Shafer, Klein, and Lance, *Estimating Community Standards: The Use of Social Science Evidence in an Obscenity Prosecution*, 55 Public Opinion Quarterly 1, 80-112 (Spring 1991); and Linz, Shafer, Donnerstein, Land, Graesser, and McCall, *Discrepancies Between the Legal Code and Community Standards for Sex and Violence: An Empirical Challenge to Traditional Assumptions in Obscenity Law*, 29 Law & Society Review 1, 127-168 (1995).

Finally, but probably most importantly here for you to be able to evaluate my qualifications to speak on these topics, because of my experience in First Amendment matters I have been extensively involved, as discussed above, in much of the recent litigation directed at the Regulation; including serving as lead counsel for 54 businesses that successfully sued the SBA, the Treasury Department, and Secretary Mnuchin in the United States District Court for the Eastern District of Michigan. I discuss that litigation, as well as other legal proceedings that have enjoined the Regulation, more fully below.

The Full Legal Test of Obscenity and its Application to SBA Loans

Let me begin by stating that the concept of "*prurience*" has no legal recognition *except* as part of the legal test of obscenity, which looks at whether:

The average person, applying contemporary community standards, would find that the work, *taken as a whole*, appeals to the *prurient interest*;

Applying contemporary community standards, the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; *and*

A reasonable person would find that the work lacks serious literary, artistic, political, or scientific value.

This comes from three Supreme Court cases: *Miller v. California*, *Smith v. United States*, and *Pope v. Illinois*.

Importantly, the Supreme Court has been clear that *all three* test elements must be found to exist before the expression can be found to be devoid of constitutional protection (the case of *Reno v. ACLU* establishes this). Simply put, constitutional protections of Free Speech and Free Expression under the First Amendment do not evaporate based on a mere finding of the presence

Turnwald Decl.

EXHIBIT C
Page 3

January 21, 2021
Page 4

of just one of these test elements or, as might even arguably be the case here, of just one *component* of one of these three test elements.[2]

Moreover, the SBA's enabling Act verifies just this point.

15 U.S.C. § 633 reads, in part:

**(e) Prohibition on provision of assistance**

Notwithstanding any other provision of law, the Administration *is prohibited* from providing any financial or other assistance to any business concern or other person engaged in the production or distribution of any product *or service* that has been determined to be obscene by a court of competent jurisdiction.

(All emphasis added, and sometimes simply referred to as "§ 633(e)").

In addition, the *legislative history* underlying this statute makes crystal clear that for an SBA loan to be denied, there must have been a *determination of obscenity made by a court utilizing the appropriate legal standards*. The original House Bill for § 633(e) had no such requirement and provided only that the entertainment must be "deemed" to be obscene in order to justify denial of a loan. The Senate felt that an actual adjudication of obscenity should be a prerequisite to justify loan denial, with the Conciliation Conference notes leading up to the final enactment of § 633(e) -- *which adopted the Senate approach* -- observing as follows:

The House bill had no similar provision.

The conferees adopted the Senate provision with the clarification that *any materials in question must have been judicially determined, in either a civil or criminal action, to be legally obscene under the prevailing constitutional standards in order for the ban to apply*.

H.R. CONF. REP. 103-824, 54, 1994 U.S.C.C.A.N. 3436, 3455 (Section 611, all emphasis added) (Ex. A hereto, highlighted language).

Consequently, *the SBA's enabling Act is in full accord* with the proposition that only entertainment that has been *determined in court* to satisfy *all three prongs* of the obscenity test as handed down by the Supreme Court (and all components of those three elements), and therefore which is then *illegal*, can serve as a basis to deny SBA loans. *Lawful* entertainment, however,

---

[2] I would also point out that the Interim Final Rules issued by the SBA for the PPP, both initially under the CARES Act and more recently with regard to the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act, make clear that SBA loans are to be made consistent with constitutional protections; *specifically including the First Amendment*.

Turnwald Decl.                                                                    EXHIBIT C
                                                                                  Page 4

January 21, 2021
Page 5

cannot constitute justification under § 633(e), and therefore under the SBA Act, for denying an SBA loan; whether through the PPP or otherwise.

This is further confirmed by the Congressional limitation for excluding loans as is contained in 15 U.S.C. § 636(a)(1)(B). There, in a subheading titled "background checks" under the general heading of "Loans to small business concerns," Congress provided that prior to the approval of any loan, the Administrator may:

> . . .verify the applicant's criminal background, or lack thereof, through the best available means, including, if possible, use of the National Crime Information Center computer system at the Federal Bureau of Investigation.

Congress has certainly empowered the SBA to deny loans based upon the *criminal history* (including then, of course, convictions for obscenity) of the applicant. What would *not* constitute a "criminal record" is presenting live performances that may (for the sake of argument here) satisfy one component of one of the three constitutional test elements of obscenity but that *nevertheless remain fully protected expression under the First Amendment.*

Accordingly, even if the entertainment of this Applicant could be considered to be "prurient" (which it cannot, for the reasons discussed in the subsection of this letter immediately below), that does not serve as a basis, under the SBA Act, to deny a PPP loan application. In fact, I would point out that there is absolutely *no history here whatsoever* of *any* performances at the Applicant's establishment charged as, let alone being convicted of, being legally obscene.

Nor has there ever been even an *allegation* that any of those performances satisfy any of the *other* test elements of obscenity which must be applied, *and found to exist by a court adjudication*, in order to justify loan denial. As such, there would be no grounds under the clear language of the SBA Act to deny this loan application based upon the nature of the entertainment that the Applicant presents.

 The Constitutional Standard of Prurient Appeal

You should also understand that the Supreme Court has *specifically defined* "prurient appeal." It means a "*shameful or morbid," and "unhealthy*" interest in sex, as opposed to a normal, healthy, interest in sex. This comes from two other Supreme Court decisions: *Roth v. United States* and *Brockett v. Spokane Arcades*, with the Court noting in *Brockett* that government cannot ban entertainment that, "taken as a whole, *does no more than arouse 'good, old fashioned, healthy' interest in sex*." This definition, which is undeniably applicable to the Regulation in light of the SBA's enabling Act's adoption of the legal test of obscenity through § 633(e), certainly does *not* encompass all "adult" entertainment. And, the Supreme Court has been clear, time and time again, that *mere nudity* in-and-of-itself does *not* make an entertainment performance legally obscene.

With these fundamental legal concepts in mind, it should be clear that performance dance entertainment, whether it be clothed, "topless," or even fully nude, does not satisfy this "prurient"

January 21, 2021
Page 6

test component, even if this one aspect of the *Miller* test of obscenity could be used by itself to evaluate the legality or illegality of any expression, which it certainly cannot; *see* the Supreme Court's very detailed discussion of just this point in *Reno v. ACLU* (even though the full three-part test of obscenity satisfies constitutional standards, one element of that test *standing alone* is impermissibly vague).

In fact, the entertainment at issue is anything but "shameful or morbid" and "unhealthy," particularly when applying the "contemporary community standards" that must be utilized under the legal standards as established by the Supreme Court. This is aptly demonstrated by the simple fact that there have been virtually no obscenity prosecutions (successful or otherwise) brought anywhere in the country against exotic dancers, *and certainly not against any entertainers who perform at the Applicant's entertainment facility*.

Consequently, it is my opinion that the denial of a PPP loan based upon this Regulation in these circumstances would be an unconstitutional and illegal action in-and-of-itself.

Recent Litigation History Concerning the Regulation

My opinions above are backed up by the decisions of numerous federal courts.

First, in *DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*, 459 F. Supp. 3d 943 (E.D. Mich. 2020) ("*DV Diamond Club*," and attached as Exhibit B), I brought suit on behalf of 53 exotic dance establishments and one adult bookstore after they had been subjected to the SBA's application of the Regulation. We moved for a preliminary injunction, which the district court granted. The SBA filed an appeal to the Sixth Circuit United States Court of Appeals, together with a motion requesting that the preliminary injunction be stayed. The appellate court _denied_ the SBA's motion to stay the preliminary injunction (Exhibit C hereto), and as a consequence that preliminary injunction order *remains in place and valid*.

Second, in *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 458 F. Supp. 3d 1044 (E.D. Wis. 2020) ("*Camelot Banquet*," and attached as Exhibit D hereto), four exotic dance nightclubs also filed suit making the same allegations as my plaintiffs in *DV Diamond Club* (basically using the pleadings that I had prepared in *DV Diamond Club*). The Judge in *Camelot Banquet* concluded "that the plaintiffs have a high likelihood of success on their claim that § 120.110(p) [*i.e.*, the Regulation] *violates the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause*," id. at 1061 (emphasis and clarification added), and similarly entered a preliminary injunction. Like the *DV Diamond Club* case, the SBA appealed and filed a motion to stay the preliminary injunction, which was similarly *denied* by the Seventh Circuit United States Court of Appeals. Exhibit E hereto.

Important to the fundamental point of this letter and the eligibility determination that must be made, the *Camelot Banquet* court specifically found that the Regulation *did not even apply* to the exotic dance nightclubs at issue there. The court stated:

Turnwald Decl.                                                                    EXHIBIT C
                                                                                   Page 6

January 21, 2021
Page 7

_____

The government does note that, when the SBA published the regulation in the Federal Register, it stated that "an establishment featuring nude dancing ... would not be eligible for SBA financial assistance" if such dancing was responsible for a significant portion of the establishment's gross revenue. 60 Fed Reg. at 64,360. But the government does not attempt to show that the meaning of "live performances of a prurient sexual nature" encompasses all forms of nude dancing or the specific forms of dancing offered by the plaintiffs. Indeed, some of the plaintiffs offer only semi-nude dancing—in which the dancers wear at least pasties and G-strings. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991) (holding that municipality may require erotic dancers to don pasties and G-strings, which makes erotic expression "less graphic").[3] The government does not argue that this "less graphic" form of erotic dance entertainment is prurient.

*Because the government has not developed an argument showing that the plaintiffs present live performances of a prurient sexual nature (or otherwise fit within the language of 15 [sic] C.F.R. § 120.110(p)), I conclude that, for this reason alone, the plaintiffs are likely to succeed on the merits of their claims.*

Id. at 1055 (emphasis added).

For the reasons that I have discussed above, the same circumstances apply here.

Moreover, the order entered in the *Camelot Banquet* case appears to me -- and appeared to our Judge in our *DV Diamond Club* litigation -- to enjoin the SBA *and its lending banks* from enforcing the Regulation against *anyone* (including, then, obviously, this Applicant).  Here is the plain language of the Wisconsin district court's preliminary injunction order:

The Administrator of the U.S. Small Business Administration and the Secretary of the Treasury, as well as their employees, agents and representatives, *including the SBA's lending banks*, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and the associated SBA Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) in making eligibility determinations for loans under 15 U.S.C. § 636(a)(36).

*Camelot Banquet*, 458 F. Supp. 3d at 1065 (emphasis added).  And please remember, again, that the SBA sought to have the appellate court stay this preliminary injunction order, but that request was *denied*.  Thus, *this order remains in place today*.

Third, on October 20, 2020, yet another district court enjoined enforcement of the Regulation in a suit brought by seven exotic dance facilities.  *D. Houston Inc. v. United States Small Bus. Admin.*, No. CV H-20-2308, 2020 WL 6268528 (S.D. Tex. Oct. 20, 2020) (Exhibit F hereto).  That court observed that the Regulation "impermissibly prohibit[ed] prospective PPP loan applicants from engaging in protected speech," and explicitly stated that the Regulation was an

_____

[3] As stated above, I was one of the attorneys in the Supreme Court on this *Barnes* case.

Turnwald Decl.

EXHIBIT C
Page 7

January 21, 2021
Page 8

_____

impermissible "content-based restriction." 2020 WL 6268528, at *5. The court thus concluded that the plaintiffs there had demonstrated a "substantial likelihood of success on the merits as to their First Amendment claim," and enjoined the SBA from enforcing the Regulation.  Id. at *8.

As in *DV Diamond Club* and *Camelot Banquet*, the SBA asked the Fifth Circuit United States Court of Appeals to stay the injunction issued by the district court, but, yet again, that request was *denied*.  Exhibit G hereto.

Three different federal district courts have *enjoined the enforcement of the Regulation at issue,* and three different appellate courts have *denied* the SBA's requests to stay those injunctions. Accordingly, the Regulation should play *no role* in determining whether to grant or deny the application at issue.

Concluding Remarks

As you are aware, this second round of PPP loans, just like the first round, are to be issued on a "first come, first served" basis (after some priority applicants).  The wrongful denial of a second round PPP loan application based upon the "prurient sexual nature" Regulation could then result in irreparable harm both to this Applicant and, even more importantly, its innocent employees who are engaged in a perfectly legal – and indeed *constitutionally protected* – occupation, if the loan funds are exhausted before any dispute concerning this particular Applicant can be resolved.

I'd be happy to provide to you copies of the Supreme Court cases that I have discussed above, to discuss these matters in further detail with you, to provide to you any supporting materials that you may desire in order to verify my comments above, and to answer any questions that you may have regarding the contents of this letter.  Please feel free to call me at my office number above or on my cell at 517-285-5222, or to email me at brad@bradshaferlaw.com.

Thank you for your consideration in this matter.

Sincerely,

*Bradley J. Shafer*

_____
Bradley J. Shafer

Turnwald Decl.                                                                                                    EXHIBIT C
                                                                                                                            Page 8

# Exhibit A

Turnwald Decl.

EXHIBIT C
Page 9

H.R. CONF. REP. 103-824, H.R. Conf. Rep. No. 824, 103RD Cong.,
2ND Sess. 1994, 1994 WL 542750, 1994 U.S.C.C.A.N. 3436 (Leg.Hist.)

**\*1** P.L. 103–403, SMALL BUSINESS ADMINISTRATION REAUTHORIZATION AND AMENDMENTS ACT OF 1994

**\*\*3436** SMALL BUSINESS ADMINISTRATION REAUTHORIZATION

DATES OF CONSIDERATION AND PASSAGE

Senate: August 18, October 5, 1994
House: September 21, October 4, 1994
Cong. Record Vol. 140 (1994)
Senate Report (Small Business Committee) No. 103–332,
Aug. 10, 1994 (To accompany S. 2060)
House Report (Small Business Committee) No. 103–616,
July 21, 1994 (To accompany H.R. 4801)
House Conference Report No. 103–824,
Oct. 3, 1994 (To accompany S. 2060)

HOUSE CONFERENCE REPORT NO. 103−824

October 3, 1994
[To accompany S. 2060]

**\*\*0** CONFERENCE REPORT (H. REPT. 103–824)

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 2060), to amend the Small Business Act and the Small Business Investment Act of 1958, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment, insert the following:

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) Short Title.–This Act may be cited as the "Small Business Administration Reauthorization and Amendments Act of 1994".

(b) Table of Contents.–The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

### TITLE I–AUTHORIZATIONS

Sec. 101. Authorizations.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 10

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 25 of 77

Congress, the President and the public need to know whether these programs represent sound investments of the taxpayers' dollars in terms of jobs created or retained and taxes paid by firms receiving SBA assistance. SBA is urged to complete this report in the most timely fashion possible consistent with quality and reliability of data. Outside contractors may be used as needed, as well as in-house resources of the Office of Advocacy or other government agencies.

The Conferees wish to make clear that as to factor number eight (Sec. 606(b)(8)), "taxes paid by businesses which received the loans or financings under each program", the Conferees expect, to the greatest extent practicable, that the Administration will include within the definition of "taxes paid," all applicable Federal taxes withheld by a business on behalf of its employees. In other words, the phrase "taxes paid by businesses" is to include, if such figures are easily obtainable, taxes owed by individuals employed by such businesses as the result of their employment.

Sec. 607. SBIR vendors

The Senate bill contained a provision that extended from one year to three years the maximum term for contracts under which private sector vendors provide technical assistance to recipients of awards under the Small Business Innovation Research (SBIR) Program, pursuant to section 9(q) of the Small Business Act.

The House amendment (Sec. 608) contained an identical provision.

The Conference Agreement includes this provision.

**3455   *54   Sec. 608. Program extension

The Senate bill extended the authority of Native American tribes to enter into joint ventures with firms certified under the Sec. 8(a) program, a business development program for firms owned by socially or economically disadvantaged individuals. The House bill contained no similar provision. The conferees adopted a provision extending the current joint venture authority for three years.

Sec. 609. Prohibition on the use of funds for individuals not lawfully within the United States

Both bills and the conference agreement prohibited SBA financial assistance to individuals who are known by SBA to be illegal aliens.

Sec. 610. Office of Advocacy Employees

The Senate bill modifies the authority of the Chief Counsel for Advocacy to hire the employees provided for under 15 U.S.C. 634d by eliminating the requirement that the Chief Counsel obtain the approval of the SBA Administrator. In addition, the Senate bill provided the Chief Counsel an increase of four employees in the personnel ceiling of the Office of Advocacy. Such employees are to be compensated at a rate not in excess of GS–15, step 10.

The House amendment contained a similar provision and receded to the Senate provision.

Sec. 611. Prohibition on the provision of assistance

The Senate bill prohibits the Administration from providing assistance to businesses engaged in the production and distribution of obscene products and services. This section was written in response to the recent repeal of SBA's "opinion molder rule". With the repeal of the rule, businesses such as newspapers, movie theaters, radio stations and bookstores now

EXHIBIT C
Page 11

are eligible for SBA assistance. This means businesses involved in the production and distribution of obscene products and services also could seek Administration support. This section makes clear that the Administration is not authorized to provide any assistance to those engaged in any class of "obscene" business as defined by the U.S. Supreme Court (and thus not entitled to First Amendment protection). The section is intended to cover the narrow range of adult theme businesses, including adult book stores, adult theaters, adult film and video producers, and adult film and video distributors. It is not meant to apply to businesses such as convenience stores carrying adult materials that do not fall within the Supreme Court's definition of obscenity.

The House bill had no similar provision.

The conferees adopted the Senate provision with a clarification that any materials in question must have been judicially determined, in either a civil or criminal action, to be legally obscene under prevailing constitutional standards in order for the ban to apply.

**\*\*3456  \*55**  Sec. 612. Certification of compliance with child support obligations

Both bills contained provisions requiring SBA borrowers to certify that they are not in violation of any court order or agreement requiring the payment of child support. The conference report contains the same provision with a clarification that the prohibition refers to a substantial non-compliance with court orders, administrative orders, or agreements, specifically 60 days or more in arrears.

While intending to strengthen federal policy in support of family support obligations, the conferees recognize that economic circumstances may from time to time cause a parent to be late in such payments. It is not the intent of the conferees to subject minor lapses to the severe criminal and civil penalties contained in both the Small Business Act and the False Statements Act for false representations made to the agency in the course of a loan application or other application for assistance. Hence, the conference agreement provides for a certification that the applicant is not more than 60 days late in making any child support payment required by court order or agreement. Loan applicants should be advised of this provision at the outset of the application process, but certification pursuant to this section may be made as part of the loan closing.

Sec. 613. Advocacy study of paperwork and tax impact

The House amendment contained a provision (sec. 708) that would require the Chief Counsel for Advocacy of the Small Business Administration (SBA) to conduct a comprehensive study of the impact of all Federal regulatory, paperwork and tax requirements on small business. State and local regulations, paperwork or tax burdens are not within the scope of this study.

Under this provision, the Chief Counsel for Advocacy must report the findings of this comprehensive study to Congress within one year of the enactment of this provision. One of the primary responsibilities of the Office of Advocacy of the SBA is to interface with all Federal regulatory agencies during the rulemaking process. Another responsibility of the Office of Advocacy is to serve as an Ombudsman for the interests of small business throughout the Federal government. The study required by the provision will greatly assist the Office of Advocacy in fulfilling its mission.

The Senate bill contained no similar provision, and receded to the House amendment.

> John J. LaFalce,
> Neal Smith,
> Ron Wyden,
> Jan Meyers,
> Richard H. Baker,
> Managers on the part of the House.

Turnwald Decl. © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 12

# Exhibit B

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 28 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

459 F.Supp.3d 943
United States District Court, E.D.
Michigan, Southern Division.

DV DIAMOND CLUB OF
FLINT, LLC, et al., Plaintiffs,

v.

UNITED STATES SMALL BUSINESS
ADMINISTRATION, et al., Defendants.

Case No. 20-cv-10899
|
Signed May 11, 2020

**Synopsis**
**Background:** Businesses that provided lawful clothed, semi-nude, or nude performance entertainment brought action against United States Small Business Administration, challenging rule which excluded sexually oriented businesses from obtaining relief in the form of loans under Paycheck Protection Program (PPP) authorized under the Coronavirus Aid, Relief, and Economic Security (CARES) Act. Businesses moved for preliminary injunction.

**Holdings:** The District Court, Matthew F. Leitman, J., held that:

preliminary injunctive relief was available;

businesses established likelihood of success on merits, as required for grant of preliminary injunction;

businesses established irreparable harm, as required for grant of preliminary injunction; and

balance of harms weighed in favor of grant of preliminary injunction.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

 **\*946** Bradley J. Shafer, Matthew J. Hoffer, Shafer Assoc., Lansing, MI, Peter E. Garrell, Fortis LLP, Costa Mesa, CA, Gary S. Edinger, Gary S. Edinger, Attorney at Law, Gainesville, FL, for Plaintiffs.

James J. Gilligan, DOJ, Washington, DC, Peter A. Caplan, United States Attorney's Office, Detroit, MI, for Defendants.

**OPINION AND ORDER GRANTING PLAINTIFFS' AND INTERVENORS' MOTIONS FOR A PRELIMINARY INJUNCTION (ECF Nos. 12, 23)**

MATTHEW F. LEITMAN, UNITED STATES DISTRICT JUDGE

In order to mitigate the economic devastation caused by the COVID-19 pandemic, the United States Congress passed, and President Trump signed, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). A primary purpose of the CARES Act is ensuring continued employment and income for employees of American small businesses. To that end, Congress created the Paycheck Protection Program (the "PPP") as part of the CARES Act. That program authorizes the Small Business Administration (the "SBA") to guarantee hundreds of billions of dollars in loans to small businesses. The loans are to be made by private lenders, and they may be forgiven if, among other things, the businesses use the funds to continue to pay their employees' wages. *See* 15 U.S.C. § 636(a)(36); 15 U.S.C. §§ 9005, 9006.

Congress intended that the SBA would make the PPP loan guarantees widely available to small businesses across the commercial spectrum. Indeed, Congress was aware that the SBA had historically declared certain classes of businesses ineligible for SBA lending, and Congress set about to "[i]ncrease[ ] [e]ligibility" for PPP loan guarantees. 15 U.S.C. § 636(a)(36)(D). Congress did that by establishing only two criteria for PPP loan guarantee eligibility and providing that "*any* business concern ... *shall* be eligible" for a PPP loan guarantee if it met those criteria. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added).

Despite this direction from Congress, the SBA adopted a rule excluding from PPP loan guarantee eligibility a wide range of businesses – including banks, political lobbying firms, certain private clubs with restrictive admissions practices, and sexually oriented businesses that present entertainment or sell products of a "prurient" (but not unlawful) nature (the "PPP Ineligibility Rule"). While Congress may once have been willing to permit the SBA to exclude these businesses from

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 14

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 29 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

its (the SBA's) lending programs, that willingness evaporated when the COVID-19 pandemic destroyed the economy and threw tens of millions of Americans out of work. Simply put, Congress did not pick winners and losers in the PPP. Instead, through the PPP, Congress provided temporary paycheck support to *all* Americans employed by *all* small businesses that satisfied the two eligibility requirements – even businesses that may have been disfavored during normal times. Thus, the SBA's PPP Ineligibility Rule is invalid because it contravenes the PPP.

The Plaintiffs in this case are primarily businesses that provide lawful "clothed, semi-nude, and/or nude performance entertainment." (Mot., ECF No. 12, PageID.475.) They have been shuttered by **\*947** the COVID-19 pandemic and the "stay at home" orders issued in response to the pandemic. They applied for PPP loans and intended to use the borrowed funds primarily to pay their displaced employees. But because their lawful entertainment was deemed to be of a "prurient sexual nature," the PPP Ineligibility Rule prevented them from obtaining PPP loans and/or from fully participating in the PPP.

Plaintiffs contend, among other things, that the PPP Ineligibility Rule is invalid because it contravenes the PPP. (*See* Am. Compl., ECF No. 11.) They have now filed a motion seeking a preliminary injunction barring the SBA from enforcing against them the provisions of the PPP Ineligibility Rule that prohibit sexually oriented businesses from obtaining PPP loan guarantees. (*See* Mot., ECF No. 12.) For the reasons explained below, the motion is **GRANTED**.

**I**

**A**

The SBA is "a government agency established by § 204 of the Small Business Act of 1953, 67 Stat. 233 (codified in 1958 at 15 U.S.C. § 633)." *United States v. Peoples Household Furnishings, Inc.*, 75 F.3d 252, 253 (6th Cir. 1996). Among other things, the SBA "aid[s], counsel[s], assist[s], and protect[s] ... the interests of small-business concerns." *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960). The Small Business Act provides the SBA and its Administrator "extraordinarily broad powers to accomplish these important objectives, including [the ability to lend] money to small businesses whenever [those businesses] could not get necessary loans on reasonable terms

from private lenders." *Id.* In addition to directly lending money to small businesses, the SBA may guarantee loans made by private lenders. *See id.* The SBA may also "establish general policies" governing the "granting and denial" of the financial assistance it provides. 15 U.S.C. § 633(d).

On January 31, 1996, the SBA first declared certain types of businesses ineligible to participate in SBA lending programs (the "Original SBA Ineligibility Rule"). The Original SBA Ineligibility Rule is codified at 13 C.F.R. § 120.110. The rule prohibits "banks," "[l]ife insurance companies," "businesses primarily engaged in political or lobbying activities," "[b]usinesses deriving more than one-third of gross annual revenue from legal gambling activities," and "[p]rivate clubs and businesses which limit the number of memberships for reasons other than capacity," among others, from receiving SBA-backed loans. 13 C.F.R. §§ 120.110(b), (f), (g), (i), and (r). In addition, and most relevant here, the Original SBA Ineligibility Rule prohibits certain sexually oriented businesses from participating in SBA lending programs. More specifically, it provides that the following businesses are barred from receiving SBA financial assistance:

(p) Businesses which:

(1) Present live performances of a prurient sexual nature; or

(2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature;

120.110(p)(1)-(2).

In 2019, the SBA issued its "Standard Operating Procedure for Lender and Development Company Loan Programs 50 10 5(K)" (the "2019 SOP"). (*See* the 2019 SOP, ECF No. 12-11.) This publication provides guidance to lenders concerning how to administer and apply the SBA's rules and regulations, including the Original SBA Ineligibility Rule. (*See id.*) In **\*948** relevant part, the 2019 SOP explains that "certain business types" may be "ineligible" to participate in SBA loan programs. (*Id.*, PageID.570.) With respect to businesses that present entertainment or sell products of a "prurient sexual nature," the 2019 SOP instructs lenders as follows:

a. A business is not eligible for SBA assistance if:

i. It presents live or recorded performances of a prurient sexual nature; or

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 15

Case 3:24-cv-04241-LJC     Document 50-1     Filed 03/19/26     Page 30 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

ii. It derives more than 5% of its gross revenue, directly or indirectly, through the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature.

b. SBA has determined that financing lawful activities of a prurient sexual nature is not in the public interest. The Lender must consider whether the nature and extent of the sexual component causes the business activity to be prurient.

c. If a Lender finds that the Applicant may have a business aspect of a prurient sexual nature, prior to submitting an application to the LGPC (non-delegated) or requesting a loan number (delegated), the Lender must document and submit the analysis and supporting documentation to the Associate General Counsel for Litigation at PSMReview@sba.gov for a final Agency decision on eligibility. Upon approval by SBA, the Lender may submit the application to the LGPC or may proceed to process the loan under its delegated authority. A non-delegated Lender must submit a copy of SBA's approval with the application to the LGPC. A delegated Lender must retain its analysis, supporting documentation, and evidence of SBA's approval in its loan file and must submit the analysis and supporting documentation to SBA with any request for guaranty purchase. SBA also may review such documentation when conducting Lender oversight activities.

(*Id.*, PageID.571.)

**B**

In March 2020, Congress passed the CARES Act in order to "provide an economic stimulus for our nation's businesses and citizens" affected by the COVID-19 pandemic. *Am. Ass'n of Political Consultants v. U.S. Small Bus. Admin.*, 2020 WL 1935525, at *1 (D.D.C. Apr. 21, 2020). Title I of the CARES Act focuses on supporting displaced American employees. It is titled the "Keeping American Workers Paid and Employed Act." *See* Pub. L. No. 116-136, 134 Stat. 281 (2020) at Title I. The PPP is within Title I of the CARES Act. *See* 15 U.S.C. § 636(a)(36).

Another federal court recently provided the following succinct and helpful explanation concerning how the PPP operates:

The PPP is a new loan program to be administered by the SBA under Section 7(a) of the Small Business Act (codified at 15 U.S.C. § 636(a)). Its purpose is to assist small businesses during the COVID-19 crisis by immediately extending them loans on favorable terms. The loans are made by the SBA's participating banks and guaranteed by the SBA itself. Section 1106 of the CARES Act provides that a borrower's indebtedness under a PPP loan will be forgiven to the extent that the borrower uses the funds to pay expenses relating to payroll, mortgage interest, rent, and utilities during the eight-week period following the loan's origination. CARES Act § 1106. If a borrower qualifies for loan forgiveness, the SBA must pay the lender an amount equal to the amount forgiven, plus any interest accrued through the date of payment. *Id.* § 1106(c)(3). However, the SBA has determined that not more than 25% of the loan forgiveness **\*949** amount may be attributable to non-payroll costs. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813–14 (April 15, 2020).

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1050–51 (E.D. Wis. May 1, 2020).

Congress initially "provided the SBA with $349 billion" in PPP loan guarantees for "small businesses struggling to make ends meet during the COVID-19 crisis." *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *1; *see also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. at 20812. The SBA quickly exhausted the initial $349 billion in loan guarantees, and Congress then appropriated an additional $310 billion for loan guarantees under the PPP. *See* The Paycheck Protection and Health Care Enhancement Act, Pub. L. No. 116-139, ——

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 16

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 31 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

Stat. ——, § 101(a)(1). The PPP loan guarantees are made on a "first-come, first-serve[ ]" basis. Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. at 20813

### C

One section of the PPP is intended to broaden the class of businesses that are eligible to receive SBA financial assistance. That section is titled "Increased Eligibility for Certain Small Businesses and Organizations." 15 U.S.C. § 636(a)(36)(D). The section provides, in relevant part, that "[d]uring the covered period, in addition to small business concerns, *any* business concern ... *shall* be eligible to receive a covered [*i.e.*, SBA-guaranteed] loan" if the business employs less than 500 employees or, "if applicable," less than "the size standard in number of employees established by the Administration for the industry in which the business concern ... operates." 15 U.S.C. § 636(a)(36)(D)(i)(I)-(II) (emphasis added).

### D

Shortly after the enactment of the PPP, the SBA adopted a set of rules governing the implementation and administration of PPP loan guarantees. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020). The PPP Ineligibility Rule is one of those new rules. *See id.* at 20812 (stating rule).

The PPP Ineligibility Rule provides that businesses that "are identified" in the Original SBA Ineligibility Rule and "described further" in the 2019 SOP "are not eligible for PPP loans." *Id.* As noted above, the Original SBA Ineligibility Rule and the 2019 SOP deem ineligible for SBA financing businesses that (1) "[p]resent live performances of a prurient sexual nature" and/or (2) "[d]erive directly or indirectly more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110.(p)(1)-(2). (*See also* 2019 SOP, ECF No. 12-11, PageID.571. [1] ) Thus, these sexually oriented businesses are ineligible to receive PPP loan guarantees under the PPP Ineligibility Rule.

### E

Plaintiffs own and operate "venues that present clothed, semi-nude, and/or nude **\*950** performance entertainment," adult novelty stores, and "businesses that service those establishments." (Mot., ECF No. 12, PageID.475.) Each Plaintiff alleges that "[n]one of the live performances" at the Plaintiff's establishment – or, for the Plaintiffs that provide services to entertainment establishments, none of the performances at the establishments that Plaintiffs provide services to – are "unlawful or obscene." (Am. Compl. at ¶147, ECF No. 11, PageID.275.) The Plaintiffs that own or operate entertainment establishments further allege that none of the "entertainers who have performed on [their] premises have ever been charged, let alone convicted, of any crimes of obscenity." (*Id.* at ¶134, PageID.272.) Finally, the establishment-owning Plaintiffs maintain that they "present[ ] lawful entertainment in conformity with [their] various licenses, permits, or government approvals." (*Id.* at ¶135, PageID.272.)

Plaintiffs have each had to cease operations for a substantial period of time and/or have lost significant business due to the ongoing COVID-19 pandemic and the various "stay at home" orders issued in the states in which they operate. Due to their financial hardships, they have each sought loans under the PPP. They seek the loans "in order to mitigate [their] business losses and to provide monetary relief to [their] employees." (*Id.* at ¶79, PageID.257.) They intend to spend at least "75% of [the] PPP loans" on "employee wages and salaries." (*Id.*)

Plaintiffs have had different experiences in the PPP loan application process. The Plaintiffs fall into the following categories:

- 33 Plaintiffs have submitted applications and had their applications denied by their local lender because of the PPP Ineligibility Rule (Plaintiffs DB Entertainment, Inc.; Millennium Restaurant Group, Inc.; T and N Incorporated; Burch Management Company, Inc.; JCB of Gainesville, Inc.; MAG Enterprises, Inc.; 2740 Corporation; Brookhurst Venture, LLC; City of Industry Hospitality Venture, Inc.; Farmdale Hospitality Services, Inc.; Inland Restaurant Venture I, Inc.; Midnight Sun Enterprises, Inc.; Olympic Avenue Venture, Inc.; The Oxnard Hospitality Services, Inc.; Platinum SJ Enterprise; Rouge Gentlemen's Club, Inc.; Washington

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 32 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

Management, LLC; PNM Enterprises, Inc.; Rialto Pockets, Inc.; Santa Barbara Hospitality Services, Inc.; Santa Maria Restaurant Enterprises, Inc.; The Spearmint Rhino Adult Superstore, Inc.; High Expectations Hospitality, LLC; Kentucky Hospitality Venture, LLC; K-Kel, Inc.; L.C.M., LLC; Nitelife, Inc.; Penn Ave Hospitality, LLC; Sarie's Lounge, LLC; World Class Ventures, LLC; W.P.B. Hospitality, LLC; The Spearmint Rhino Companies Worldwide, Inc.; and Spearmint Rhino Consulting Worldwide, Inc.);

- 2 Plaintiffs have attempted to submit a loan application but their local lender refused to accept or process the application because of the PPP Ineligibility Rule (Plaintiffs Filosadelfia, LLC and Polmour, Inc.);

- 6 Plaintiffs have submitted loan applications, have not received a decision on their applications, and "reasonably believe" that – because of the PPP Ineligibility Rule – their applications will be rejected and/or delayed until the PPP funds are exhausted (Plaintiffs BDS Restaurant, Inc.; Benelux Corporation; MAG Pitt LP; Stone Park Entertainment, Inc.; Seventy7, LLC; and V.C. Lauderdale, Inc.); and

- 1 Plaintiff has been told its application for a PPP loan will be approved (absent a lack of funding or other **\*951** unforeseen circumstance) but has also been told that it may not qualify for loan forgiveness because of the PPP Ineligibility Rule (Plaintiff DV Diamond Club of Flint, LLC).

While Plaintiffs' PPP loan applications have been denied by lenders, rather than by the SBA itself, the Plaintiffs have presented evidence that the lenders are acting in accord with the SBA's view of the PPP Ineligibility Rule. For instance, Plaintiffs have presented evidence that at least one representative of the SBA has opined that a "men's club with strippers" is "definitely not eligible" for a PPP loan. (ECF No. 31-2, PageID.1004.) Moreover, the Plaintiffs have presented evidence that in parallel federal litigation in another district, the SBA has argued that "businesses that feature live entertainment explicitly intended to be 'erotic' " – as most of the Plaintiffs do here – "undoubtedly fall within the plain language of" the PPP Ineligibility Rule. (Motion for Stay filed in *Camelot Banquet Rooms*, *supra*, ECF No. 39-3, PageID.1135.)

## II

This action was initially filed on April 8, 2020, by Plaintiff DV Diamond Club of Flint, LLC, an adult-entertainment establishment located in Flint, Michigan. (*See* Compl., ECF No. 1.) On April 17, 2020, DV Diamond Club and 41 new co-Plaintiffs from across the country filed an Amended Complaint. (*See* Am. Compl., ECF No. 11.) They name as Defendants the SBA, Jovita Carranza (the SBA's Administrator), the United States of America, and Steven Mnuchin (the United States Treasury Secretary). (*See id.*)

In the Amended Complaint, Plaintiffs each broadly allege that:

- They are sexually oriented businesses engaged in lawful conduct;

- They have had to close and/or they have lost significant business due to the ongoing COVID-19 pandemic;

- They meet the eligibility requirements identified in the PPP for a PPP loan but have been denied such a loan, fear that they will be denied such a loan, and/or fear that they will be denied loan forgiveness due to the PPP Ineligibility Rule; and

- They plan to use at least 75% of the PPP loan to pay for the salaries and wages of their employees.

Plaintiffs bring three claims in the Amended Complaint. In Count One, Plaintiffs allege that the portions of the PPP Ineligibility Rule excluding sexually oriented businesses from participating in the PPP violate the First Amendment because they are "impermissible content-based restrictions on speech," are "unconstitutionally vague," and "fail to conform to constitutional standards regarding obscenity." (*Id.* at ¶520, PageID.361-362.) In Count Two, Plaintiffs claim that the portions of the PPP Ineligibility Rule excluding sexually oriented businesses from participating in the PPP violate the Fifth Amendment because they "treat establishments presenting certain forms of performance dance entertainment, such as Plaintiff, differently from establishments presenting other forms of entertainment or no entertainment, for no compelling, important, or rational reason" and because they are "impermissibly vague." (*Id.* at ¶523, PageID.363-364.) Finally, in Count III, Plaintiffs seek to invalidate the PPP Ineligibility Rule under the Administrative Procedures Act. (*See id.* at ¶¶ 526-527, PageID.364; *see also id.* at ¶4,

Turnwald Decl.  WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 18

PageID.239, quoting the Administrative Procedures Act.) In this Count, Plaintiffs allege that the SBA "lacked the authority to promulgate" the PPP Ineligibility Rule because that rule conflicts with the provision of the **\*952** PPP extending eligibility to any business concern that satisfies the criteria in the statute. (*Id.* at ¶526, PageID.364)

On the same day that Plaintiffs filed their Amended Complaint, Plaintiffs also filed a renewed emergency motion for a temporary restraining order and/or preliminary injunction. (*See* Renewed Mot., ECF No. 12.) The arguments Plaintiffs make in the renewed motion largely track the claims made in the Amended Complaint. (*See id.*) Plaintiffs ask the Court, among other things, to bar the Defendants from enforcing against them the portions of the PPP Ineligibility Rule that prohibit sexually oriented businesses from obtaining PPP loan guarantees and/or from having PPP loans forgiven. (*See id.*, PageID.504.)

Following an on-the-record status conference with counsel for all parties, the Court set an expedited briefing schedule on Plaintiffs' renewed emergency motion. (*See* Order, ECF No. 18.) Defendants filed their response to the motion on April 24, 2020 (*see* Resp. Br., ECF No. 25), and Plaintiffs filed a reply (*see* Reply Br., ECF No. 28).

While Plaintiffs' renewed emergency motion was being briefed, three new parties, 689 Eatery Corp., 725 Eatery Corp., and GJJM Enterprises, Inc. (the "Intervenors") filed a motion to intervene as co-plaintiffs in this action. (*See* Mot. to Intervene, ECF No. 22.) The Intervenors are sexually oriented businesses that are "similarly situated" to the original Plaintiffs. (*Id.*, PageID.648.) The Defendants did not object to the Intervenors joining this action, and the Court orally granted the motion to intervene on April 30, 2020. The Intervenors have filed their own emergency motion seeking the same relief as Plaintiffs. (*See* Intervenors' Mot., ECF No. 23.) The Intervenors' motion "adopt[ed] the arguments" made in Plaintiffs' emergency motion. (*Id.*, PageID.684-685.)

On April 30, 2020, the Court held a hearing on the emergency motions for a preliminary injunction. It held a continuation of the hearing on May 5, 2020.

### III

The Court begins with a threshold question: may the Court enter preliminary injunctive relief against the SBA?

Defendants say that the answer is "no." They insist that Section 634(b)(1) of the Small Business Act bars courts from entering injunctions against the SBA and its Administrator. (*See* Resp. Br., ECF No. 24, PageID.730, quoting 15 U.S.C. § 634(b)(1).) That statute provides that:

> In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; **but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property.**

15 U.S.C. § 634(b)(1) (emphasis added).

The United States District Court for the Eastern District of Wisconsin recently held that this statute does not preclude the precise award of injunctive relief that Plaintiffs seek against the SBA here. *See Camelot Banquet Rooms*, 458 F. Supp. 3d at 1052–53. That court explained:

> I conclude that § 634(b)(1) does not preclude injunctive relief against the SBA in a case such as this. Provisions like it are found in other federal statutes creating agencies that participate in commercial activity. These statutes **\*953** allow the agency to be sued but specifically provide that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property." *See* 19 U.S.C. § 1920; 42 U.S.C. § 3211(a)(13); 15 U.S.C. § 714b(c); 19 U.S.C. § 2350; 7 U.S.C. 1506(d); 20 U.S.C. § 1082(a)(2). As the United States Claims Court explained, *see Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 522 (1983), Congress began including such language in its statutes after the Supreme Court decided *Federal Housing Administration v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). In that

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 19

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 34 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

case, the Court held that a clause allowing the Federal Housing Administration to sue and be sued rendered it subject to a state-law garnishment action. The Court reasoned that "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Id.* at 245, 60 S.Ct. 488. The Court indicated that, if Congress intends to limit the kinds of relief available against an agency that acts in commerce, it must do so clearly. *Id.* Thus, after *Burr*, Congress began specifying that certain agencies that participated in commerce are not subject to attachment, injunction, garnishment, and similar process.

As the First Circuit has recognized, this limitation on garnishment and similar process was "intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987). It was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an injunction would not interfere with the agency's internal operations. *Id.* at 1057. Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional. For example, the SBA could adopt a policy stating that it will extend small business loans only to companies owned by white men. If § 634(b)(1) means that the SBA may never be enjoined, then a court could not enjoin this policy, even though it would be blatantly unconstitutional.

In the present case, the plaintiffs only seek to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations. Under the injunction the plaintiffs seek, the SBA would have to do no more than process the plaintiffs' loan applications in the same manner that it processes the applications of other small businesses. Section 634(b)(1) does preclude the court from entering such an injunction.

*Id.* [2]

For the reasons cogently explained by the district court in **\*954** *Camelot Banquet Rooms*, the Court is persuaded that injunctive relief is available to Plaintiffs. As in that case, the Plaintiffs here seek only "to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations." *Id.* at 1052. Moreover, Defendants themselves candidly acknowledge that courts "have held that [Section 634(b)(1)] does not necessarily bar injunctions against the SBA in all circumstances." (Resp. Br., ECF No. 24, PageID.730.) Finally, as in *Camelot Banquet Rooms*, Plaintiffs have sued both the United States and Steven Mnuchin in his official capacity as Secretary of the Treasury, and those Defendants "do not claim to be immune from injunctive relief; nor do they claim that they could not grant the plaintiffs access to the PPP unless the SBA were also enjoined." *Camelot Banquet Rooms*, 458 F. Supp. 3d at 1052. For all of these reasons, the Court concludes that it may enter the requested injunctive relief against the SBA.

## IV

A preliminary injunction "is an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008)). Although the movant "is not required to prove his case in full at a preliminary injunction hearing," *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), a preliminary injunction should not "be granted lightly." *S. Glazer's*, 860 F.3d at 849.

A district court balances four factors when considering a motion for a preliminary injunction or a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quotations omitted). "The last two factors (the balance of equities and public interest) 'merge when the Government is the opposing party.' " *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at \*2 (quoting *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).

"[T]hese are factors to be balanced, not prerequisites to be met." *S. Glazer's*, 860 F.3d at 849. "[N]o one factor is

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 20

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 35 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

controlling." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).


## V

The Plaintiffs have shown a strong likelihood that they will prevail on the merits of their claim that the PPP Ineligibility Rule is invalid. As explained below, Plaintiffs have demonstrated that the rule cannot stand because it directly conflicts with the PPP.


## A

The Administrative Procedures Act prohibits agencies from taking action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). This Court "review[s] the propriety of agency action under the two-step framework set forth in **\*955** *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1037 (6th Cir. 2018).

At step one of a *Chevron* analysis, a court asks whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. To answer this question, "courts must determine whether the statute is ambiguous, applying the ordinary tools of statutory construction. If the statute is unambiguous, then the court applies it as-written; that is the end of the matter." *Arangure v. Whitaker*, 911 F.3d 333, 337-38 (6th Cir. 2018) (internal quotation marks and citation omitted). If Congress has spoken to the precise question at issue, then "the reviewing court must give effect to the will of Congress irrespective of any contrary agency interpretation." *Mid–Am. Care Found. v. N.L.R.B.*, 148 F.3d 638, 642 (6th Cir. 1998). However, if the statute is ambiguous, then (and only then) does the court move to step two of the *Chevron* analysis. At that step, a court must "defer to the agency's construction if it is 'permissible'—*i.e.*, 'within the bounds of reasonable interpretation.' " *Arangure*, 911 F.3d at 338 (quoting *City of Arlington v. F.C.C.*, 569 U.S. 290, 296, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013)).

The Sixth Circuit recently emphasized that a district court must work hard at *Chevron*'s first step to determine a statute's meaning before finding that a statute is ambiguous and deferring to an agency's interpretation:

*Chevron*'s first step is grounded in a recognition that "[t]he judiciary is the final authority on issues of statutory construction." *Chevron*, 467 U.S. at 843 n.9, 104 S.Ct. 2778. This means courts must do their best to determine the statute's meaning before giving up, finding ambiguity, and deferring to the agency. When courts find ambiguity where none exists, they are abdicating their judicial duty. *Cf.* Kent Barnett & Christopher J. Walker, Chevron *in the Circuit Courts*, 116 Mich. L. Rev. 1, 33–34 (2017) (concluding that circuit courts find ambiguity at *Chevron* step one 70% of the time, based on a sample of over 1,000 cases). This abdication by ambiguity impermissibly expands an already-questionable *Chevron* doctrine. *See Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 780–81 (2018) (Ho, J., concurring) ("Finding ambiguity where it does not exist—granting deference where it is not warranted...misuse[s] *Chevron*" and "abrogates separation of powers without even the fig leaf of Congressional authorization."). Unsurprisingly, when courts neglect their duty, the Supreme Court has not hesitated to reverse. *See, e.g.*, *Pereira [v. Sessions]*, [—— U.S. ——], 138 S.Ct. [2105] at 2113–14 [201 L.Ed.2d 433 (2018) ] ("[T]he Court need not resort to *Chevron* deference, as some lower courts have done, for Congress has supplied a clear and unambiguous answer to the interpretive question at hand."); *id.* at 2120 (Kennedy, J., concurring) (chiding lower courts for "engag[ing] in cursory analysis" in *Chevron* step one and rushing to "reflexive deference"); *Kingdomware Techs., Inc. v. United States*, —— U.S. ——, 136 S.Ct. 1969, 1979, 195 L.Ed.2d 334 (2016) (reversing lower court's *Chevron*-based decision because the statute was unambiguous); *United States v. LaBonte*, 520 U.S. 751, 762, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (same). In short, *Chevron*'s first step is not a free pass.

*Arangure*, 911 F.3d at 337-38 (internal footnote omitted).


## \*956 B

The Court begins its *Chevron* step one analysis by identifying the "precise question" presented. Here, that question is:

> May the SBA exclude from eligibility for a PPP loan guarantee

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 21

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 36 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

a business concern that (1) during the covered period (2) has less than 500 employees or less than the size standard in number of employees established by the Administration for the industry in which the business operates?

For the reasons explained below, the Court finds that Congress has unambiguously answered: no.

**1**

First, the text of the PPP makes clear that every business concern meeting the statutory criteria is eligible for a PPP loan during the covered period. Congress identified in the PPP only two criteria that a business concern must satisfy in order to qualify for loan guarantee eligibility: (1) during the covered period (2) it must have less than 500 employees or less than the size standard in number of employees established by the Administration for the industry in which the business operates. Under the settled *expressio unius exclusio alterius* rule of statutory construction, Congress's express listing of these two eligibility criteria indicates that Congress did not intend there to be any other criteria for loan guarantee eligibility. *See*, *e.g.*, *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 283 (6th Cir. 2010) (explaining in the context of statutory interpretation that "the germane maxim *expressio unius est exclusio alterius*" means "the expression of one thing is the exclusion of others"). After establishing only two criteria for loan guarantee eligibility, Congress provided that "*any* business concern ...shall be eligible to receive a covered [*i.e.*, SBA guaranteed] loan" if it meets those criteria. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added). "[T]he word 'any' naturally carries 'an expansive meaning.' " *SAS Inst., Inc. v. Iancu*, ––– U.S. ––––, 138 S. Ct. 1348, 1354, 200 L.Ed.2d 695 (2018) (quoting *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997)). And "[w]hen used (as here) with a 'singular noun in affirmative contexts,' the word 'any' ordinarily 'refer[s] to a member of a particular group or class without distinction or limitation' and in this way 'impl[ies] *every* member of the class or group.' " *Id.* (emphasis in original) (quoting Oxford English Dictionary (3d ed., Mar. 2016), www.oed.com/view/Entry/8973 (OED)). Thus, when Congress said that "any business concern" employing the requisite number of Americans during the covered period "shall be eligible" for a PPP loan guarantee,

it meant that *all* such businesses are eligible for a loan guarantee.

The Supreme Court reached a similar conclusion in *SAS Institute*, *supra*. In that case, the Supreme Court was called upon to interpret a statute concerning "*inter partes* review" of a challenged patent by the United States Patent Office. That statute, 35 U.S.C. § 318(a), provided in relevant part that "[i]f an *inter partes* review is instituted and not dismissed under this chapter, the [Board] *shall issue* a final written decision with respect to the patentability of *any patent claim challenged by the petitioner*...." *SAS Inst.*, 138 S. Ct. at 1354 (emphasis in original) (quoting § 318(a)). Notwithstanding this language, the Patent Office contended that it had discretion to render a decision on less than all of the claims challenged by a petitioner. The Supreme Court disagreed:

> We find that the plain text of § 318(a) supplies a ready answer. It directs that "[i]f an *inter partes* review is instituted and not dismissed under this chapter, the [Board] *shall issue* a final written decision with respect to the patentability of *any patent claim* **\*957** *challenged by the petitioner* ...." § 318(a) (emphasis added). This directive is both mandatory and comprehensive. The word "shall" generally imposes a nondiscretionary duty. See *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). And the word "any" naturally carries "an expansive meaning." *United States v. Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). When used (as here) with a "singular noun in affirmative contexts," the word "any" ordinarily "refer[s] to a member of a particular group or class without distinction or limitation" and in this way "impl[ies] *every* member of the class or group." Oxford English Dictionary (3d ed., Mar. 2016), www.oed.com/view/Entry/8973 (OED) (emphasis added) (all Internet materials as last visited Apr. 20, 2018). So when § 318(a) says the Board's final written decision "shall" resolve the patentability of "any patent claim challenged by the petitioner," it means the Board *must* address *every* claim the petitioner has challenged.

*Id.* at 1354. The Supreme Court further held that because the statute unambiguously required the Patent Office to review all challenged claims, the Office's contrary construction was not entitled to any deference under *Chevron*. *See id.* at 1358.

Turnwald Decl. © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 22

Case 3:24-cv-04241-LJC     Document 50-1     Filed 03/19/26     Page 37 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

*SAS Institute* guides the way here. The PPP, like the *inter partes* review statute at issue in *SAS Institute*, combines the expansive term "any" with the mandatory directive "shall." And, just as Congress's use of those terms in the *inter partes* review statute required the Patent Office to review every challenged patent claim, Congress's use of those terms in the PPP requires the SBA to deem eligible for a PPP loan guarantee every business concern that employed the specified number of Americans during the covered period. This reading of the PPP effectuates Congress's two stated intentions (as reflected in the name of Title I of the CARES Act and in the caption of the relevant section of the PPP): to "Keep[ ] American Workers Paid and Employed" and to "[i]ncrease[ ] [e]ligibility" for businesses to participate in the PPP. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020) at Title I; *see also* 15 U.S.C. § 636(a)(36)(D).

The Court recognizes that the Supreme Court has not always adopted the construction of "any" that it employed in *SAS Institute*. The Supreme Court has noted that " '[a]ny' can and does mean different things depending on the setting" and has explained that, at times, in order "[t]o get at Congress's understanding [of 'any'], what is needed is a broader frame of reference." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132, 124 S.Ct. 1555, 158 L.Ed.2d 291 (2004). [3] In these instances, "[i]t helps if we ask how Congress could have envisioned" the statutory provision at issue "actually working" if "any" is given its natural broad meaning. *Id.* Taking this approach to understanding "any," however, yields the same result as the *SAS Institute* approach to the term. Indeed, construing the term broadly, as the Court has done, results in the PPP "actually working" in the manner that Congress, by **\*958** all indications, intended – as providing temporary paycheck support to as many displaced and suffering American workers as possible. [4]

For all of these reasons, the plain language of the PPP makes clear that any business concern is eligible for a PPP loan if it employed the requisite number of Americans during the covered period. Thus, the Defendants may not exclude Plaintiffs from participating in the PPP on the ground that they present entertainment or sell products of a "prurient sexual nature."

### 2

The context in which Congress enacted the PPP further confirms the Court's reading of the PPP loan guarantee eligibility provisions. By the time Congress created the PPP, the SBA had been applying the Original SBA Ineligibility Rule – and excluding numerous business from receiving SBA financial assistance – for nearly 25 years. And just one year before Congress enacted the PPP, the SBA reiterated – in the 2019 SOP – the exclusions it had been applying through the Original SBA Ineligibility Rule.

Congress is "presumed to [have been] aware of" the Original SBA Ineligibility Rule and the 2019 SOP "when it passe[d]" the PPP. *Patel v. U.S. Citizenship & Immigration Servs.*, 2016 WL 795925, at \*13 (E.D. Mich. Mar. 1, 2016) (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988)). [5] Congress nonetheless provided in the PPP that "*any* business concern ... shall be eligible" for a loan guarantee if it employed the requisite number of Americans during the covered period. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added). That is a clear indication that Congress did not want the SBA's existing eligibility limitations to be imported wholesale into the PPP. Indeed, if Congress had intended to permit the SBA to apply its existing eligibility limitations, Congress could easily have provided that "any *otherwise eligible* business concern" employing the requisite number of Americans during the covered period would be eligible for a PPP loan. It did not. This confirms that the SBA may not apply to the PPP its historical limitation against supporting businesses of a "prurient sexual nature."

### C

The Defendants resist the Court's conclusion that the PPP Ineligibility Rule conflicts with the PPP. While the Defendants' arguments are thoughtful and effectively presented, they do not persuade the Court that the PPP Ineligibility Rule may stand.

### 1

The Defendants begin with a series of textual arguments. They contend that several provisions of the PPP demonstrate Congress's intent to allow the SBA to apply **\*959** its existing eligibility limitations to the PPP. The Court respectfully declines to adopt the Defendants' reading of these provisions.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 23

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 38 of 77

**a**

Defendants first cite the provision of the PPP that states: "*Except as otherwise provided in this paragraph*, the [SBA] may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection." (Resp. Br., ECF No. 24, PageID.729; quoting 15 U.S.C. § 636(a)(36)(B) (emphasis in Defendants' response).) Defendants contend that (1) the SBA's historical limitations on eligibility for financial assistance (*i.e.*, the eligibility limitations in the Original SBA Ineligibility Rule and the 2019 SOP) are part of the "terms, conditions, and processes" that apply to PPP loan guarantees and (2) no provision of the PPP "otherwise provide[s]" that the SBA may not apply these limitations to PPP loan guarantees. Thus, Defendants conclude, the SBA may continue to apply these eligibility limitations to PPP loan guarantees.

The flaw in this argument is that another provision of the PPP *does* "otherwise provide[ ]" that the SBA may not import its historical eligibility limitations into the PPP. As explained in detail above, the provision of the PPP that specifically addresses eligibility bars the SBA from doing so. Again, that section provides that "*any* business concern" employing the requisite number of Americans during the covered period "shall be eligible" for a loan guarantee. 15 U.S.C. § 636(a)(36)(D)(i) (emphasis added). Through that language, Congress "otherwise provide[d]" that the SBA may not apply to PPP loan guarantees the eligibility limitations from the Original SBA Ineligibility Rule and/or the 2019 SOP.

**b**

Defendants next cite a provision of the PPP that specifically references certain SBA regulations and deems those regulations inapplicable to the PPP. The provision to which Defendants refer, 15 U.S.C. § 636(a)(D)(iv), says:

> During the covered period, *the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations*, *or any successor regulation, are waived* with respect to eligibility for a covered loan for—
>
> (I) any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American

Industry Classification System code beginning with 72;

> (II) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; and
>
> (III) any business concern that receives financial assistance from a company licensed under section 681 of this title.

15 U.S.C. § 636(a)(D)(iv)(I)-(III) (emphasis added). The regulations waived by this provision – *i.e.*, the regulations found in "section 121.103 of title 13, Code of Federal Regulations" – concern how to determine the size of a business concern. More specifically, the waived regulations, among other things, (1) explain how to determine whether two entities are "affiliates" and (2) provide that affiliates will be a treated as a single entity when "determining [a] concern's size." 13 C.F.R. §§ 121.103(a)(1) and (a)(6). Defendants contend that under the *expressio unius* canon of statutory construction, Congress's express waiver of these size-determination regulations indicates Congress's intent that the SBA *could* incorporate other existing regulations – such as the Original SBA Ineligibility Rule and the 2019 SOP – into the PPP program. (*See* Resp. Br., ECF No. 24, PageID.729.)

**\*960** Defendants stretch the *expressio unius* canon too far. They apply it to a statutory provision that has nothing to do with the substantive criteria for PPP loan eligibility in an effort to overcome Congress's clear expression of those criteria in another provision. Simply put, Congress's statement in one provision that size-determining regulations do not apply to PPP loan guarantees does not – by virtue of the *expressio unius* canon – overcome Congress's unambiguous statement in another provision that the sole requirements for PPP loan guarantee eligibility are that (1) during the covered period (2) a business concern has less than the specified number of employees.

**c**

Finally, during the continued hearing on Plaintiffs' injunction motion, the Defendants argued that the provision of the PPP on which the Court rested its analysis actually supports their view that the SBA may exclude from the PPP businesses that present entertainment or sell products of a "prurient sexual

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 39 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

nature." This argument is easiest to understand when broken down into the following steps:

Step 1: Before Congress enacted the PPP, the Original SBA Ineligibility Rule excluded from SBA financial assistance programs (1) nonprofit organizations and (2) a variety of businesses, including, for instance, banks, political lobbying firms, certain private clubs with restrictive admissions practices, and businesses that present entertainment or sell products of a "prurient sexual nature."

Step 2: In the PPP provision cited by the Court, Congress specifically provided that "nonprofit organization[s]" are eligible for PPP loan guarantees if, during the covered period, they employed the requisite number of employees. *See* 15 U.S.C. 636(a)(36)(D)(i). This shows that Congress was aware of the Original SBA Ineligibility Rule and knew how to extend eligibility to the entities excluded by that rule if it wished to do so.

Step 3: In the PPP provision cited by the Court, Congress did not specifically say that any other businesses excluded by the Original SBA Ineligibility Rule are eligible for PPP loan guarantees.

Step 4: If Congress had intended to make any of the other previously excluded businesses eligible for PPP loan guarantees, it would have specifically said so – just as it did with nonprofit organizations.

Step 5: Because Congress did not specifically say that any of the other previously excluded businesses are eligible for PPP loan guarantees, it necessarily follows that Congress did not intend to extend eligibility to any of those businesses, including businesses that present entertainment or sell products of a "prurient sexual nature."

This argument ignores that Congress had no need to individually identify the previously excluded businesses in the PPP because it conferred eligibility on "any business concern" – a term that encompasses all of those businesses. Indeed, using the general term "any business concern" was a much more efficient way of conferring eligibility on previously excluded businesses than specifically listing each of those businesses one-by-one. Moreover, it made sense for Congress to specifically confer eligibility on "nonprofit organizations" at the same time it used the broad term "any business concern" to confer eligibility on the previously excluded businesses. It was necessary to separately and specifically identify nonprofit "organizations" because not all such organizations would fall within the broad category

of "any business concern." For all of these reasons, the fact that Congress did not specifically confer PPP eligibility on businesses that present entertainment or sell products of a "prurient sexual nature" **\*961** does not mean that the SBA deny PPP loan guarantees to those businesses.

**2**

In addition to their textual arguments, Defendants contend that the Court's construction of the PPP will lead to absurd results that Congress could not have intended. The Defendants insist, for instance, that Congress could not possibly have intended to support the businesses that have historically been denied SBA financing under the Original SBA Ineligibility Rule – including certain sexually oriented businesses, private clubs that discriminate, and political lobbying firms. While this argument has some initial surface appeal, it does not withstand closer scrutiny.

Defendants are correct that it would ordinarily be absurd to conclude that Congress meant to provide financial assistance to, among others, certain sexually oriented businesses and private clubs that discriminate. But these are no ordinary times, and the PPP is no ordinary legislation. The COVID-19 pandemic has decimated the country's economy, and the PPP is an unprecedented effort to undo that financial ruin. More importantly, the PPP is an effort to protect American *workers* – as noted above, it is located within a Title of the CARES Act named the "Keeping American Workers Paid and Employed Act" – and Congress could rationally have concluded that those workers need protection no matter the line of business in which they work. From this perspective, Congress's decision to expand funding to previously ineligible businesses is not an endorsement or approval of those businesses. Instead, it is a recognition that in the midst of this crisis, the workers at those businesses have no viable alternative options for employment in other, favored lines of work and desperately need help. It is not absurd to conclude that in order to support these workers, Congress temporarily permitted previously excluded businesses to obtain SBA financial assistance.[6]

Notably, the SBA itself seems to recognize that Congress is willing to extend PPP loan guarantees to businesses that were previously excluded from receiving SBA financial assistance. The Original SBA Ineligibility Rule deemed ineligible for SBA funding any business that "deriv[es] more than one-third of gross annual revenue from legal gambling activities." 13 C.F.R. § 120.110(g). Yet, on April 28, 2020, the SBA decided

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 25

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 40 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

to allow these businesses to receive PPP loan guarantees. *See* Business Loan Program Temporary Changes; Paycheck Protection Program – Requirements – Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23451 (Apr. 28, 2020). The SBA explained that it would allow gambling businesses to participate in the PPP because it "*believes this approach is more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses.*" *Id.* (emphasis added). Thus, even the SBA recognizes Congress's willingness to support employees in lines of business that were previously disfavored. This further undercuts the Defendants' argument that the Court's construction of the PPP here would lead to an absurd result that Congress could not have intended.

For all of these reasons, the Court's construction of the PPP does not yield an absurd result. [7]

**\*962  D**

For all of the reasons explained above, the Court concludes under step one of *Chevron* that the PPP Ineligibility Rule conflicts with the PPP and is therefore invalid. [8] Accordingly, Plaintiffs have shown a substantial likelihood of success on their claim that the SBA may not enforce against them the provision of the rule excluding from eligibility for a PPP loan businesses that present entertainment or sell products of a "prurient sexual nature." [9]

**VI**

The Court now turns to the remaining preliminary injunction factors – irreparable harm, the balance of harms, and the public interest. Each factor favors the issuance of preliminary injunctive relief here.

To begin, Plaintiffs have established that they will suffer irreparable harm in the absence of an injunction. Indeed, Plaintiffs have shown that if the Court does not grant preliminary injunctive relief, there may be no relief at all available to them. The PPP is a short-term program with limited loan guarantees that are offered "on a first-come, first-served basis. Once the funds Congress appropriated **\*963** for the PPP are exhausted, the SBA will be unable to guarantee further loans." *Camelot Banquet Rooms*, 458 F. Supp. 3d at 1060–61. Because PPP loan guarantees are being exhausted

so quickly, there is a substantial likelihood that without injunctive relief, the Plaintiffs will be "permanently excluded from the PPP." *Id.* And Plaintiffs would have no monetary remedy for such an exclusion because Defendants have sovereign immunity from any claim for monetary damages. As the federal district court explained in *Camelot Banquet Rooms*, "the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable":

> I note that the government does not concede that it could be held liable for damages at the end of this case. Ordinarily, the federal government and its officials sued in their official capacities (as they are sued here) have sovereign immunity from damages. *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). No party has suggested that the federal government has waived its sovereign immunity from damages under the present circumstances. Moreover, the Tenth Circuit has held that the Small Business Act's sue-and-be-sued clause, 15 U.S.C. § 634(b)(1), does not render the SBA liable for damages in a suit involving the SBA's refusal to guarantee a small business loan. *See Ascot Dinner Theatre, Ltd. v. Small Bus. Admin.*, 887 F.2d 1024, 1027–28 (10th Cir. 1989). Thus, I assume for purposes of this motion that the plaintiffs could not obtain damages for any harm caused by the SBA's refusal to guarantee their loans. The plaintiffs therefore lack an adequate remedy at law. Moreover, the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable. *See Smith v. City of Hammond, Ind.*, 388 F.3d 304, 307 (7th Cir. 2004) (noting that in some cases "a defendant's immunity from damages liability might constitute irreparable harm entitling the plaintiff to preliminary relief").

*Id.*

And even if Defendants did not enjoy sovereign immunity, it would appear that Plaintiffs would still lack an adequate remedy. There is a substantial risk that Plaintiffs will lose their businesses if they do not obtain PPP loans now. Plaintiffs' businesses involve relatively close contact between (1) certain staff (*i.e.*, servers, bus staff, bartenders, valet team, *etc.*) and patrons and (2) groups of patrons. Thus, Plaintiffs' businesses will almost certainly be the last ones to be permitted to return to anything close to normal operations. In the meantime, they will continue to suffer large – and potentially unsustainable – losses. Indeed, "as a general matter, it is reasonable to

Turnwald Decl.    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 26

Case 3:24-cv-04241-LJC   Document 50-1   Filed 03/19/26   Page 41 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

infer that *any* small business, regardless of the services and/or products it provides, would have trouble surviving if forced to close its doors for two months followed by a limited, piecemeal reopening." *Id.* at 1063 (emphasis in original). And "[t]he loss or destruction of an entire business" that Plaintiffs face here has "widely been held to constitute irreparable harm, at least when the business has been in operation for some time." *Truglia v. KFC Corp.*, 692 F. Supp. 271, 279 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 308 (2d Cir. 1989).

Next, the balance of harms and public interest factors also favor the granting of a preliminary injunction here. As explained above, the purpose of the PPP is to protect the employment and livelihood of employees who, through no fault of their own, have found their places of employment closed due to the COVID-19 pandemic.  **\*964**  That purpose would be frustrated if the Court did not grant the requested preliminary injunction. "Guaranteeing the plaintiffs' loans now, rather than months from now when this case is over, furthers the public interest in helping all small businesses and their employees get through the pandemic." *Camelot Banquet Rooms*, 458 F. Supp. 3d at 1064. The Defendants counter that a preliminary injunction is not in the public interest because "Congress did not deem it in the public interest to compel the SBA to make PPP loans available to businesses of a prurient sexual nature." (Resp. Br., ECF No. 24, PageID.701.) But for all of the reasons explained in detail above, the Court disagrees and concludes that Congress did intend to include Plaintiffs in the PPP. Thus, granting preliminary relief is fully consistent with Congress's intent and is in the public interest. Finally, Defendants argue that others may be harmed by the issuance of an injunction because "PPP financing allocated to Plaintiffs necessarily would come at the cost of denying it to others seeking the same assistance." (*Id.*, PageID.733.) The Defendants made the same argument in the *Camelot Banquet Rooms* litigation, and the court there rejected it. It concluded that "the plaintiffs' high likelihood of success on the merits makes up for this potential harm. That is, because the plaintiffs have shown that they likely should have received PPP loans when they applied, any harm to the third parties who applied after them and who would have received loans if the plaintiffs' applications were denied" is too speculative. *Camelot Banquet Rooms*, 458 F. Supp. 3d at 1064. This Court agrees.

Because each of the injunction factors favors issuing a preliminary injunction in this action, the Court will issue such an injunction as set forth below.

## VII

As explained above, Plaintiffs have advanced several constitutional arguments in support of their request for injunctive relief. The Court does not reach those constitutional claims because "[i]t is well settled that if a case may be decided on either statutory or constitutional grounds, [courts], for sound jurisprudential reasons, [should] inquire first into the statutory question. This practice reflects the deeply rooted doctrine that [courts] ought not to pass on questions of constitutionality...unless such adjudication is unavoidable." *Harris v. McRae*, 448 U.S. 297, 306-07, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (internal quotation marks omitted); *see also Camreta v. Greene*, 563 U.S. 692, 706, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (noting that "a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"). Here, because the Court has concluded that the SBA exceeded its statutory authority when it adopted the PPP Ineligibility Rule, the Court need not address Plaintiffs' constitutional challenges.

## VIII

Finally, the Court must consider whether to require Plaintiffs to post a bond. Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, notwithstanding that provision, "the rule in [the Sixth] [C]ircuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995); *see also*  **\*965**  *Concerned Pastors for Social Action v. Khouri*, 220 F. Supp. 3d 823, 829 (E.D. Mich. 2016) (same). And courts have "significant discretion to waive the bond requirement in light of the public interest." *Khouri*, 220 F. Supp. 3d at 829.

Here, the Court declines to require a bond. Forcing Plaintiffs to post a bond would frustrate the purpose of the PPP and the purpose of the injunction – to get essential PPP loans to struggling small businesses as soon as possible so that the businesses may use the funds to pay displaced employees. If the Court forced the Plaintiffs to expend funds by posting a bond, that would divert money that could be used to pay employees and that are needed to help secure Plaintiffs'

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 27

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 42 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

financial survival. Moreover, with the PPP loans, Plaintiffs stand an increased chance of surviving and being able to repay the loans in full in the event that Defendants ultimately prevail on the merits. That further weighs against requiring a bond here.

## IX

For all of the reasons explained above, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction is **GRANTED AS FOLLOWS**:

1. By 5:00 p.m. Eastern Time on Monday, May 11, 2020, Plaintiffs and Intervenors shall transmit to counsel for Defendants the name and full contact information (including email addresses) for the employee of their lenders who has responsibility for their applications for PPP loans.

2. By 12:00 p.m. Eastern time on Thursday, May 14, 2020, the SBA shall notify the identified lender representatives in writing that (a) the applications by Plaintiffs and Intervenors for PPP loans shall not be denied based on the "prurient sexual nature" provisions of the Original SBA Ineligibility Rule, the 2019 SOP, and/or the PPP Ineligibility Rule, and (b) in the event that Plaintiffs and Intervenors otherwise meet the eligibility requirements for PPP loans, the SBA will guarantee the loans for which Plaintiffs and Intervenors have applied or attempted to apply.

3. In the event that Plaintiffs and Intervenors otherwise meet the eligibility requirements for PPP loans, the SBA shall guarantee the loans for which Plaintiffs and Intervenors have applied or attempted to apply.

4. This is not a "nationwide injunction" and does not affect in any way actions that Defendants may take in connection with applications for PPP loans by any entity other than the Plaintiffs and Intervenors in this action.

**IT IS SO ORDERED**.

**All Citations**

459 F.Supp.3d 943

## Footnotes

1    The 2019 SOP refers to the Original SBA Ineligibility Rule, but it states slightly different ineligibility criteria. As quoted above, the 2019 SOP provides that "a business is not eligible for SBA assistance" if it (1) presents *either* live "*or recorded*" performances of a prurient sexual nature or (2) derives "more than 5% of its gross revenue" from "the sale of products, services or the presentation of any depictions or displays of a prurient sexual nature." (2019 SOP, ECF No. 12-11, PageID.571; emphasis added.)

2    In *American Association of Political Consultants*, *supra*, the plaintiffs sought an injunction barring the SBA from excluding lobbying businesses from the PPP. The district court in that case did not squarely decide whether it had the authority to issue the requested injunction. But it did observe that the "D.C. Circuit ... at a minimum [ ] 'strongly intimated that injunctive relief is available...when the SBA exceeds its statutory authority.' " *Am. Ass'n of Political Consultants*, 2020 WL 1935525, at *6 (quoting *Elk Assocs. Funding Corp. v. U. S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 20 (D.D.C. 2012)).

3    One "setting" that has led the Supreme Court to depart from the *SAS Institute* construction of "any" is when neighboring statutory terms demand a narrower construction. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115-16, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (applying narrow construction of "any other class of workers engaged in ... commerce" in light of Court's previous interpretation of "in commerce" as a term of art with a narrower meaning). No neighboring term here demands such a construction.

4    The Court further acknowledges that "any" should not be construed broadly where such a construction would lead to an "absurd result." *Nixon*, 541 U.S. at 138, 124 S.Ct. 1555 (citing *United States v. Am. Trucking Ass'n, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). But as explained in detail below (*see* Section (V)(C)(2), *infra*), the Court's construction of "any" here does not cause such a result.

Turnwald Decl.    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 28

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 43 of 77

DV Diamond Club of Flint, LLC v. United States Small..., 459 F.Supp.3d 943...

5       *See also Reasonable Consideration*, 2A Sutherland Statutory Construction § 45:12 (7th ed.) (confirming that courts may "presume[e]" that Congress is "aware of existing ... relevant ... administrative decisions" when passing legislation). Defendants themselves have acknowledged this point. In parallel litigation in another district, the Defendants have argued that it is "reasonable to assume that Congress was aware of" the SBA Ineligibility Rule when it enacted the PPP. (Motion for Stay filed in *Camelot Banquet Rooms*, *supra*, ECF No. 39-3, PageID.1135.)

6       The PPP is a short-term program. The "covered period" during which SBA guaranteed loans are available began on February 15, 2020, and ends on June 30, 2020. *See* 15 U.S.C. § 636(a)(36)(A)(iii).

7       The PPP Ineligibility Rule bars "businesses engaged in illegal activity" and "businesses located in a foreign country" from obtaining PPP loans. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811, 20812 (April 15, 2020) (stating illegibility rule and incorporating 13 C.F.R. §§ 120.110(e), (h)). Though the Court deems the rule invalid, these two eligibility limitations from the rule are inherent in the PPP itself and do not depend upon the continued validity of the rule. First, all federal spending statutes – including the PPP – necessarily limit spending to lawful pursuits even without specifying that limitation. Second, the term "any business concern" in the PPP is naturally read in light of the "ordinary assumption" that a statute passed by Congress "applies domestically, not extraterritorially." *Small v. United States*, 544 U.S. 385, 391, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005) (holding, in light of that "ordinary assumption," that the term "convicted in any court" does not include convictions in foreign courts). Thus, the Court's conclusion that the PPP Ineligibility Rule may not be enforced does not lead to the absurd result that PPP loans must be extended to businesses committing crimes or businesses located outside the United States.

8       The Plaintiffs have consistently argued that the PPP Ineligibility Rule is invalid because it purports to establish limits on PPP loan guarantee eligibility that conflict with the eligibility provisions of the PPP. (*See*, *e.g.*, Am. Compl. at ¶¶ 526-27, ECF No. 11, PageID.364.) When Plaintiffs first made that argument, they identified the eligibility provisions of the PPP as those set forth in 15 U.S.C. § 636(a)(36)(F)(ii)(II). That section provides: "In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower – (aa) was in operation on February 15, 2020; and (bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or (BB) paid independent contractors, as reported on a Form 1099-MISC." 15 U.S.C. § 636(a)(36)(F)(ii)(II)(aa)-(bb)(AA)-(BB). The Court does not believe that this section establishes the substantive eligibility criteria for a PPP loan. This section is best understood as directing lenders as to what they should consider in determining whether the eligibility factors – which are set forth in 15 U.S.C. § 636(a)(36)(D)(i) – have been satisfied. During the continuation of the hearing on May 5, 2020, the Court discussed with Defendants' counsel its view that the PPP eligibility criteria are set forth in 15 U.S.C. § 636(a)(36)(D)(i) and offered counsel the opportunity to respond to that view.

9       The United States District Court for the Eastern District of Wisconsin reached the same conclusion in *Camelot Banquet Rooms*, *supra*. However, the court in *Camelot Banquet Rooms* rested its holding on a different statutory provision than the one discussed at length by the Court above. *See Camelot Banquet Rooms*, 458 F. Supp. 3d at 1056–57 (citing 15 U.S.C. § 636(a)). While the Court agrees with and finds the reasoning of the Wisconsin district court persuasive, the Court chooses to rest its analysis primarily on the statutory provision discussed at length above.

---

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 29

# Exhibit C

960 F.3d 743
United States Court of Appeals, Sixth Circuit.

DV DIAMOND CLUB OF FLINT,
LLC, et al., Plaintiffs-Appellees,
689 Eatery, Corp.; 725 Eatery, Corp.; GJJM
Enterprises, LLC, Intervenors-Appellees,
v.
SMALL BUSINESS ADMINISTRATION, an agency
of the United States, et al., Defendants-Appellants.

No. 20-1437
|
FILED May 15, 2020

**Synopsis**
**Background:** Sexually oriented businesses brought action alleging that Small Business Administration (SBA) its statutory authority when it adopted rule rendering sexually oriented businesses and certain other businesses ineligible to receive Paycheck Protection Program (PPP) loan guarantees under Coronavirus Aid, Relief, and Economic Security Act (CARES Act). The United States District Court for the Eastern District of Michigan, Matthew F. Leitman, J., granted plaintiffs' motion for preliminary injunction. SBA moved for stay pending appeal.

The Court of Appeals held that SBA was not entitled to stay pending appeal.

Motion denied.

Siler, Senior Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** Motion for Stay.

**Attorneys and Law Firms**

 **\*744**  Bradley J. Shafer, Matthew Joseph Hoffer, Shafer & Associates, Lansing, MI, for Plaintiffs - Appellees DV Diamond Club of Flint, LLC, Stone Park Entertainment, Inc., Millennium Restaurants Group, Inc., 2740 Corporation, T and N, Inc., VC Lauderdale, Inc., Benelux Corporation, BDS Restaurant, Inc., Seventy7, LLC, Burch Management Company, Inc., DB Entertainment, Inc., Filosadelfia, LLC, Mag Pitt LP, Polmour, Inc., Mag Enterprises, Inc., JCB of

Gainesville, Inc., Heritage Management Services, Inc., Club Cabaret, Inc., Mag Entertainment, LLC, Kimmico, Inc., East Coast Restaurant & Nightclubs, LLC, Ferney Properties, LLC, Peoria Speakeasy, Inc., King Bee, Inc., Vonch, LLC, Oasis on Essington, Ltd.

Bradley J. Shafer, Matthew Joseph Hoffer, Shafer & Associates, Lansing, MI, Peter E. Garrell, Fortis, Costa Mesa, CA, for Plaintiffs - Appellees Brookhurst Venture, LLC, High Expectations Hospitality, LLC, PNM Enterprises, Inc., Platinum SJ Enterprise, Santa Maria Restaurant Enterprises, Inc., Spearmint Rhino Companies Worlwide, Inc., Saries Lounge, LLC, Washington Management, LLC, City of Industry Hospitality Venture, Inc., City of Industry Hospitality Venture, Inc., Rouge Gentlemens Club, Inc., Penn Ave Hospitality, LLC, Rialto Pockets, Inc., Spearmint Rhino Adult Superstore, Inc., Oxnard Hospitality Services, Inc., World Class Ventures, LLC, Spearmint Rhino Consulting Worldwide, Inc., Olympic Avenue Venture, Inc., Santa Barbara Hospitality Services, Inc., W.P.B. Hospitality, LLC, L.C.M., LLC, Inland Restaurant Venture I, Inc., Farmdale Hospitality Services, Inc., Nitelife, Inc., Midnight Sun Enterprises, Inc., Kentucky Hospitality Venture, LLC, K-Kel, Inc.

Jennifer M. Kinsley, Kinsley Law Office, Cincinnati, OH, for Intervenors - Appellees

Courtney L. Dixon, James Jordan Gilligan, U.S. Department of Justice, Civil Rights Division, Washington, DC, Peter A. Caplan, Assistant U.S. Attorney, United States Attorney's Office, Detroit, MI, for Defendants - Appellants

Before: SILER, STRANCH, and DONALD, Circuit Judges.

**\*745** <u>ORDER</u>

Defendants, the Small Business Administration and others (collectively the "SBA"), appeal the district court's opinion and order granting plaintiffs' motion for a preliminary injunction. A district court's order granting or denying a preliminary injunction is immediately appealable pursuant to 28 U.S.C. § 1292(a)(1). The SBA moves to stay the preliminary injunction pending a decision on the merits of its appeal. *See* Fed. R. App. P. 8(a)(2). The district court denied a similar motion but granted the SBA's alternative request to extend the date by which it must comply with the injunction. Plaintiffs and intervenors jointly respond, and the SBA replies.

At issue is the proper interpretation of recent legislation enacted by the United States Congress to alleviate the incredible economic hardship caused by the COVID-19 pandemic. *See* Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). Under a CARES Act provision entitled "Keeping American Workers Paid and Employed Act," Congress created the Paycheck Protection Program ("PPP"), authorizing the SBA to guarantee up to $349 billion in PPP loans. In April 2020, Congress increased the amount to $659 billion. The PPP is intended to "[i]ncrease[ ] eligibility for certain small businesses and organizations." 15 U.S.C. § 636(a)(36)(D). During the covered time-period,

> in addition to small business concerns, *any* business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title *shall* be eligible to receive a covered loan if the business concern, nonprofit organization, veterans organization, or Tribal business concern employs not more than the greater of-- (I) 500 employees; or (II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, veterans organization, or Tribal business concern operates.

15 USC § 636(a)(36)(D)(i) (emphasis added). Despite this language, the SBA has adopted a "PPP Ineligibility Rule" that renders sexually oriented businesses and certain other businesses ineligible to receive PPP loan guarantees. Plaintiffs are sexually oriented businesses that own and operate (1) venues that present clothed, semi-nude, and/or nude performance entertainment, (2) adult novelty stores, and (3) businesses that service those establishments. They represent that their businesses are not unlawful and operate in conformity with various licenses and permits. The SBA does not argue otherwise. Nevertheless, lenders are denying plaintiffs' applications for PPP loans based on the SBA's PPP Ineligibility Rule. The district court concluded that the SBA

exceeded its statutory authority when it adopted this rule and granted plaintiffs' motion for preliminary injunctive relief.

We evaluate four factors when deciding whether to grant a stay under **\*746** Federal Rule of Appellate Procedure 8(a): "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coal.*, 945 F.2d at 153. As the moving party, the SBA has the burden of showing it is entitled to a stay. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

"We begin by considering 'the likelihood that the district court's preliminary injunction order will be upheld on appeal.' " *Serv. Emp. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 343–44 (6th Cir. 2012) (quoting *Coal. to Defend*, 473 F.3d at 244). "[T]he district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion. This standard of review is 'highly deferential' to the district court's decision." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (citation omitted) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "Thus, we reverse a decision granting a preliminary injunction 'only if the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." ' " *Southern Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997)).

An agency's interpretation of a statute is reviewed using the two-step framework outlined in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778;

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 32

*see Arangure v. Whitaker*, 911 F.3d 333, 336 (6th Cir. 2018) ("[A]ll too often, courts abdicate this duty by rushing to find statutes ambiguous, rather than performing a full interpretive analysis.") In applying *Chevron* to the first factor—likelihood of success on the merits—the district court determined that the CARES Act unambiguously foreclosed the SBA from precluding sexually-oriented businesses from receiving PPP loan guarantees during the pandemic. It relied on language in the Act specifying that eligibility would be conferred to "any business concern." 15 U.S.C. § 636(a)(36)(D)(i). The term "any" carries an expansive meaning. *See SAS Inst., Inc. v. Iancu*, ––– U.S. ––––, 138 S. Ct. 1348, 1354, 200 L.Ed.2d 695 (2018). It "refer[s] to a member of a particular group or class without distinction or limitation" and, in this way, "impl[ies] *every* member of the class or group." *Id.* (quoting Oxford English Dictionary (3d ed., Mar. 2016)). Thus, the Act's specification that "any business concern" is eligible, so long as it meets the size criteria, is a reasonable interpretation. That broad interpretation also comports with Congress's intent to provide support to as many displaced American workers as possible and, in doing **\*747** so, does not lead to an "absurd result" as the SBA claims. Finally, by specifying "any business concern," Congress made clear that the SBA's longstanding ineligibility rules are inapplicable given the current circumstances. Neither may the SBA continue to apply these rules pursuant to § 636(a)(36)(B), which states: "Except as otherwise provided in this paragraph, the [SBA] may guarantee covered loans under the same terms, conditions, and processes as a loan made under this subsection." 15 U.S.C. § 636(a)(36)(B). This provision likely constitutes a catch-all governing procedures otherwise unaffected by the mandate of the CARES Act and the PPP and does not detract from the broad grant of eligibility.

The SBA points out that the CARES Act specifies that "nonprofit organization[s]" are eligible for PPP loans, even though they are ineligible for ordinary SBA loans. *See* 15 U.S.C. § 636(a)(36)(D)(i). Therefore, it reasons, if Congress wanted sexually-oriented businesses to be eligible for PPP loan guarantees, it would have said so. This specification, however, supports the district court's analysis. It was necessary to specify non-profits because they are not businesses, whereas the Act's specification that eligibility is conferred on "any business concern" encompasses sexually oriented businesses such as strip clubs that would ordinarily be ineligible for loans.

With regard to the remaining factors, the harm to the SBA in the absence of a stay is far outweighed by the harm to plaintiffs if a stay is granted. Plaintiffs will be unable to obtain relief, and there will likely be no funds available to them through the PPP by the time this appeal is concluded. Plaintiffs are also at a substantial risk of losing their businesses. The stated purpose of the PPP is to protect the employment and livelihood of employees. Thus, the public interest is served in guaranteeing that any business, including plaintiffs', receive loans to protect and support their employees during the pandemic which, we can all agree, constitutes extraordinary circumstances. The fact that other businesses will not receive loans if plaintiffs do is inherent in the SBA's practice of guaranteeing loans on a first-come, first-served basis. Regardless of whether plaintiffs do or do not receive these loans, there will be other businesses that do or do not receive loans as well. The SBA otherwise continues doing the same work it has been doing.

On balance we conclude that the relevant factors weigh in favor of denying a stay. The motion for a stay is **DENIED**. The request for an administrative stay is **DENIED** as moot.

SILER, J., dissenting.

I respectfully dissent from the majority order. I would like to amplify further on this, but only a few short hours remain before the Small Business Administration (SBA) has to comply with the order and provide the funds requested. It is also a weekend and time is running short. The district court granted a preliminary injunction largely based on the plaintiffs' strong likelihood of success on the merits. In doing so, the court found that Congress has unambiguously made "any business concern" eligible for PPP loans under the CARES Act. However, the relevant language in the Act seems to be ambiguous because it is open to two plausible interpretations. Certainly, the statute says "any business concern." Still, it is unclear whether Congress meant that any business concern was eligible for a PPP loan regardless of SBA restrictions or whether the language modifies the preceding language allowing businesses with up to 500 employees to be eligible for the loans.

**\*748** Congress said that PPP loans are to be administered "under the same terms, conditions, and processes" as 7(a) loans, which exclude private clubs and adult entertainment businesses from eligibility. 15 U.S.C. § 636(a)(36)(B). Congress was clearly aware of SBA's regulatory restrictions on 7(a) loans. If it intended for any business entity to be eligible for PPP loans, it could have simply said that without providing the additional language contained in the text.

Turnwald Decl. © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 33

Instead, Congress specifically allowed certain businesses who were not previously eligible to apply for PPP loans. Under the interpretation from the district court, it admitted that "it would ordinarily be absurd to conclude that Congress meant to provide financial assistance to, among others, certain sexually oriented businesses and private clubs that discriminate."

In conclusion, I do not think that the plaintiffs have demonstrated a strong likelihood of success on the merits that Congress intended for clubs of this sort to receive loans through the PPP. Although it is clear that the plaintiffs may be seriously harmed if they are not eligible for these loans, if they do receive the loans, the money may be denied to other small businesses because the funds would be expended on the plaintiffs herein. I would grant the stay of the injunction until a decision on the merits of the case has been determined. Plaintiffs have not met their burden of demonstrating a high likelihood of success on the merits. They should not be allowed to ride the gravy train without a careful analysis of this law more than we can give them on short notice.

**All Citations**

960 F.3d 743

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 34

# Exhibit D

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 50 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

458 F.Supp.3d 1044
United States District Court, E.D. Wisconsin.

CAMELOT BANQUET ROOMS, INC.,
Downtown Juneau Investments, LLC, Midrad,
LLC, and PPH Properties I, LLC, Plaintiffs,
v.
UNITED STATES SMALL BUSINESS
ADMINISTRATION; Jovita Carranza, in her
Official Capacity as Administrator of the Small
Business Administration; United States of America;
and Steven Mnuchin, in his Official Capacity as
United State Secretary of Treasury, Defendants.
J.R. Schuster, LLC, Plaintiff,
v.
United States Small Business Administration;
Jovita Carranza, in her Official Capacity
as Administrator of the Small Business
Administration; United States of America; and
Steven Mnuchin, in his Official Capacity as
United State Secretary of Treasury, Defendants.

Case No. 20-C-0601, Case No. 20-C-634
|
Signed May 1, 2020

**Synopsis**
**Background:** Owners of nightclubs that featured nude and/or semi-nude erotic dance entertainment brought action seeking a temporary restraining order and preliminary injunction against United States, Treasury Secretary, the U.S. Small Business Administration (SBA), and SBA Administrator, after the nightclub owners were denied Paycheck Protection Program (PPP) loans under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) due to SBA regulation precluding participation in loan programs by businesses that present live performances of a prurient sexual nature.

**Holdings:** The District Court, Lynn Adelman, J., held that:

statutory limitation on garnishment and similar process did not preclude injunctive relief against the SBA;

nightclub owners were likely to succeed at showing their performances were not prurient within meaning of the regulation, as required to enter preliminary injunction;

the regulation served no statutory purpose and exceeded scope of regulatory authority granted to the SBA under the Small Business Act and the CARES Act;

nightclub owners were likely to succeed in showing that the regulation was unconstitutional under First and Fifth Amendments, as required to enter preliminary injunction;

nightclub owners would suffer irreparable harm and lacked adequate remedy at law, as required to enter preliminary injunction;

public interest favored preliminary injunction against the SBA; and

nightclub owners were not required to post a bond upon entry of a preliminary injunction.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

**\*1049** Jeff Scott Olson, Jeff Scott Olson Law Firm Sc, Madison, WI, for Plaintiffs.

Carter Bryan Stewart, Emily Ann Constantine, United States Department of Justice (ED-WI) Office of the US Attorney, Milwaukee, WI, for Defendants.

## <u>DECISION AND ORDER</u>

LYNN ADELMAN, District Judge

Each of the plaintiffs in these cases runs a nightclub in Wisconsin that features nude and/or semi-nude erotic dance entertainment, which are forms of expression protected by the Free Speech Clause of the First Amendment. *See, e.g., Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Because of the COVID-19 pandemic and the "safer at home" order issued by Wisconsin officials, each nightclub is closed and will remain closed for weeks, maybe months. On March 27, 2020, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). Among its provisions is a program known as the Paycheck Protection Program ("PPP"), which authorizes the

 © 2021 Thomson Reuters. No claim to original U.S. Government Works. EXHIBIT C
Page 36

U.S. Small Business Administration ("SBA") to guarantee loans to small businesses to help them pay employees during the economic crisis caused by the response to the pandemic. *Id.* § 702 Each plaintiff applied for a loan through this program. However, each plaintiff's bank, in conjunction with the SBA, determined that they were not eligible for relief through the PPP. This decision was based on a regulation enacted by the SBA in 1996, under which small businesses that "[p]resent live performances of a prurient sexual nature" are not eligible to participate in any SBA business loan program. *See* 13 C.F.R. § 120.110(p).

The plaintiffs promptly commenced these actions against the United States, Treasury Secretary Steven Mnuchin, the SBA, and SBA Administrator Jovita Carranza, and filed motions for a temporary restraining order and preliminary injunction. They allege that the SBA regulation, as applied to them through the PPP, violates their rights under the Free Speech Clause of the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause. Because PPP funds are limited and distributed on a first-come, first-served basis, the plaintiffs requested temporary restraining orders to preserve their spots in the application queue. I held a telephonic proceeding on that request, at which the defendants appeared through counsel, and then granted the request. Pursuant to the restraining orders, the defendants set aside enough reserve authority to guarantee the PPP loans sought by the plaintiffs and prepared internal loan numbers that, if transmitted to the plaintiffs' bank, would allow the bank to complete the loans.

In this order, I address the plaintiffs' motions for a preliminary injunction, in which they seek to enjoin the defendants from continuing to use the SBA regulation to exclude them from the PPP.

## I. BACKGROUND

Each plaintiff in Case No. 20-C-0601 (the "Camelot" case) operates a nightclub in Wisconsin under the name Silk Exotic **\*1050** Gentlemen's Club. Three of the clubs are located in Milwaukee, and the fourth is located in Middleton. Each club is licensed by the municipality in which it operates to present erotic dance entertainment. The dancers at the clubs in Milwaukee wear a costume made of nontransparent material that covers the areola and nipple of the breasts, their pubic hair, and the cleavage of their buttocks, as is required by local ordinance. The dancers at the club in Middleton appear nude

or semi-nude. The plaintiffs allege that all the entertainment they provide "is non-obscene (and not prurient), appeals to healthy human interests and desires, and is in full compliance with [local law]." Compl. ¶ 404.

The plaintiff in Case No. 20-C-634 (the "Schuster" case) operates "The Vegas Gentlemen's Club" in Darien, Wisconsin. It is licensed by the municipality to present erotic dance entertainment. The entertainment provided by The Vegas Club consists of semi-nude performers on a stage with a vertical pole that spins. The entertainers use the pole during their performances, which are colloquially referred to as "pole dancing." Compl. ¶ 41. The plaintiff alleges that all the entertainment it provides is non-obscene, appeals to healthy human interests and desires, and is in compliance with the numerous licenses and permits that it holds which are annually reviewed by the Town of Darien.

In late March 2020, the State of Wisconsin began issuing orders in response to the coronavirus pandemic and the disease COVID-19. Under the orders, many businesses were required to close, and Wisconsin residents were ordered to remain at home unless they were engaged in essential activities. As a result of these orders, each of the plaintiffs' clubs has been closed for business since 5:00 p.m. on March 17, 2020. They will remain closed at least until the orders expire. As of this writing, the orders are set to expire on May 26, 2020. It is not certain that the plaintiffs will be allowed to reopen on May 26, 2020. And even if they are permitted by law to reopen at that time, they likely will be subject to restrictions designed to minimize the spread of COVID-19.

To address the economic impact of COVID-19, Congress passed the CARES Act. Title I of the Act is the "Keeping Workers Paid and Employed Act." Among the provisions of this title is the "Paycheck Protection Program," or PPP. *See* CARES Act § 702, 15 U.S.C. § 636(a)(36). The PPP is a new loan program to be administered by the SBA under Section 7(a) of the Small Business Act (codified at 15 U.S.C. § 636(a)). Its purpose is to assist small businesses during the COVID-19 crisis by immediately extending them loans on favorable terms. The loans are made by the SBA's participating banks and guaranteed by the SBA itself. Section 1106 of the CARES Act provides that a borrower's indebtedness under a PPP loan will be forgiven to the extent that the borrower uses the funds to pay expenses relating to payroll, mortgage interest, rent, and utilities during the eight-week period following the loan's origination. CARES Act § 1106. If a borrower qualifies for loan forgiveness, the SBA

Turnwald Decl.     WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.     EXHIBIT C

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 52 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

must pay the lender an amount equal to the amount forgiven, plus any interest accrued through the date of payment. *Id.* § 1106(c)(3). However, the SBA has determined that not more than 25% of the loan forgiveness amount may be attributable to non-payroll costs. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813–14 (April 15, 2020).

The plaintiffs, like nearly all other businesses in the United States, have suffered significant losses because they cannot conduct business as usual. Thus, they applied for PPP loans through their banks. Each **\*1051** plaintiff's bank informed it that its application would be denied under an SBA regulation providing that businesses that "[p]resent live performances of a prurient sexual nature" are not eligible to participate in SBA loan programs. *See* 13 C.F.R. § 120.110(p). This regulation was not enacted in connection with the PPP. Instead, it is a regulation that the SBA issued in 1996 and that applies to all its business loan programs, including those under § 7(a) of the Small Business Act—of which the PPP is now a part. *See* Business Loan Programs, 61 Fed. Reg. 3226, 3227 (Jan. 31, 1996).

Once the plaintiffs learned that their applications had been denied, they commenced these actions. They allege that the SBA regulation denying eligibility to businesses that present live performances of a prurient sexual nature is unconstitutional to the extent that it applies to non-obscene nude or semi-nude dancing, which is a form of expression protected by the Free Speech Clause of the First Amendment. Because the PPP is "first-come, first-served," *see* 85 Fed. Reg. at 20,813, and funding for the program was expected to be exhausted quickly, the plaintiffs immediately filed motions for a temporary restraining order and preliminary injunction to preserve their ability to obtain PPP loans if they succeed on the merits of their claims.

As noted, I granted the plaintiffs' motions for a temporary restraining order, and the government has since reserved guarantee authority for the PPP loans the plaintiffs applied for. However, I allowed the government to instruct the plaintiffs' bank to refrain from funding the loans until I decided the plaintiffs' motions for a preliminary injunction. The parties have completed briefing on those motions, and I address them below.

## II. INJUNCTIVE RELIEF AGAINST THE SMALL BUSINESS ADMINISTRATION

Before turning to the traditional preliminary injunction factors, I first address the defendants' suggestion that injunctive relief is not available against the SBA. They point to the "sue and be sued" provision of the Small Business Act, which provides that the SBA Administrator may

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property.*

15 U.S.C. § 634(b)(1) (emphasis added).

Initially, I note that this provision applies only to the SBA and its Administrator, who are not the sole defendants. The plaintiffs have also sued the United States and Steven Mnuchin in his official capacity as Secretary of the Treasury. These defendants do not claim to be immune from injunctive relief; nor do they claim that they could not grant the plaintiffs access to the PPP unless the SBA were also enjoined. Moreover, the government has only half-heartedly asserted that the sue-and-be-sued provision blocks injunctive relief against the SBA and its Administrator. The government notes that various lower courts have reached different conclusions on this issue, but it does not argue that the courts that have interpreted § 634(b)(1) to preclude all injunctive relief against the SBA are correct. Rather, the government only suggests that the split of authority on this issue "casts further doubt" on the plaintiffs' likelihood of success. Br. in Opp. at 25.

**\*1052** In any event, I conclude that § 634(b)(1) does not preclude injunctive relief against the SBA in a case such as this. Provisions like it are found in other federal statutes creating agencies that participate in commercial activity. These statutes allow the agency to be sued but specifically provide that "no attachment, injunction, garnishment, or other

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 38

similar process, mesne or final, shall be issued against the [agency] or [its] property." *See* 19 U.S.C. § 1920; 42 U.S.C. § 3211(a)(13); 15 U.S.C. § 714b(c); 19 U.S.C. § 2350; 7 U.S.C. 1506(d); 20 U.S.C. § 1082(a)(2). As the United States Claims Court explained, *see Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 522 (1983), Congress began including such language in its statutes after the Supreme Court decided *Federal Housing Administration v. Burr*, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940). In that case, the Court held that a clause allowing the Federal Housing Administration to sue and be sued rendered it subject to a state-law garnishment action. The Court reasoned that "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Id.* at 245, 60 S.Ct. 488. The Court indicated that, if Congress intends to limit the kinds of relief available against an agency that acts in commerce, it must do so clearly. *Id.* Thus, after *Burr*, Congress began specifying that certain agencies that participated in commerce are not subject to attachment, injunction, garnishment, and similar process.

As the First Circuit has recognized, this limitation on garnishment and similar process was "intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987). It was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an injunction would not interfere with the agency's internal operations. *Id.* at 1057. Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional. For example, the SBA could adopt a policy stating that it will extend small business loans only to companies owned by white men. If § 634(b)(1) means that the SBA may never be enjoined, then a court could not enjoin this policy, even though it would be blatantly unconstitutional.

In the present case, the plaintiffs only seek to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations. Under the injunction the plaintiffs seek, the SBA would have to do no more than process the plaintiffs' loan applications in the same manner that it processes the applications of other

small businesses. Section 634(b)(1) does preclude the court from entering such an injunction.

## III. PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits. *E.g., Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). If a plaintiff makes such a showing, the court must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. *Id.* This assessment is made on a sliding scale: The **\*1053** more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. *Id.* Finally, the court must ask whether the preliminary injunction is in the public interest, which means considering what effect an injunction will have on non-parties. *Id.* Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted. *Id.*

### A. Likelihood of Success on the Merits

The merits of this case present three key questions: (1) Does the SBA regulation rendering businesses that present live performances of a "prurient sexual nature" ineligible for SBA loans apply to the plaintiffs? (2) Is that regulation within the scope of the authority Congress delegated to the SBA under the CARES Act or the Small Business Act? (3) Assuming that the answer to the first two questions is yes, does the regulation violate either the Free Speech Clause of the First Amendment or the equal-protection component of the Fifth Amendment's Due Process Clause?

To answer these questions, the court must know something about why the SBA decided to exclude businesses that present live performances of a prurient sexual nature from its business loan programs—programs in which nearly every other form of small business in the United States may participate. The SBA's purpose in enacting this exclusionary regulation informs its meaning, and it would shed light on whether the regulation coincides with the goals Congress had in mind when it passed the enabling statutes. The SBA's purpose is also relevant to the constitutional issues. Under the First Amendment, the SBA may not refuse to fund an otherwise eligible business simply because the business engages in a

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 39

Case 3:24-cv-04241-LJC Document 50-1 Filed 03/19/26 Page 54 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

disfavored form of protected expression. However, the SBA may refuse to extend loans to businesses that do not fit within the purpose of the loan program. And under an equal-protection analysis, the SBA may make distinctions among small businesses only if the distinctions are rationally related to a legitimate governmental purpose.

Although the purpose of the SBA regulation is highly relevant to this case, the government has made no serious effort to identify it. Instead, the government vaguely asserts that "[t]he SBA adopted this rule in furtherance of its statutory mandate to consider the public interest when directing its limited resources." Br. in Opp. at 1–2., ECF No. 11. But presumably everything the government does is in the public interest. Thus, a naked reference to the public interest says nothing about the regulation's purpose. To understand the regulation's purpose, we must know *why* the SBA thinks that it serves the public interest. The government's brief is silent on that point.

The government has, however, identified the purposes of the Paycheck Protection Program and the Small Business Act— the laws that confer authority on the SBA to enact regulations such as the one at issue here. As every contemporary reader of this opinion likely knows, the PPP was "enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus." Br. in Opp. at 6 (citing PPP Interim Final Rule, 85 Fed. Reg. at 20,811). And the purpose of the Small Business Act "is to 'aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns,' in order to preserve the system of free competitive enterprise that is 'essential' to the economic well-being and security of the Nation." *Id.* at 3 (quoting 15 U.S.C. § 631(a)).

The plaintiffs are small businesses experiencing economic hardship because of COVID-19. **\*1054** Like any other small business forced to close its doors to prevent the virus from spreading, the plaintiffs will find it harder to make payroll and pay their rent and utility bills now that their usual sources of revenue are temporarily unavailable. Thus, the broad purposes of both the CARES Act and the Small Business Act would be served by allowing the plaintiffs to participate in the program on the same terms as any other small business. Moreover, neither the CARES Act nor the Small Business Act creates classifications of small businesses or deems certain forms of small businesses to be less deserving of the government's "limited resources" than others. Indeed, the SBA understands the PPP to be "first-come, first-served" and

has made no attempt to prioritize loans to certain types of small businesses. *See* 85 Fed. Reg. at 20,813. In short, one can find nothing in either the CARES Act or the Small Business Act to suggest that Congress wanted to exclude the plaintiffs from the PPP because of the nature of their business.

With these observations in mind, I turn to the specific legal questions this case presents.

### 1. Whether the plaintiffs present performances of a "prurient sexual nature"

The parties agree that the only reason the plaintiffs' applications for PPP loans were denied was because they were deemed ineligible for loans under the SBA regulation at issue. In relevant part, that regulation provides as follows:

> The following types of businesses are ineligible:
>
> ....
>
> (p) Businesses which:
>
>> (1) Present live performances of a prurient sexual nature; or
>>
>> (2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature.

13 C.F.R. § 120.110(p).

The plaintiffs contend that the erotic dance entertainment they offer is not "prurient." More specifically, they allege that their entertainment is "non-obscene (and not prurient), appeals to healthy human interests and desires, and is in full compliance with the numerous licenses and permits" that they must hold under local law. See Camelot Compl. ¶ 404; Olson Decl. ¶ 10; *see also* Schuster Compl. ¶¶ 40–45. Thus, one of the central issues in this case is whether the plaintiffs' entertainment is of a "prurient sexual nature." If it is not, then the plaintiffs are certain to succeed on the merits of their claims, for the regulation would not disqualify them from loan eligibility. Oddly, however, the government states in its brief that it "takes no position at this time regarding whether the performances offered by Plaintiffs is [sic] obscene, prurient —or, as Plaintiffs put it, 'erotic but not obscene[.]' " Br. in Opp. at 14. But if the government takes no position on whether the plaintiffs' entertainment is "prurient," then it cannot take the position that the regulation disqualifies them

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 40

Case 3:24-cv-04241-LJC   Document 50-1   Filed 03/19/26   Page 55 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

from participation in the PPP. Unless their entertainment is prurient, the regulation does not apply.

Perhaps what the government meant to say was that it believes the plaintiffs' entertainment is *at least* prurient, but it takes no position on whether the plaintiffs' entertainment is also obscene. (Obscenity receives no First Amendment protection. *See Miller v. California*, 413 U.S. 15, 23–24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).) Still, the government makes no attempt to show that the entertainment the plaintiffs offer is of a prurient sexual nature. Not one sentence of the government's brief is **\*1055** used to disagree with the plaintiffs' assertion that the entertainment they offer is not prurient. The government does not, for example, contend that all forms of nude and semi-nude dancing are prurient or that the kinds of nude and semi-nude performances the plaintiffs offer are prurient. Nor does the government respond to the plaintiffs' contention that, to be prurient, a work or performance must appeal to a shameful, morbid, and unhealthy interest in sex, as opposed to a normal, healthy sexual desire. Pl. Br. at 17, ECF No. 11-1 (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–99, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985); *Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Essentially, the government strenuously argues that the Constitution allows the SBA to choose not to subsidize the plaintiffs' expression, but it does not pause to address the threshold issue of whether the SBA has actually made that choice through its regulation.

The government does note that, when the SBA published the regulation in the Federal Register, it stated that "an establishment featuring nude dancing ... would not be eligible for SBA financial assistance" if such dancing was responsible for a significant portion of the establishment's gross revenue. 60 Fed Reg. at 64,360. But the government does not attempt to show that the meaning of "live performances of a prurient sexual nature" encompasses all forms of nude dancing or the specific forms of dancing offered by the plaintiffs. Indeed, some of the plaintiffs offer only semi-nude dancing—in which the dancers wear at least pasties and G-strings. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (holding that municipality may require erotic dancers to don pasties and G-strings, which makes erotic expression "less graphic"). The government does not argue that this "less graphic" form of erotic dance entertainment is prurient.

Because the government has not developed an argument showing that the plaintiffs present live performances of a prurient sexual nature (or otherwise fit within the language of 15 C.F.R. § 120.110(p)), I conclude that, for this reason alone, the plaintiffs are likely to succeed on the merits of their claims. [1]

**2. Whether the regulation exceeds the statutory authority granted the SBA by the CARES Act and the Small Business Act**

The plaintiffs argue that the SBA lacks authority to limit the type of small businesses that are eligible for PPP loans. The plaintiffs correctly note that no provision of the CARES Act relating to the PPP creates classifications of small businesses or provides that certain kinds of small businesses are not within the scope of the PPP. Indeed, the purpose of the CARES Act, as stated in Title I, is "keeping workers paid and employed." To achieve that end, Congress decided to make favorable loans to all small businesses to assist them in making payroll and paying rent and utility bills. Congress did not single out any industry for ineligibility under the PPP, much less specify that sexually oriented businesses are ineligible **\*1056** for PPP loans. Such business must make payroll and pay rent and utility bills, just like any other business. Their contributions to the national economy are no different than the contributions made by small businesses in other industries.

The government contends that because Congress, in creating the PPP, specifically removed some conditions that would ordinarily apply to SBA loans under § 7(a) of the Small Business Act, it must have intended for the SBA to enforce all other conditions, including the ineligibility of businesses that offer goods or services of a prurient sexual nature. However, most of the conditions that Congress removed were conditions that appeared in the Small Business Act itself, rather than in the SBA regulations. For example, the § 7(a) business loan program ordinarily applies only to "small business concern[s]." 15 U.S.C. § 636(a). For purposes of the PPP, however, Congress specified that "in addition to small business concerns," the PPP applies to nonprofits, sole proprietorships, and independent contractors, among other organizations that do not ordinarily qualify as small business concerns. *See* 15 U.S.C. § 636(a)(36)(D). Another example is the "credit elsewhere" provision of Section 7(a), 15 U.S.C. §§ 632(h), 636(a)(1)(A)(i). In the CARES Act, Congress provided that PPP loan applicants are not subject to the

Case 3:24-cv-04241-LJC   Document 50-1   Filed 03/19/26   Page 56 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

requirement that they demonstrate that they are unable to obtain credit elsewhere. 15 U.S.C. § 636(a)(36)(I).

To be sure, the CARES Act occasionally identifies specific provisions in the Code of Federal Regulations and states that they shall not apply to the PPP. For example, the CARES Act waives certain affiliation rules that would otherwise apply under 13 C.F.R. § 121.103. *See* 15 U.S.C. § 636(a)(36)(D)(iv). But this does not give rise to an inference that, when it enacted the PPP, Congress combed through all SBA regulations applicable to § 7(a) and determined that any regulation that it did not expressly override was consistent with the purposes of the CARES Act. And given Congress's clear intent to extend PPP loans to all small businesses affected by the pandemic and the government's failure to identify any legitimate purpose behind the SBA's exclusion of sexually oriented businesses, it seems highly unlikely that Congress intended the SBA to apply its exclusion to the PPP.

The same result obtains under the Small Business Act. Nothing in that Act suggests that Congress authorized the SBA to enact a regulation excluding small businesses in certain industries from the SBA's business loan program. To the contrary, the Small Business Act authorizes the SBA to "make loans to *any* qualified small business concern." 15 U.S.C. § 636(a). Congress then expressly identified the "restrictions, limitations, and provisions" that govern the SBA's power to make business loans to any small business. *Id.* No such restriction, limitation, or provision states that the SBA has power to render an entire class of small businesses ineligible for its business loan program.

Perhaps if the government had identified some purpose of either the CARES Act or the Small Business Act that is furthered by the SBA's exclusion of businesses that sell goods or services of a prurient sexual nature, I could find that Congress granted the SBA authority in one of these laws to enact the regulation at issue. But the government has not done so. Instead, it offers only the vague assertion that excluding such businesses from its loan programs serves the public interest. Accordingly, I conclude that 13 C.F.R. § 120.110(p) serves no statutory purpose and exceeds the scope of the regulatory authority Congress granted the SBA in the CARES Act and the Small Business Act. *See, e.g.,* **\*1057** *Campbell v. Galeno Chem. Co.*, 281 U.S. 599, 610, 50 S.Ct. 412, 74 L.Ed. 1063 (1930) ("The limits of the power to issue regulations are well settled. They may not extend a statute or modify its provisions.").

**3. Whether the regulation is unconstitutional**

As explained above, the SBA has not shown that its regulation applies to the plaintiffs or that, if it does, Congress granted the SBA authority to issue a regulation excluding sexually oriented businesses from the PPP or its other business loan programs. However, for purposes of addressing the plaintiffs' constitutional claims, I will assume that the regulation applies to the plaintiffs and that Congress granted the SBA authority to exclude sexually oriented businesses from its loan programs.

Turning to these constitutional claims, I begin by reiterating that nude dancing is a form of expression protected by the First Amendment. *See, e.g., Schad*, 452 U.S. at 66, 101 S.Ct. 2176; *Schultz v. City of Cumberland*, 228 F.3d 831, 839 (7th Cir. 2000). Thus, Congress could not flatly prohibit the plaintiffs from offering erotic dance entertainment. As the government notes, however, under the Spending Clause of the Constitution, Congress may sometimes place speech-related conditions on the receipt of federal funds. *See, e.g., Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213, 133 S.Ct. 2321, 186 L.Ed.2d 398 (2013). This is so, because, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* at 214, 133 S.Ct. 2321. However, Congress's power to place conditions on federal funding is not limitless. The Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The Court wrote that "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Id.* Moreover, Congress cannot "discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.' " *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (quoting *Speiser v. Randall*, 357 U.S. 513, 519, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)).

In the present case, the plaintiffs contend that the SBA has denied them a benefit—participation in the PPP—on the ground that they have exercised their constitutional right to present erotic dance entertainment as part of their business. The government contends that this is not so. Instead, it contends, it has merely elected not to subsidize the plaintiffs' expressive activities. The government relies on the Supreme Court's statement that "although government

Turnwald Decl.    WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 42

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 57 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

may not place obstacles in the path of a [person's] exercise of ... freedom of [speech], it need not remove those not of its own creation." *Regan*, 461 U.S. at 549–50, 103 S.Ct. 1997 (quoting *Harris v. McRae*, 448 U.S. 297, 316, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)). Here, the government notes that the obstacle preventing the plaintiffs from presenting the quantity of erotic dance entertainment they wish to present is the COVID-19 pandemic, not the federal government. Therefore, the government contends, the government has no obligation to remove the obstacle by allowing the plaintiffs to participate in the PPP.

The obvious flaw in the government's reasoning is that it has chosen to remove the COVID-19 obstacle from the path of **\*1058** nearly every other small business in the United States. In leaving the obstacle in the plaintiffs' path, the government has singled them out for unfavorable treatment based solely on the content of their speech. Moreover, the government has not articulated any legitimate governmental interest that might be served by excluding the plaintiffs from the PPP. As explained below, in the cases on which the government relies, the Supreme Court allowed Congress to make content-based distinctions in its funding programs only when those distinctions were either related to the purpose of the funding program or were rationally related to another legitimate governmental interest. Here, the purpose of the funding program is to make favorable loans to all small businesses to help them survive the economic crisis brought on by the COVID-19 pandemic. The funding program has no "message," and the government cannot point to any legitimate purpose that would be served by denying the plaintiffs access to the program. Thus, the Constitution does not permit the SBA to exclude the plaintiffs from the PPP based on the content of their speech.

One of the government's cases is *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). That case involved Title X of the Public Health Service Act, which provided federal funding for family-planning services. *Id.* at 178, 111 S.Ct. 1759. The Act provided that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* This provision was intended to ensure that Title X funds were used only to support "preventative family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Id.* at 178–79, 111 S.Ct. 1759. To implement this provision, the Department of Health and Human Services issued regulations that imposed certain conditions on the

grant of federal funds. Among those conditions was a requirement that the fund recipient not provide counseling concerning the use of abortion as a method of family planning or otherwise "encourage, promote or advocate abortion as a method of family planning." *Id.* at 179–80, 111 S.Ct. 1759. Some participants in the funding program challenged these regulations on the ground that they impermissibly discriminated on the basis of viewpoint by prohibiting all discussion about abortion and requiring fund recipients to provide information about continuing a pregnancy to term. *Id.* at 192, 111 S.Ct. 1759.

The Supreme Court held that the funding condition did not violate the First Amendment. Crucial to the Court's holding was its recognition that Congress had a specific, lawful purpose in mind when it set up the funding program, which was to promote "family planning services which will lead to conception and childbirth." *Id.* at 192–93, 111 S.Ct. 1759. In the government's view, abortion was inconsistent with that purpose, and thus it chose not to authorize participants to use program funds to advocate for abortion. The Supreme Court recognized that the government had not discriminated on the basis of viewpoint but had "merely chosen to fund one activity to the exclusion of the other." *Id.* at 193, 111 S.Ct. 1759. The regulations were "designed to ensure that the limits of the federal program [were] observed." *Id.* Said the Court: "This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside the project's scope." *Id.* at 194, 111 S.Ct. 1759. The Court noted that Congress could fund a program dedicated to advancing certain permissible goals without also funding alternative goals. Thus, when Congress established the National Endowment for Democracy to **\*1059** encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism. *Id.* The Court observed that "we have here not a case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded." *Id.* at 194–95, 111 S.Ct. 1759.

Unlike the statute in *Rust*, neither the CARES Act nor the Small Business Act has a permissible goal that would be undermined by allowing sexually oriented small businesses to participate in the PPP on the same terms as other small businesses. The goal of the CARES Act is to extend a lifeline

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 43

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 58 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

to all small businesses, not to promote or encourage any specific subset of small businesses. And the purpose of the Small Business Act is to strengthen the economy by assisting all small businesses. Thus, unlike in *Rust*, we have here "a case of a general law singling out a disfavored group on the basis of speech content." *Id.* at 194, 111 S.Ct. 1759. For this reason, the SBA regulation appears to be aimed at suppressing what the government deems to be a dangerous (or at least disfavored) idea, namely, dancing that conveys an erotic message.

This is not to say that if the government chose to establish a small-business loan program designed to encourage a certain form of small business, it would be compelled to establish a similar program for sexually oriented businesses. For example, Congress or the SBA might establish a loan program designed to promote dinner theaters without being compelled to establish a similar program for strip clubs. But Congress has done nothing along those lines in either the CARES Act or the Small Business Act. Accordingly, the SBA's content discrimination cannot be upheld on the theory that the government is trying to "ensure that the limits of the federal program are observed." *Id.* at 193, 111 S.Ct. 1759. As the Supreme Court has said, "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 547, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001).

The case on which the government most heavily relies is *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). In that case, a nonprofit organization challenged § 501(c)(3) of the tax code to the extent that it prohibited tax-exempt organizations from using tax-deductible contributions to support lobbying activities. The plaintiff alleged that the prohibition on lobbying violated both the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause.

In connection with its First Amendment argument, the plaintiff argued that the ban on lobbying imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Court disagreed, reasoning that "Congress has merely refused to pay for lobbying out of public moneys." *Id.* at 545, 103 S.Ct. 1997. The Court stated that it "has never held that [Congress] must grant a benefit ... to a person who wishes to exercise a constitutional right." *Id.* However, the Court made clear that "[t]he case would be different if

Congress were to discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Id.* at 548, 103 S.Ct. 1997. The Court recognized that because Congress prohibited all lobbying (with the exception of lobbying by veterans' organizations), it had not engaged **\*1060** in viewpoint discrimination or tried to suppress a particular idea.

The present case is different from *Regan* because, here, the SBA has targeted a much narrower form of expressive activity. Lobbying, of course, embraces a wide variety of viewpoints. Although it is perhaps inaccurate to say that nude dancing is a viewpoint, it is a form of expression that, unlike lobbying, inherently conveys a specific message. *See Schultz v. City of Cumberland*, 228 F.3d 831, 847 (7th Cir. 2000) ("The dominant theme of nude dance is 'an emotional one; it is one of eroticism and sensuality.'"). Thus, excluding erotic entertainment from a generally available loan program could well be characterized as an attempt to suppress a disfavored expressive message. Indeed, if the SBA could target sexually oriented businesses in the way it has here, then Congress could revise the tax code to exclude them from every deduction available to other businesses, such as the deduction for ordinary and necessary business expenses. *See* 26 U.S.C. § 162(a). Such a revision would undoubtedly be an attempt to suppress a disfavored form of protected expression rather than a mere refusal to subsidize the exercise of a constitutional right. The same is true of the SBA's attempt to exclude sexually oriented businesses from its loan programs.

A related point is that the SBA has not pointed to any legitimate governmental purpose to justify its singling out of sexually oriented businesses. In *Regan*, the plaintiff advanced an equal-protection claim in addition to a First Amendment claim. To resolve the equal-protection claim, the Court examined whether the exclusion of lobbying bore "a rational relation to a legitimate governmental purpose." 461 U.S. at 547, 103 S.Ct. 1997. The Court found that the law did serve such a purpose, which was preventing tax-exempt organizations from using "tax-deductible contributions to lobby to promote the private interests of their members." *Id.* at 550, 103 S.Ct. 1997.[2] Here, however, the government has not identified a legitimate governmental purpose for its exclusion. As noted, the government only vaguely refers to the public interest without explaining how its exclusion serves the public interest.

The government also states that it was "not irrational of the SBA to decide that it would not be worth the commitment of

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 44

its finite resources to subsidize additional speech of a prurient sexual nature, which lies at the outer perimeters of the First Amendment." Br. in Opp. at 222. But the PPP and the Small Business Act do not subsidize speech, they subsidize small businesses. The fact that the plaintiffs engage in speech as part of their small business is not relevant to the purposes of either program. Neither the CARES Act nor the Small Business Act directs the SBA to determine whether some expression is more deserving of the government's assistance than others. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (noting that Congress must take artistic merit into account when making grants under the National Foundation on the Arts and the Humanities Act). By using the plaintiffs' expression as a reason to exclude them from the program, the SBA has introduced content discrimination into programs that were designed to be indifferent to speech. If the SBA could identify some legitimate governmental **\*1061** purpose for doing this, then perhaps the regulation could withstand an equal-protection challenge. But the only apparent purpose for this regulation is to exclude small businesses that express a disfavored message from programs that were created to assist all small businesses. Because that is not a *legitimate* governmental purpose, the SBA's distinction violates equal-protection principles. [3]

For these reasons, I conclude that the plaintiffs have a high likelihood of success on their claim that § 120.110(p) violates the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause.

### B. Irreparable Harm/Lack of an Adequate Remedy at Law

I also find that the plaintiffs lack an adequate remedy at law and that they would suffer irreparable harm without an injunction. Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)). To show that there is no adequate remedy at law, the plaintiff is not required to demonstrate that the remedy would be wholly ineffectual; the plaintiff must show only that any award would be seriously deficient as compared to the harm suffered. *Id.* at 1046 (citations and quotations omitted).

Initially, I note that the government does not concede that it could be held liable for damages at the end of this case.

Ordinarily, the federal government and its officials sued in their official capacities (as they are sued here) have sovereign immunity from damages. *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). No party has suggested that the federal government has waived its sovereign immunity from damages under the present circumstances. Moreover, the Tenth Circuit has held that the Small Business Act's sue-and-be-sued clause, 15 U.S.C. § 634(b)(1), does not render the SBA liable for damages in a suit involving the SBA's refusal to guarantee a small business loan. *See Ascot Dinner Theatre, Ltd. v. Small Bus. Admin.*, 887 F.2d 1024, 1027–28 (10th Cir. 1989). Thus, I assume for purposes of this motion that the plaintiffs could not obtain damages for any harm caused by the SBA's refusal to guarantee their loans. The plaintiffs therefore **\*1062** lack an adequate remedy at law. Moreover, the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable. *See Smith v. City of Hammond, Ind.*, 388 F.3d 304, 307 (7th Cir. 2004) (noting that in some cases "a defendant's immunity from damages liability might constitute irreparable harm entitling the plaintiff to preliminary relief").

The plaintiffs certainly will suffer irreparable harm if the SBA is not preliminarily enjoined to continue reserving guarantee authority for their loans. As noted, the PPP is administered on a first-come, first-served basis. Once the funds Congress appropriated for the PPP are exhausted, the SBA will be unable to guarantee further loans. Congress's initial allocation of $349 billion was exhausted in two weeks. Although the fund has been replenished, the current allocation will almost certainly be exhausted by the time this case is litigated to conclusion. And while the temporary restraining order currently in place preserves guarantee authority for the plaintiffs' loans, denying a preliminary injunction would necessarily involve dissolving that order. The SBA could then use the guarantee authority for other applicants. Thus, without a preliminary injunction, the plaintiffs will almost certainly suffer irreparable harm in the form of being permanently excluded from the PPP.

The plaintiffs have also shown that they will suffer irreparable harm if the SBA is not compelled to immediately transmit guarantee authority to their lenders so that the lenders can disburse the funds. The loss of First Amendment freedoms is presumed to constitute irreparable injury for which money damages are inadequate. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citing *Joelner v. Vill. of Washington Park, IL*, 378 F.3d 613, 620 (7th Cir. 2004));

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 45

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 60 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

*see also Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) ("[Plaintiff] lacks an adequate remedy at law as any post-election remedy would not compensate it for the loss of the freedom of speech."). Here, the *Camelot* plaintiffs have shown that their inability to obtain a loan through the PPP will prevent them from exercising their First Amendment right to present erotic dance entertainment. They filed a declaration stating that they are currently presenting such entertainment through a live streaming platform three nights a week for three hours at a time. *See* Zubke Decl., ECF No. 24. The plaintiffs themselves receive no income from the live stream. However, individual dancers (who are not employees of the plaintiffs) perform on these live streams, and they receive tips from viewers. To present this streaming service, the plaintiffs invested in equipment and web-hosting services. They also pay three employees (a DJ, a manager, and an IT person) an hourly wage to facilitate the live stream. With their current lack of revenue, the plaintiffs can afford to live stream the entertainment on only three evenings a week for three hours at a time. They assert that if they do not receive a PPP loan soon, they will have to discontinue even this limited amount of expression. Based on this evidence, I conclude that, without an injunction requiring the SBA to guarantee their loans, the plaintiffs will suffer irreparable harm in the form of being unable to engage in protected expression between now and when the case is finally resolved on the merits.

The plaintiff in *Schuster* has not presented erotic dance entertainment through a live stream, and it does not express an intent to do so. Thus, it does **\*1063** not propose to use PPP funds to facilitate such expression. However, I conclude that it will suffer irreparable harm if it does not receive a PPP loan soon. Although economic loss generally will not sustain a preliminary injunction, an award of damages can be inadequate if the damage award would come "too late to save the plaintiff's business." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also, Girl Scouts of Manitou Council*, 549 F.3d at 1090, 1095 (finding "the potential loss of property, employees, or its entire business" to pose enough risk of irreparable harm); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (irreparable harm found where potential losses "would drive [movant] out of business within six months"). In accordance with Wisconsin's "Safer at Home" order, the plaintiff's club has been closed since

March 17. Under Wisconsin's current plan for reopening the economy, the earliest the club could reopen (at reduced capacity) is May 26. Since March 17, the plaintiff has earned no revenue; any revenues earned after reopening will likely be a small fraction of what they would have been under normal circumstances. Revenue and sales for the months of March, April, and May will likely be just 10% of revenue generated for the same months in 2019. The plaintiff intends to use funds received through the PPP to pay payroll, benefits, rent/mortgage, and utilities. It has been unable to obtain a loan from another lender. The plaintiff expects that, without a PPP loan, its business will not survive.

Based on these facts, I am satisfied that the *Schuster* plaintiff has demonstrated irreparable harm based on the likelihood that it will go out of business without a PPP loan. While the current pandemic has been harsh on the entire economy, restaurants and businesses that present live entertainment have been hit especially hard because in-person gatherings are forbidden. These businesses will be among the last to return to full and normal operations. Finally, as a general matter, it is reasonable to infer that *any* small business, regardless of the services and/or products it provides, would have trouble surviving if forced to close its doors for two months followed by a limited, piecemeal reopening.

**C. Balance of Harms & Public Interest**
Under the balance of harms, I must consider any harm that the defendants might suffer from an injunction. Here, the only conceivable harm the defendants could suffer would be guaranteeing a loan to a small business that turned out not to be eligible for such a guarantee because it engaged in a form of expression that the SBA did not wish to fund. But, in the context of the PPP, this is not a substantial harm. The purpose of the PPP is to extend loans to small businesses so that they can pay employees and otherwise finance their operations until the mass closures required by the COVID-19 pandemic have ended. As I have explained in this opinion, that purpose would be served by the SBA's guaranteeing the plaintiffs' loans. Moreover, if the SBA did not guarantee the plaintiffs' loans, it almost certainly would immediately use the same guarantee authority on loans for other small businesses. Thus, an injunction requiring the SBA to guarantee the plaintiffs' loans would not cause the SBA any financial loss. With or without an injunction, the SBA would be using the same appropriations to guarantee loans during the same time period. The only difference would be the identity of the borrower. But so long as the borrower is a small business, the SBA should not care about its identity. Perhaps

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 46

Case 3:24-cv-04241-LJC Document 50-1 Filed 03/19/26 Page 61 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

being required to guarantee a loan to a business that the SBA would rather not fund is a harm, but in the context of the PPP, this could only be described as *de minimis* harm. It certainly **\*1064** does not outweigh the harm that the plaintiffs would suffer without an injunction, especially considering that they are highly likely to succeed on the merits of their claims.

Moreover, I conclude that the public interest favors an injunction. As noted, the purpose of the PPP is to extend help to small businesses now, while the mass closures caused by the COVID-19 pandemic are in effect. Guaranteeing the plaintiffs' loans now, rather than months from now when this case is over, furthers the public interest in helping all small businesses and their employees get through the pandemic. The government notes that because PPP appropriations are limited, guaranteeing the plaintiffs' loans will necessarily prevent the SBA from guaranteeing loans to third parties using the same appropriations. The government contends that these third parties would be harmed by an injunction. Although that is true, the plaintiffs' high likelihood of success on the merits makes up for this potential harm. That is, because the plaintiffs have shown that they likely should have received PPP loans when they applied, any harm to the third parties who applied after them and who would have received loans if the plaintiffs' applications were denied is warranted.

**D. Bond**

Finally, I must consider whether the plaintiffs are required to post a bond under Federal Rule of Civil Procedure 65(c), which provides that the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, if there is "no danger that the opposing party will incur any damages from the injunction," then the court does may dispense with the bond. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

Here, I find that the defendants will not incur damages from the injunction. As explained above, the purpose of the PPP is to extend loans to small businesses now, while the mass closures required by the COVID-19 pandemic are ongoing. But for the injunction, the defendants would use the guarantee authority reserved for the plaintiffs to guarantee loans to other small businesses. The total cost to the defendants of guaranteeing the loans is the same whether the borrowers are the plaintiffs or third parties. Thus, the injunction does not require the defendants to incur costs that they would not incur in the absence of the injunction. Only the identity of the

borrower is different. But the identity of the borrower does not increase the government's costs.

If the plaintiffs ultimately lose this case, the defendants might demand that the plaintiffs immediately repay the amount of the loans rather than receive loan forgiveness under Section 1106 of the CARES Act. If, at that point, the COVID-19 crisis was over and the PPP had expired, then the SBA might reap a financial benefit because it could return the money to its general appropriations or to the United States treasury rather than lend it to a different PPP applicant. However, requiring the plaintiffs to repay the loans after they used the proceeds in a way that qualified them for loan forgiveness would be a windfall to the government, not compensation for harm caused by the injunction. In that case, the plaintiffs would have used the loan proceeds during the COVID-19 crisis and, in doing so, have furthered the governmental purpose behind the PPP. The government thus would have received the desired "return" on its investment—small businesses would have used PPP loans to stay in business and pay employees during the crisis. But if, after the crisis was over, the government insisted that the plaintiffs repay the loans rather than receive **\*1065** loan forgiveness, the government would receive an additional benefit. This additional benefit would be made possible only by the injunction—for, as noted, but for the injunction the government would have immediately guaranteed a loan to another applicant who would have been eligible for loan forgiveness. Thus, the loss of this additional benefit would not be a loss caused by the injunction.

For these reasons, I conclude that there is no danger of the defendants' incurring costs or damages from the injunction, and therefore I will not require the plaintiffs to post a bond.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motions for a preliminary injunction (ECF No. 8 in Case No. 20-C-0601 and ECF No. 3 in Case No. 20-C-0634) are **GRANTED**. The Administrator of the U.S. Small Business Administration and the Secretary of the Treasury, as well as their employees, agents and representatives, including the SBA's lending banks, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and the associated SBA Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) in making eligibility determinations for loans under 15 U.S.C. § 636(a)(36). By **Monday, May 4, 2020, at 12:00 p.m.**, the Administrator of the U.S. Small Business Administration

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 47

Case 3:24-cv-04241-LJC    Document 50-1    Filed 03/19/26    Page 62 of 77

Camelot Banquet Rooms, Inc. v. United States Small..., 458 F.Supp.3d 1044...

and the Secretary of the Treasury shall transmit guarantee authority to the plaintiffs' lenders so that those lenders may finish processing the plaintiffs' applications for PPP loans and immediately fund the loans.

**IT IS FURTHER ORDERED** that J.R. Schuster LLC's motion for leave to file excess pages is **GRANTED**.

**All Citations**

458 F.Supp.3d 1044

## Footnotes

1    The plaintiffs also contend that the regulation is unconstitutionally vague. Because the government has not developed an argument showing that the regulation applies to the plaintiffs, I do not discuss the vagueness claim in detail. However, the government's failure to define "prurient sexual nature" does present vagueness issues. Aside from the problem in identifying live performances of a prurient sexual nature, the regulation also presents the problem of identifying "products" that are of a prurient sexual nature. *See* 13 C.F.R. § 120.110(p) (2). For example, does this provision bar small businesses that sell adult sex toys from obtaining PPP loans?

2    The Court also determined that Congress's decision to allow veterans' organizations to deduct contributions used for lobbying did not violate equal-protection principles because favoring veterans is a legitimate governmental purpose. *Regan*, 461 U.S. at 550–51, 103 S.Ct. 1997.

3    The failure of the SBA to demonstrate a rational connection to a legitimate purpose is also a reason to invalidate the SBA regulation under the Administrative Procedure Act. *See* 5 U.S.C. § 706. Indeed, the case under the APA is even stronger than the case under the Constitution, for under the APA it is not enough that the court be able to conceive of a rational basis for the regulation, which is usually enough to sustain a statute evaluated under rational-basis review. *See Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1043, 1049 (7th Cir. 1992). Under the APA, the statement accompanying the regulation "must demonstrate that a reasonable person upon consideration of all the points urged pro and con the rule would conclude that it was a reasonable response to a problem that the agency was charged with solving." *Id.* In the present case, the SBA's statement accompanying the regulation says nothing more than that it considers the rule "to be consistent with its obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest." 60 Fed. Reg. at 64,360. Again, however, the SBA fails to explain *why* singling out sexually oriented businesses for unfavorable treatment best accomplishes its mission, serves it constituency, or serves the public interest. Thus, even if I could conceive of a legitimate reason for the regulation (and I cannot), the regulation would be invalid under the APA.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 48

# Exhibit E

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



| Everett McKinley Dirksen United States Courthouse<br>Room 2722 - 219 S. Dearborn Street<br>Chicago, Illinois 60604 | | Office of the Clerk<br>Phone: (312) 435-5850<br>www.ca7.uscourts.gov |

## ORDER

May 20, 2020

Before

**MICHAEL S. KANNE**, *Circuit Judge*
**ILANA DIAMOND ROVNER**, *Circuit Judge*
**DAVID F. HAMILTON**, *Circuit Judge*

| | |
|---|---|
| No. 20-1729 | CAMELOT BANQUET ROOMS, INC., et al.,<br>Plaintiffs - Appellees<br><br>v.<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION, et al.,<br>Defendants - Appellants |
| **Originating Case Information:** | |
| District Court No: 2:20-cv-00601-LA<br>Eastern District of Wisconsin<br>District Judge Lynn Adelman | |
| No. 20-1730 | J.R. SCHUSTER, LLC,<br>Plaintiff - Appellee<br><br>v.<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION, et al.,<br>Defendants - Appellants |
| **Originating Case Information:** | |
| District Court No: 2:20-cv-00634-LA<br>Eastern District of Wisconsin<br>District Judge Lynn Adelman | |

Turnwald Decl.

EXHIBIT C
Page 50

Nos. 20-1729 & 20-1730                                            Page 2

1.  **GOVERNMENT'S EMERGENCY MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY**, filed on May 4, 2020, by counsel.

2.  **BRIEF OF PLAINTIFFS-APPELLEES CAMELOT BANQUET ROOMS, INC., ET AL. IN RESPONSE TO MOTION FOR STAY PENDING APPEAL (DKT. #4)**, filed on May 8, 2020, by counsel.

3.  **PLAINTIFF- APPELLEE J.R. SCHUSTER, LLC'S BRIEF IN OPPOSITION TO GOVERNMENT'S EMERGENCY MOTION FOR STAY PENDING APPEAL**, filed on May 8, 2020, by counsel.

4.  **GOVERNMENT'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL**, filed on May 11, 2020, by counsel.

5.  **CITATION OF ADDITIONAL AUTHORITY,** filed on May 11, 2020, by Attorney Jeff Scott Olson.

6.  **CITATION OF ADDITIONAL AUTHORITY**, filed on May 15, 2020, by Attorney Jeff Scott Olson.

**IT IS ORDERED** that the motion to stay the preliminary injunction is **DENIED**. The temporary stay order issued on May 4, 2020, is **VACATED**.

form name: **c7_Order_3J**(form ID: **177**)

Turnwald Decl.                                                   EXHIBIT C
                                                                 Page 51

# Exhibit F

2020 WL 6268528
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

D. HOUSTON INC. et al., Plaintiffs,
v.
The UNITED STATES SMALL BUSINESS
ADMINISTRATION et al., Defendants.

Civil Action No. H-20-2308
|
Signed 10/20/2020

**Attorneys and Law Firms**

William Xander King, Casey T. Wallace, Wallace & Allen, LLP, Houston, TX, for Plaintiffs.

Richard A. Kincheloe, United States Attorney's Office, Houston, TX, for Defendants.

ORDER

DAVID HITTNER, United States District Judge

**\*1** Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Document No. 13). On September 11, 2020, the Court held an in-person hearing (the "Hearing") to address the motion for a preliminary injunction. Having considered the motion, submissions, evidence and arguments presented at the Hearing, and applicable law, the Court determines the motion should be granted in part and denied in part.

I. BACKGROUND

This case concerns exotic dance clubs seeking loans under the Paycheck Protection Program (the "PPP") created by the Coronavirus Aid Relief, and Economic Security Act ("CARES Act"). Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286-94 (2020). The PPP authorizes Defendant Small Business Administration (the "SBA") to guarantee hundreds of billions of dollars in loans to small businesses to help with economic hardship during the COVID-19 pandemic. 15 U.S.C. § 636(a)(36)(D)(1). The SBA has adopted rules excluding certain businesses from receiving the PPP loans,

including, *inter alia*, businesses which "(1) present live performances of a prurient sexual nature; or (2) derive directly or indirectly more than de minimis gross revenue through the ... presentation of any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110(p) (hereinafter "Subpart (p)"). Plaintiffs D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., Westwood, Inc., and D. Procyon, LLC (collectively, "Plaintiffs") operate small businesses that serve alcohol and food, and provide entertainment. All Plaintiffs except D. Procyon, LLC present exotic dancing as entertainment.[1] Plaintiffs allege they applied for the PPP loans from various authorized lenders and were denied because their businesses present exotic dancing as entertainment.

On June 30, 2020, the Plaintiffs filed suit against the SBA, United States Treasury Secretary Steven Mnuchin in his official capacity, and SBA Administrator Jovita Carranza in her official capacity (collectively, "Defendants") seeking injunctive relief. Plaintiffs assert claims for violation of the First Amendment free speech clause, violation of the Fifth Amendment equal protection clause, vagueness, and overbreadth. On August 3, 2020, Plaintiffs moved for a preliminary injunction. On September 11, 2020, the Court conducted the Hearing.

II. FINDINGS OF FACT[2]

The following facts have been established by a preponderance of the evidence:

*A. The SBA, PPP, and Related Regulations*
1. On March 27, 2020, the United States enacted the CARES Act, which created the PPP for the purpose of assisting small businesses during the coronavirus crisis by immediately extending them funds on favorable terms. Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94 (2020).

**\*2** 2. Congress's purpose in guaranteeing hundreds of billions of dollars in loan relief to small businesses was to "keep[ ] workers paid and employed." *Id.* at 281.

3. In 1996, the SBA adopted regulations, including Subpart (p), denying the availability of SBA business loans to certain businesses. 13 C.F.R. § 120.110; Business Loan Program, 61 Fed. Reg. 3226, 3227 (Jan. 31, 1996).

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 53

4. Subpart (p) denies SBA business loans to "businesses which: (1) present live performances of a prurient sexual nature; or (2) derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110(p).

5. The SBA's Standard Operating Procedure distributed to the lenders requires lenders to "determine whether the [loan applicant] is one of the types of businesses listed as ineligible in SBA regulations," including Subpart (p). [3] If the lender finds the applicant "may have a business aspect of a prurient sexual nature, ... the Lender must document and submit the analysis and supporting documentation to the [SBA] for a final Agency decision on eligibility." [4]

6. The SBA determined that businesses deemed ineligible under Subpart (p) may not receive loans because they engage in activities that "may be considered by the average person to be obscene or pornographic," so therefore "an establishment featuring nude dancing ... would not be eligible for SBA financial assistance ...." Business Loan Program, 60 Fed. Reg. 64356, 64360 (Dec. 15, 1995).

*B. Application for PPP Loans*
7. D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc. are entertainment venues that present exotic dancing. D. Procyon, LLC is a night club that does not present any exotic dancing.

8. On April 3, 2020, Plaintiffs executed applications for the PPP loans. [5]

9. At the Hearing, Plaintiffs represented the PPP applications were denied multiple times by different lending institutions. The denial letters produced by Plaintiffs indicate the applications were denied by the lenders because of the sexually prurient entertainment presented in Plaintiffs' businesses. [6]

 **\*3** 10. On July 30, 2020, D. Procyon, LLC, the Plaintiff whose business does not include exotic dancing, was approved for a PPP loan. [7]

11. At the Hearing, Plaintiffs' counsel acknowledged that one of Plaintiffs who presents exotic dancing, W. L. York, Inc.,

had been approved for a PPP loan since the filing of the motion, despite Subpart (p).

12. Defendants' counsel represented that some applications may have been approved in error and the SBA may later take action to recover those improperly disbursed loans.

*C. Claims*
13. On June 30, 2020, Plaintiffs filed suit against Defendants, asserting claims for: (1) violation of the First Amendment free speech clause; (2) violation of the Fifth Amendment guarantee of equal protection; (3) vagueness; and (4) overbreadth. Plaintiffs seek a temporary restraining order, preliminary and permanent injunctive relief, and declaratory relief against Defendants. [8]

## II. CONCLUSIONS OF LAW [9]

14. Plaintiffs move for a preliminary injunction, contending Subpart (p) violates their First Amendment right to free speech, violates their Fifth Amendment right to due process, and is unconstitutionally vague and overbroad. Defendants contend that Subpart (p) does not violate Plaintiffs' constitutional rights.

*A. Preliminary Injunction*
15. The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the Court's ability to render a meaningful decision on the merits. *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975).

16. To obtain a preliminary injunction, an applicant must show: (1) substantial likelihood of success on the merits; (2) substantial threat of irreparable injury if the injunction is not issued; (3) the threatened injury outweighs harm to the defendant; and (4) the injunction will not disserve the public interest. *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000).

  *i. Substantial Likelihood of Success on the Merits*
17. Plaintiffs contend they are substantially likely to succeed on the merits as to their First Amendment claim, asserting that Subpart (p) is a content-based restriction that violates their right to free speech. Defendants contend Plaintiffs are not substantially likely to succeed on their First Amendment

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 54

claim, because the Government may impose conditions on subsidies, such as the PPP loans.

18. To show substantial likelihood of success on the merits a plaintiff need not prove that it is entitled to summary judgment. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

19. When the preliminary injunction involves a regulation on protected speech, the Court should inquire into the likelihood the Government will prove its regulation is constitutional. *Id.*

20. First, Plaintiffs must show Subpart (p) constitutes a restriction on protected speech. *See Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 548-49 (1997).

**\*4** 21. Whether limitations on a Government spending program amount to a restriction on protected speech turns on whether the Government is denying a benefit based on the exercise of a constitutional right or simply choosing which speech to subsidize. *See id.* at 545, 549 (noting that "the government may not deny a benefit to a person because he exercises a constitutional right," but also that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right").

22. When a regulation burdens protected speech, the Court must determine: (1) whether the regulation is content-based or content-neutral; and (2) the appropriate level of scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163–64; *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696, 701–02 (5th Cir. 2020).

23. Generally, content-based restrictions on protected speech are presumptively unconstitutional and receive strict scrutiny. *Reed*, 576 U.S. at 163–64; *Reagan*, 972 F.3d at 702.

24. To survive strict scrutiny, the burden is on the Government to show that the regulation is narrowly tailored to serve a compelling governmental interest. *Reed*, 576 U.S. at 171.

25. Exotic dancing is within the range of speech that receives First Amendment protection. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65–66 (1981); *J & B Entertainment, Inc. v. City of Jackson*, 152 F.3d 362, 369 (5th Cir. 1998).

26. The Spending Clause of the Constitution provides Congress broad discretion in how it taxes and spends funds for the general welfare, including the funding of particular programs and activities. *See Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013); *Rust v. Sullivan*, 500 U.S. 173, 194–95 (1991). Congress may decide not to subsidize the exercise of a fundamental right without infringing upon that right. *Regan*, 461 U.S. at 549–50 (upholding a law granting tax exemption for certain nonprofit organizations that do not engage in lobbying on a First Amendment challenge).

27. However, the Government may not deny a benefit to a person on a basis that infringes their constitutionally protected interests, such as freedom of speech. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F3d 343, 348 (5th Cir. 2012). When the Government denies a benefit to a person because of their exercise of constitutionally protected speech, the exercise of those freedoms is in effect penalized and inhibited, even when the Government has no obligation to furnish that benefit in the first place. *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006); *Suehs*, 692 F.3d at 348-49.

28. The Supreme Court acknowledges the line distinguishing a subsidy from a benefit is not always clear. *See Agency for Intern. Dev.*, 570 U.S. at 215. "[T]he relevant distinction ... is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214-15. A condition that goes beyond defining the limits of the federally funded program to defining the recipient is unconstitutional. *Id.* at 218 (striking down a requirement in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 that programs receiving funding to fight HIV/AIDS from the Government have a policy expressly opposing prostitution).

**\*5** 29. Federal district courts are split as to whether the PPP is a subsidy or a benefit. *Compare Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 20-CV-665, 2020 WL 3489404 (W.D.N.Y. June 26, 2020) (Vilardo, J.) (denying preliminary injunction) *with Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, Case No. 20-C-0601, 2020 WL 2088637 (E.D. Wisc. May 1, 2020) (Adelman, J.) (granting preliminary injunction); *see also Am. Assoc. of Political Consultants v. United States Small Bus. Admin.*, 810 F. App'x 8, 9 (D.C. Cir. 2020) (per curiam) (affirming the determination that the PPP is a subsidy in the context

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 55

of a different restriction, specifically, a small business loan limitation concerning political lobbying).

30. The purpose of the PPP is to keep people, whose jobs would otherwise be terminated, employed. Pub. L. No. 116-136, § 1102, 134 Stat. 281, 281 (2020).

31. Congress and the SBA have waived several eligibility prohibitions that would have otherwise reduced the number of potential PPP loan applicants. *See, e.g.*, 15 U.S.C. § 636(a)(36)(D)(i) (waiving the prohibition as to nonprofit organizations); Business Loan Program Temporary Changes, 85 Fed. Reg. 23450, 23451 (April 28, 2020) (waiving the prohibition as to businesses that receive substantial revenue from gambling); UNITED STATES SMALL BUSINESS ADMINISTRATION, FAITH-BASED ORGANIZATIONS FAQs (2020), https://www.sba.gov/sites/default/files/2020-04/SBA%20Faith-Based%20FAQ%20Final.pdf (last visited October 15, 2020) (waiving the prohibition as to faith-based organizations).

32. Considering the basic purpose of the PPP loans, the SBA restrictions on businesses that can receive business loans, and the waived restrictions, the Court determines the PPP loans are not a subsidy. *Compare Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829 (1989) *with Rust*, 500 U.S. 173, *and Regan*, 461 U.S. 540, *and Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998). Rather, the PPP loans are a benefit the Government confers upon small businesses.

33. Subpart (p) therefore impermissibly prohibits prospective PPP loan applicants from engaging in protected speech, rather than just defining the acceptable limits of a federal spending program. *See Agency for Int'l Dev.*, 570 U.S. at 217. Thus, Subpart (p) burdens free speech and is subject to First Amendment analysis. The Court must therefore determine the type of restriction and what level of scrutiny applies.

34. Both parties agree Subpart (p) is a content-based restriction. [10]

35. Because Subpart (p) is a content-based restriction on a benefit conferred by the Government, strict scrutiny applies. *See Reed*, 576 U.S. at 163–64.

36. Thus, the burden shifts to the Defendants to show Subpart (p) is narrowly tailored to serve a compelling governmental interest. *See id.* at 171.

37. At the Hearing, Defendants represented the compelling interest served by Subpart (p) was the SBA Administrator's statutory discretion to decide how to use a finite pool of funding.

38. When deciding how to distribute public money from a Government funding program, scarcity of those resources alone is not a compelling enough interest to discriminate between speakers. *See Rosenberger v. Rectors and Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995). The SBA appears to have conceded as much in its decision to waive the prohibition as to faith-based organizations. Business Loan Program Temporary Changes, 85 Fed. Reg. 20817, 20819 (April 15, 2020) ("The Administrator ... concluded ... she does not have a compelling interest in denying emergency assistance to faith-based organizations ... who would [otherwise] be eligible for PPP ...."). Thus, Defendants do not offer a compelling interest served by Subpart (p) at this procedural stage.

**\*6** 39. Based on the foregoing, the Court determines Plaintiffs have met their burden to show substantial likelihood of success on the merits as to their First Amendment claim. [11]

   *ii. Substantial Threat of Irreparable Injury*

40. Plaintiffs contend that they will suffer irreparable injury unless the preliminary injunction is granted. Defendants contend Plaintiffs will not suffer irreparable injury, because the deadline for applying for PPP loans has passed.

41. The moving party for a preliminary injunction must show that irreparable injury is likely in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, (2008). A harm is irreparable when there is no adequate remedy at law. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

42. No monetary damages are available to parties suing the SBA for access to PPP loans. *See DV Diamond Club v. United States Small Bus. Admin*, Case No. 20-cv-10899, 2020 WL 2315880, at \*16 (E.D. Mich. May 11, 2020) (Leitman, J.) (citing *Camelot*, 2020 WL 2088637, at \*11).

43. The funds guaranteeing the PPP loans are administered on a first come, first serve basis. *See* 85 Fed. Reg. 20811, 20813. The PPP and its funding were reauthorized through August 8, 2020. Pub. L. 116-147, 134 Stat. 660.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Turnwald Decl.

EXHIBIT C
Page 56

44. The parties agree there are still remaining funds for the PPP loans, but those funds are quickly being depleted. [12] Plaintiffs all applied for the PPP loans before the August 8, 2020, application deadline. [13]

45. Plaintiffs do not produce information showing D. Procyon, LLC makes money from the presentation of exotic dancing or other similar displays. Plaintiffs represented at the Hearing that D. Procyon, LLC did actually receive a PPP loan, but continue to assert that it may be injured by the Government subsequently deciding to rescind the loans on the basis of Subpart (p).

46. Notwithstanding D. Procyon, LLC's assertion, Defendants represented at the Hearing that they would not attempt to recover loan funds on the basis of Subpart (p) if D. Procyon, LLC does not fall within Subpart (p)'s restrictions. Therefore, D. Procyon, LLC fails to meet its burden to show irreparable injury.

47. Plaintiffs also represented at the Hearing that W.L. York, Inc., whose business does present exotic dancing, **was actually granted** a PPP loan. At the Hearing, Defendants represented that some loan applications may have been approved in error, and the SBA may rescind loans on the basis of Subpart (p) if the SBA later determines the business presents sexually prurient performances, depictions, or displays. Thus, W.L. York, Inc. shows it will suffer irreparable injury if denied injunctive relief despite the receipt of a PPP loan.

 **\*7** 48. Because monetary damages are unavailable and funds for the PPP loans are depleting, D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc. have shown a substantial threat of irreparable injury if the preliminary injunction is not granted. D. Procyon, LLC fails to carry the burden because it has already received a PPP loan and fails to show it is subject to Subpart (p).

*iii. Balancing the Harms*

49. Plaintiffs contends their harm outweighs that faced by the Defendants. Defendants contend their harm outweighs that faced by Plaintiffs.

50. Once an applicant satisfies the first two factors, the traditional equitable relief inquiry calls for assessing the harm

to the opposing party and weighing the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

51. Here, the threatened harms to the Defendants are minimal. The funds have already been allocated by Congress and remain available until the money runs out. Therefore, an injunction requiring the SBA to guarantee the Plaintiffs' loans would not cause the SBA any financial loss. *See Camelot*, 2020 WL 2088637, at \*12.

52. Plaintiffs produce evidence showing they face the risk of failing to make basic expenses like payroll, insurance premiums, bank notes, mortgage payments, and utilities. [14]

53. D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc. therefore show the harm they face outweighs any potential harm to Defendants.

*iv. Public Interest*

54. Plaintiffs contend a preliminary injunction will serve the public interest.

Defendants contend a preliminary injunction will not serve the public interest.

55. Injunctions protecting First Amendment rights are always in the public interest. *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).

56. Therefore, the public interest would be served by enjoining the SBA from burdening Plaintiffs' constitutional rights.

57. The Court concludes D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc. have successfully carried the burden of meeting the four requirements for a preliminary injunction. D. Procyon, LLC fails to show it meets the four requirements for a preliminary injunction. Accordingly, the motion for a preliminary injunction is denied as to D. Procyon, LLC and granted as to the remaining Plaintiffs.

*B. Bond*

58. Plaintiffs contend they should not be required to post any bond. Defendants contend the Plaintiffs should be required to post bond in an amount equal to any loan funds the Defendants eventually distribute to Plaintiffs.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.
EXHIBIT C
Page 57

59. Federal Rule of Civil Procedure 65 provides that the Court may issue a preliminary injunction only if "the movant gives security in an amount that the court considers proper[.]" Fed. R. Civ. P. 65(c).

60. The amount of the security is a matter for the discretion of the Court and the Court may elect to waive the bond requirement. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

61. Here, where the purpose of the injunction is to help resolve Plaintiffs' cashflow issues to enable them to pay employees, a bond would defeat the purpose of granting the injunction. *DV Diamond Club*, 2020 WL 2315880, at * 17.

62. Accordingly, the Court determines the bond requirement should be waived in this case.

### III. CONCLUSION

**\*8** Based on the foregoing, the Court hereby

**ORDERS** that Plaintiffs' Motion for Preliminary Injunction (Document No. 13) is **GRANTED IN PART** and **DENIED IN PART.** The motion is granted as to D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc. The motion is denied as to D. Procyon, LLC. The Court further

**ORDERS** that Defendants notify approved lenders participating in the Paycheck Protection Program to whom Plaintiffs submitted loan applications on or before the August 8, 2020, deadline they are to reevaluate D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc.'s applications for loans without regard to 13 C.F.R. § 120.110 (p). [15] Notification to the lenders should be made within seven days of the signing of this Order to avoid any delay in processing these loan applications.

**All Citations**

Slip Copy, 2020 WL 6268528

### Footnotes

1    The Court notes that Plaintiffs' pleadings indicate their businesses present "exotic dancing" which involves dancing "performed ... in various stages of undress," and, at times, "topless." *See Plaintiffs' Motion for Preliminary Injunction*, Document No. 13 at 4; *Plaintiffs' Verified Original Complaint for Emergency Temporary Restraining Order, Preliminary Injunctive Relief and Declaratory Relief*, Document No. 1 at 9.

2    Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.

3    *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13, Exhibit M at 3–4 (*Small Business Administration Standard Operating Procedure).*

4    *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13, Exhibit M at 5 (*Small Business Administration Standard Operating Procedure*). The Court notes the potential delegation concerns that exist with regard to applying Subpart (p), including the initial determination by the lenders and the final determination by the SBA whether the applicant has a business aspect of a prurient sexual nature. Challenges to the SBA's application of Subpart (p) and if Subpart (p) falls within the authority delegated to the SBA by Congress have been heard by other courts. *See DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*, 960 F.3d 743, 746–47 (6th Cir. 2020) (upholding an injunction against the application of Subpart (p) as violating the Administrative Procedure Act). Because the Plaintiffs do not seek the preliminary injunction by way of the Administrative Procedure Act, the Court does not address this issue.

5    *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13, Exhibits A–G (*Plaintiffs' Paycheck Protection Program Borrower Applications).*

6    *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13, Exhibits H, I, and L (*Correspondence Relating to the PPP Loan Denials).*

Turnwald Decl. WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C
Page 58

7       *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13 at 4.

8       *Plaintiffs' Verified Original Complaint for Emergency Temporary Restraining Order, Preliminary and Permanent Injunctive Relief, and Declaratory Relief*, Document No. 1 at 12–16.

9       Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

10      *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13 at 13; *Defendants' Response to Plaintiffs' Motion for Preliminary Injunction*, Document No. 16 at 12.

11      In light of the Court's holding that Plaintiffs have shown a substantial likelihood of success on the merits as to their First Amendment claim, the Court need not address Plaintiffs' Fifth Amendment, vagueness, or overbreadth claims.

12      *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13 at 25. *Defendants' Response to Plaintiffs' Motion for Preliminary Injunction*, Document No. 16 at 18.

13      *Plaintiffs' Motion for Preliminary Injunction*, Document No. 13, Exhibits A–G (*Plaintiffs' Paycheck Protection Program Borrower Applications).*

14      *See Plaintiffs' Motion for Preliminary Injunction*, Document No. 13, Attachment 1, ¶¶ 9, 10 (*Declaration of Ali "David" Davari).*

15      The parties represented at the Hearing that Congress is considering extending the PPP loans by providing additional funding and setting a new application deadline. If the PPP is once again extended and Plaintiffs would be eligible for the benefit but for Subpart (p), Plaintiffs may request additional relief from the Court in accordance with this order.

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

 WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT C

Page 59

# Exhibit G

# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 20-20548

———————————

D. Houston, Incorporated; A.H.D. Houston,
Incorporated; D WG FM, Incorporated; D. Cam, L.L.C.;
W.L. York, Incorporated; D. Westwood, Incorporated;
D. Procyon, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

United States Small Business Administration; Jovita
Carranza, in her Official Capacity as Administrator of
the Small Business Administration; United States of
America; Steven Mnuchin, in his Official Capacity as
United States Secretary of Treasury,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-2308

———————————————————————

Before Dennis, Southwick, and Engelhardt, *Circuit Judges*.

Per Curiam:

IT IS ORDERED that Appellants' opposed motion for stay pending appeal is DENIED.

IT IS FURTHER ORDERED that Appellants' opposed motion for an immediate stay while the Court considers the motion for stay is DENIED as moot.

Judge Engelhardt dissents, and would grant the motion.

2

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

October 29, 2020

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 20-20548    D. Houston, Incorporated, et al v. U.S. Small
                     Business Assn., et al
                     USDC No. 4:20-CV-2308

Enclosed is an order entered in this case.

                     Sincerely,

                     LYLE W. CAYCE, Clerk

                     By: _____
                     Shawn D. Henderson, Deputy Clerk
                     504-310-7668

Mr. David J. Bradley
Ms. Courtney Dixon
Mr. Richard Alan Kincheloe
Mr. William King
Mr. Casey T. Wallace

Turnwald Decl.

EXHIBIT C
Page 63